**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 4:26-cr-00023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**<u>DEFENDANT'S MOTION TO DISMISS THE INDICTMENT</u>**

Dr. Steve Bynon is one of our Nation's leading and most highly respected organ transplant surgeons. He has performed over 2,000 transplant surgeries and saved thousands of lives in a renowned 40-year career.[1] For reasons that remain unclear,[2] the United States Department of Justice seeks to convict him of five federal felonies based on a legally flawed theory of prosecution explicitly set forth in the indictment. In particular, the indictment should be dismissed, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), for failure to state an offense for the following two reasons:

- The indictment's theory of "falsity" – an essential element of 18 U.S.C. § 1035(a)(2) – fails as a matter of law; and

- The indictment fails, as a matter of law, to allege sufficiently "delivery of," or "payment for," health care benefits or services involving a "health care benefit program" – also an essential element of § 1035(a)(2).[3]

---

[1] *See, e.g.*, Evan McDonald, *Former Texas Lt. Gov. Ben Barnes becomes one of the state's oldest kidney transplant recipients*, HOUSTON CHRON., Dec. 20, 2023, https://www.houstonchronicle.com/health/article/ben-barnes-texas-kidney-transplant-oldest-18549755.php; Kyrie O'Connor, *After decades with hepatitis C, liver transplant gives man life back*, HOUSTON CHRON., Jan. 20, 2015, https://www.houstonchronicle.com/news/houston-texas/health/article/After-decades-with-hepatitis-C-liver-transplant-6027331.php.

[2] Unlike virtually every other reported prosecution of a medical professional under 18 U.S.C. § 1035, this indictment does not allege that Dr. Bynon sought to profit from his allegedly false statements (because he did not do so).

[3] The elements of § 1035 are: "(1) that [the defendant] … made a materially false, fictitious, or fraudulent statement or representation, or made or used any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; (2) that [the defendant] did so in connection with the delivery of or payment for health care benefits, items, or service[s] involving a

In addition to these two fatal flaws in the indictment, there is a third reason this Court should dismiss it:  the indictment applies § 1035(a)(2) in an entirely novel way that an ordinary person (as well as a transplant doctor) could not have reasonably foreseen that the undisputed conduct in this case was criminal, in violation of the Fifth Amendment's Due Process Clause.

In support of this motion, Dr. Bynon would show the following:

## I.    Introduction

The indictment alleges Dr. Bynon willfully made false statements in a transplant waitlist computer system in order to deprive his patients of needed transplants and even implies that three of his patients died because of his allegedly false statements.  As explained below, not only does the indictment fail to state an offense under 18 U.S.C. § 1035(a)(2), it also violates due process to prosecute Dr. Bynon under an entirely novel and unforeseeable application of the statute pleaded in the indictment.  The Court should dismiss all charges.

## II.    The Relevant Facts

The relevant facts are either undisputed or incontrovertible and thus do not require a trial to be developed.[4]  During the period charged in the indictment, Dr. Bynon was Director of Abdominal Organ Transplantation and Surgical Director for Liver Transplantation at Memorial

---

health care benefit[] program; and (3) that [the defendant] did so knowingly and willfully." *United States v. Ramirez*, Criminal Action No. H-16-259-1, 2025 WL 3707567, at *3 (S.D. Tex. Dec. 21, 2025).

[4] "[A] district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Flores*, 404 F.3d 320, 324 n.6 (5th Cir. 2005) (citation and internal quotation omitted), *overruled on other grounds as stated in United States v. Garcia*, 707 Fed. App'x 231, 234 (5th Cir. 2017); *see also United States v. Hall*, 420 F.3d 1084, 1087-88 (10th Cir. 1994) (recognizing a district court's authority, under limited circumstances, "to go beyond the allegations of the indictment and make predicate findings of fact" when ruling on a motion to dismiss the indictment).

Hermann Hospital–Texas Medical Center (MHH-TMC) in Houston.  He also was the primary surgeon who performed liver transplants at the hospital.  *See* Indictment ¶ 10.

Liver transplants, like other organ transplants, are carried out pursuant to a national program created by the National Organ Transplant Act of 1984.  Part of the program is an organ "waitlist" administered by a private non-profit entity, the United Network of Organ Sharing (UNOS).  UNOS maintains an organ transplant database used to match donated organs with patients needing them.  *See* Indictment ¶¶ 5-6.  UNOS works in coordination with another private entity, the Organ Procurement and Transplantation Network (OPTN).[5]

UNOS uses an online platform called "UNet" to match patients with needed donated organs.  During the relevant periods alleged in the indictment, UNet included a relatively simple portal for transplant personnel to enter data about the "physical parameters" for a potential organ match, such as the age and weight of a potential donor ("donor matching criteria").  Indictment ¶¶ 7-8.[6]  This portal included a drop-down menu for setting criteria:[7]

**Donor Characteristics**

| | | | | |
|---|---|---|---|---|
| Minimum acceptable donor age: R | Local: | 98 | Years ▼ | |
| | Import: | 98 | Years ▼ | |
| Maximum acceptable donor age: R | Local: | 99 | Years ▼ | |
| | Import: | 99 | Years ▼ | |

---

[5] *See* "About the OTPN," https://www.hrsa.gov/optn/about (last visited May 1, 2026).

[6] Although the indictment describes these parameters as "donor matching criteria," UNOS and the transplant community describe them – more accurately – as "donor acceptance criteria" or "organ acceptance criteria."  *See, e.g.*, *See* UNOS, "COVID-19 Updates: April 7, 2020," https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/.

[7] This image appears in a UNOS online newsletter from 2020.  *See* UNOS, "COVID-19 Updates: April 7, 2020," https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/.  The drop-down menu appeared in the same manner at all relevant dates in the indictment.

All five patients included in the indictment were under the care of Dr. Bynon, and they were covered by Medicare during the relevant time periods.  There is no dispute that Dr. Bynon adjusted donor acceptance criteria using UNet for the express purpose of having a donated liver not match the criteria for each of the five patients at certain points during his treatment of the patients.  In particular, he set the donor age and weight criteria (e.g., at the weight and age of a small child) so as to preclude organ offers for an adult transplant patient.[8]  Before such adjustments were made, the donor criteria for each of the five patients in UNet would not necessarily have precluded an organ offer from being made.

Although Dr. Bynon's motives for such adjustments is not relevant to his legal challenges to the indictment, it should be noted that Dr. Bynon changed the donor acceptance criteria for the five patients to keep them on the "active" transplant waitlist until their medical conditions could improve to the point where they would be able to undergo a transplant (at which time their donor criteria could be changed back to permit liver offers).  In the case of each patient, at the time that Dr. Bynon changed their donor acceptance criteria to preclude offers of donated livers, the patients were suffering from health conditions or had other circumstances that rendered them not to be in an appropriate position to undergo a transplant (but, in Dr. Bynon's medical judgment, each patient had the potential to improve to a future point in time when a transplant *would* be possible – which is why he did not simply inactive them from the waitlist).[9]

---

[8] As detailed below, Dr. Bynon did so because, in his medical judgment, each of the patients was not medically suitable for transplant at that juncture.  Medical suitability depended, in part, on the medical acuity of the patient; but it also depended on *other* factors, including a patient's co-morbidities and/or social issues that needed resolution before a "waitlisted" patient was ready to be transplanted.

[9] UNOS has recognized that, "[w]hile every patient on a transplant waiting list hopes to receive a new organ, not every active candidate is ready for transplant when it's offered.  Patients could be ill, or determined temporarily unsuitable for transplant due to other factors."  UNOS, *Achieving a Shorter, More Active Kidney Waitlist*, Feb. 7, 2009, https://unos.org/news/improvement/achieving-a-shorter-more-active-waitlist/.

Dr. Bynon did this to keep the five patients cited in the indictment "active" on the UNOS waitlist rather than formally classifying them as "inactive" (called "Status 7")[10] based on their worsened medical conditions. The only alternative to adjusting the donor acceptance criteria – so as to preclude an organ match based on a patient's condition and a consequent offer of a donated liver (that would have to be declined if the patient was not ready for a transplant) – would be to classify a patient as Status 7.  Yet classifying a patient as "Status 7" would adversely affect the patient's ability eventually to get a donated organ in the future, when the patient's health had improved (and the patient can return to "active" on the waitlist).  That is because the scoring that UNOS uses to determine a patient's place on the waitlist is in part based on how long a patient has been "active" on the waitlist.  The longer a liver patient has been active on the waitlist, the more favorable that patient's place on the waitlist.  Conversely, being "inactive" (Status 7) lowers a patient's place on the waitlist after they are reactivated on the waitlist.[11]

Significantly, Dr. Bynon's adjustment of donor acceptance criteria, so as to render the patient temporarily ineligible to receive offers for donated livers, was entirely consistent with the express guidance provided by UNOS during the COVID-19 pandemic.  In April 2020, UNOS advised organ transplant professionals who had patients with COVID-19 that "you have the option of either temporarily inactivating them [i.e., placing them on Status 7] *or* temporarily setting your

---

[10] *See* Lissi Hansen *et al.*, *The Power of the Liver Transplant Waiting List: A Case Presentation*, 23 AMER. J. CRIT. CARE 510 (Nov. 2014) (discussing "Status 7" for liver transplant patients), https://pmc.ncbi.nlm.nih.gov/articles/PMC4377639/.

[11] UNOS, *Emergency actions help members protect patient safety and access to transplant during COVID-19*, June 29, 2020 ("Non-kidney transplant candidates do *not* accrue waiting time for a transplant if they are placed in an inactive status.") (emphasis added), https://web.archive.org/web/20200922133234/https://unos.org/news/emergency-actions-help-members-protect-patient-safety-and-access-to-transplant-during-covid-19/.

screening criteria to make them ineligible for organ offers."[12]   UNOS then explained how to do so:   "The recommendation is to set the acceptable donor age acceptance criteria to 98 years (minimum) and 99 years (maximum)."   The benefit of doing so would allow patients "to continue to accrue waiting time [i.e., maintain their 'active' status] but temporarily render them unable to receive organ offers . . . ."[13]

The full explanation from UNOS – from its April 7, 2020 newsletter – is reproduced below.

---

[12] *See* UNOS, *COVID-19 Updates*, Apr. 7, 2020 (emphasis added), https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/.

[13] *Id.*



UNOS repeated this advice in June 2020: "Non-kidney transplant candidates do not accrue waiting time for a transplant if they are placed in an inactive status [i.e., Status 7]. For this reason, the OPTN [has] recommended that non-kidney transplant programs that opt to defer any offers for certain candidates due to COVID-19 *should not inactivate the candidate, but instead change their organ acceptance criteria*."[14]

_____

[14] UNOS, *Emergency actions help members protect patient safety and access to transplant during COVID-19*, June 29, 2020 (emphasis added),

Although UNOS officially advised transplant programs about this option in 2020 – commonly referred to as an "internal hold" (as distinguished from a formal "Status 7" designation) – transplant programs throughout the United States, including at MHH-TMC, use internal holds for reasons other than a patient's contracting COVID-19.[15]

Significantly, on April 3, 2026, OPTN issued a notice that rescinded UNOS's 2020 guidance, stating:

> The Organ Procurement and Transplantation Network (OPTN), in collaboration with the Health Resources and Services Administration (HRSA), is notifying members that prior COVID-era guidance permitting the use of certain waitlist screening parameters to prevent organ offers is rescinded, effective immediately.
>
> In April 2020, during the COVID-19 emergency, the OPTN issued guidance permitting transplant programs to temporarily implement waitlist screening criteria. This approach enabled candidates to keep accumulating waiting time even if they were not eligible to receive organ offers at that moment. These criteria included setting donor age limits to a minimum of 98 years and a maximum of 99 years.
>
> The COVID-19 public health emergency has ended. ***Moving forward**, transplant programs must return to using the OPTN-approved procedures to temporarily inactivate candidates*. This is critical to ensure patient safety and system integrity. *It is inappropriate **to continue to use** excessively narrow donor acceptance criteria*

---

https://web.archive.org/web/20200922133234/https://unos.org/news/emergency-actions-help-members-protect-patient-safety-and-access-to-transplant-during-covid-19/.

[15] *See* American Hospital Association, *Comments on CMS' Proposed Rule on the Increasing Organ Transplant Access (IOTA) Model*, Feb. 9, 2026, https://www.aha.org/lettercomment/2026-02-09-aha-comment-cms-proposed-rule-increasing-organ-transplant-access-iota-model; Health Services and Resources Administration (UNOS's Policy Department), *Public Comment Proposal Require Patient Notification for Waitlist Status Changes*, Oct. 2025, https://www.hrsa.gov/optn/policies-bylaws/public-comment/require-patient-notification-for-waitlist-status-changes; *see also* Susan E. Quaggin, M.D. (President of the American Society of Nephrology), *Request for Information; Health and Safety Requirements for Transplant Programs, Organ Procurement Organizations, and End-Stage Renal Disease Facilities* (Feb. 1, 2022) ("Almost all centers use an unofficial status of 'internal hold' for patients who remain active on the waitlist and continue to receive offers but are not eligible to receive transplants."), https://www.asn-online.org/policy/webdocs/ASNTxRFIFinal2.1.22.pdf.

These recent public comments from the transplant community repeatedly refer to the common practice of "internal hold" (as an alternative to classifying a patient as "Status 7," which status would prevent a patient from continuing to accrue waitlist time).

*or other screening parameters to effectively render a candidate ineligible for organ offers*.

HRSA, *Discontinuation of COVID-Era Practice Regarding: Waitlist Screening Parameters*, Apr. 3, 2026 (emphasis added), https://www.hrsa.gov/optn/news-events/news/discontinuation-covid-waitlist-screening-parameters.  Obviously, the revocation of UNOS's 2020 guidance occurred two years *after* the events alleged in the indictment.

### III.    The Allegations in the Indictment

The indictment alleges Dr. Bynon "entered false donor matching criteria" in five patients' "medical records" within UNet and that these "false statements" rendered the patients "either severely restricted or functionally ineligible to receive a donor [liver] offer" for various time periods.  Indictment ¶¶ 12-13, 15, 17 & 19.  Based on these allegations, the indictment charges Dr. Bynon with violating 18 U.S.C. § 1305(a)(2).  Indictment ¶ 20-21. The charging paragraph, tracking the statute,[16] alleges that Dr. Bynon, in setting the donor acceptance criteria:

> did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Medicare.

Indictment ¶ 21.

---

[16] Section 1035(a)(2) reads in pertinent part:

> Whoever, in any matter involving a health care benefit program, knowingly and willfully … makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1035(a)(2).

**IV.     The Indictment Does Not Sufficiently Charge a Violation of Section 1035(a)(2).**

This Court should dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failing to state an offense. "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017) (citation and internal quotation marks omitted). "To be sufficient, an indictment must 1) enumerate each prima facie element of the charged offense, 2) notify the defendant of the charges filed against him, and 3) provide the defendant with a double jeopardy defense against future prosecutions." *United States v. Suarez*, 966 F.3d 376, 382 (5th Cir. 2020) (citation and internal quotation marks omitted); *see also* Fed. R. Crim. P. 7(c)(1). To satisfy the first prong, an indictment must do more than merely state each element of the crime charged; it must also allege that *the defendant's conduct* meets each of those elements. *Suarez*, 966 F.3d at 382; *see also United States v. Aleynikov*, 676 F.3d 71, 76–80 (2d Cir. 2012).

**A. The Charged Conduct Did Not Involve Any "False," "Fictitious," or "Fraudulent" Statement, Representation, Writing, Document, or Entry.**

The indictment does not identify any statement, representation, writing, document, or entry that was "false," "fictitious," or "fraudulent" – as those terms are legally defined. The indictment's sole focus is Dr. Bynon's adjustment to five patients' "donor matching criteria" in the UNet portal from one set of criteria to another – for the purpose of rendering the patients "functionally ineligible" for a liver transplant (while still remaining "active" on UNOS's waitlist).

Yet those donor acceptance criteria are not "facts" capable of being objectively "true" or "false" – which is the legal standard applicable to the issue of whether the defendant has made a false, fictitious, or fraudulent statement, representation, writing, document, or entry. *See Williams*

*v. United States*, 458 U.S. 279, 284 (1982) ("Although petitioner [knowingly] deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a 'false statement' [in violation of 18 U.S.C. § 1014[17]] for a simple reason:  technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'"); *id.* at 285 ("Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts.  Each check did not, in terms, make any representation as to the state of petitioner's bank balance.");[18] *United States v. Blankenship*, 382 F.3d 1110, 1135 (11th Cir. 2004) ("Like a check, a contract is not a factual assertion [within the meaning of 18 U.S.C. § 1001], and therefore cannot be characterized as 'true' or 'false.' …  Just as a check is not 'false' simply because neither the drawer nor the drawee intends that the drawee cash it, a contract is not false simply because neither party intends to enforce it.").

Dr. Bynon's adjustment of donor acceptance criteria was not a "statement" or "representation," because it was neither intended, nor offered, to convey a "fact" as "true" when it was actually "false" – in other words, it was "not a factual assertion at all." *Williams*, 458 U.S. at 284.  For the same reason, Dr. Bynon's adjustment of donor acceptance criteria was not a false, fictitious, or fraudulent "writing," "document," or "entry." *It was not as if Dr. Bynon entered false data about his patients* (e.g., providing false information about *his patients'* objectively verifiable

---

[17] 18 U.S.C. § 1014 makes it a crime to "knowingly mak[e] any false statement or report" for the purpose of influencing the action of a specified financial institution (such as a federally insured bank).  Although § 1014 is a different statute from § 1035(a)(2), both statutes have false (or fictitious or fraudulent) statements or assertions as elements.  Other courts have applied *Williams* to other federal statutes with falsity as an element.  *See, e.g.*, *United States v. Blankenship*, 382 F.3d 1110, 1135 (11th Cir. 2004) (applying *Williams* to 18 U.S.C. § 1001 – which criminalizes making a false statement to a government official).  There is no reason *Williams* does not equally apply to § 1035(a)(2).

[18] *See also Thompson v. United States*, 604 U.S. 408, 416-17 (2025) (reaffirming the Court's holding in *Williams*).

11

age or weight) *in order to affect their ability to receive donated livers*. Instead, he merely modified the criteria for *donors*, in what effectively was an organ acceptance "filter,"[19] to prevent patients medically unsuitable for transplant from receiving organ offers – as an "internal hold" in lieu of formally reclassifying them as "Status 7" (which, again, would have removed them from "active" status on the waitlist).

As with the bank check in *Williams*, Dr. Byon's alleged conduct did not constitute "a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" 458 U.S. at 284. Rather than making any false, fictitious, or fraudulent assertion of fact, Dr. Bynon exercised *medical judgment* in adjusting donor acceptance criteria to screen out unwanted organ offers based on a recipient's medical suitability for transplant at the time. Such an exercise of medical judgment cannot – as a matter of law – be a false, fictitious, or fraudulent statement of fact. *Cf. United States v. AseraCare Inc.*, 176 F. Supp.3d 1282, 1285-86 (N.D. Ala. 2016) ("The Government has presented no evidence of an *objective* falsehood for any of the patients at issue. Because a difference of opinion [in medical judgment] between physicians and medical experts about which reasonable minds could differ is all the Government has presented to prove falsity of the claims for the 123 patients at issue, the Government cannot prove the falsity element as a matter of law.") (emphasis added), *rev'd on other grounds*, *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1281

---

[19] UNOS itself has recommended that transplant programs use "filters" to narrow the UNet criteria for organ offers. *See* UNOS, *UNet Offer Filters*, https://unos.org/technology/offer-filters/ (last visited May 1, 2026); *see also* https://web.archive.org/web/20240614025145/https://unos.org/news/offer-filters-for-liver-and-heart-now-available/ (last visited May 1, 2026). Modifying the parameters in a "filter" about criteria for donors is not a statement of "fact" and certainly not one that can be deemed "false," "fictitious," or "fraudulent."

Consider a simple, contrary example: an applicant lies on a passport application stating that he is a United States citizen when, in truth and fact, he is not. What Dr. Bynon did is more akin to a homeowner who wishes to avoid receiving offers on his or her home placing the price so high that no buyer will make an offer. The former involves a false statement; the latter does not.

(11th Cir. 2019) ("[W]e concur with the district court's ultimate determination that a clinical judgment of terminal illness warranting hospice benefits under Medicare cannot be deemed false, for purposes of the False Claims Act.").

For these reasons, the indictment fails to allege an essential element of the offense – that Dr. Bynon made any statement, representation, writing, document, or entry that was "false," "fictitious," or "fraudulent."

> **B. The Indictment Fails to Allege an Offense Because Dr. Bynon Did Not Make a Statement, Representation, Document, Writing, or Entry (1) in a "Matter Involving a 'Heath Care Benefit Program,'" or (2) in Connection with the "Delivery of," or "Payment For," Health Care Benefits, Items or Services.**

The indictment also fails to state an offense for an entirely different reason: its factual allegations in the body of the indictment do not claim that Dr. Bynon made any statement, representation, document, writing, or entry in a "matter involving a 'health care benefit program,'" or "in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1035.

The indictment alleges that Medicare is a "health care benefit program." Indictment ¶ 2. Dr. Bynon agrees that Medicare qualifies as a "health care benefit program" under 18 U.S.C. §§ 24(b)[20] & 1035, and he does not dispute that his patients' medical expenses were paid for by Medicare. The charging paragraph of the indictment (¶ 21), however, merely makes the conclusory allegation that Dr. Bynon's allegedly false statements were made in a matter involving a "health care benefit program." That was not the case.

---

[20] Section 24(b) provides that: "As used in this title, the term 'health care benefit program' means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

Specifically, the body of the indictment does not allege that Dr. Bynon made a false, fictitious, or fraudulent statement, representation, document, writing, or entry with respect to Medicare. Instead, the body of the indictment alleges that Dr. Bynon made a statement, representation, document, writing, or entry involving UNOS's UNet. *See* Indictment ¶¶ 12-13, 15, 17 & 19. But UNOS, a non-profit entity[21] that helps match donors' organs with transplant recipients, does not constitute a "health care benefit program," as defined by 18 U.S.C. § 24(b). It is simply a non-profit organization that matches donors' organs with eligible patients on the waitlist. The requirement that the false statement arise in a matter involving a "health care benefit program" is also a jurisdictional element, *United States v. Natale*, 719 F.3d 719, 733 (7th Cir. 2013); *see also* PATTERN JURY INSTRUCTIONS: FIFTH CIRCUIT (CRIMINAL) § 2.50 (2024), Note ("Since the object of § 1035 must be a "health care benefit program," and since health care benefit programs must, by definition, "affect commerce," it would appear that proof of an effect on interstate commerce is both a jurisdictional requirement and an essential element of the offense.").

Furthermore, UNOS – the entity to which Dr. Bynon made the allegedly false statements – does not provide the "delivery of," or "payment for," health care benefits, items, or services within the meaning of 18 U.S.C. § 1035. In fact, as alleged in the indictment, Dr. Bynon narrowed the parameters of organ donor criteria in order to *prevent* (unwanted)[22] organ offers. His conduct

---

[21] *Holt v. United Network for Organ Sharing*, No. 1:24-cv-01599-VMC, 2025 WL 2683996, at *1 (N.D. Ga. Mar. 21, 2025) ("Defendant UNOS is the private nonprofit entity that has been the non-profit organization operating the kidney transplant waitlist for the last thirty-five years pursuant to federal contract."); *see also Callahan v. United States Department of Health and Human Services Through Azar*, 434 F. Supp.3d 1319, 1352 (N.D. Ga. 2020) (noting "Congress's intent … that the OPTN be a nonprofit entity separate from the government").

[22] Dr. Bynon's conduct was entirely consistent with the "final rule" promulgated by the U.S. Department of Health and Human Services, which remains in effect. *See* 42 CFR § 121.8(a)(5), 63 Federal Register 16295, at 16332, Organ Procurement and Transplantation Network ("Allocation of Organs") (Apr. 2, 1998) (national policy of program is "*[t]o avoid wasting organs*, *to avoid futile transplants*, to promote patient access to transplantation, and *to promote the efficient management of organ placement*") (emphasis added).

14

cannot be said to have facilitated the "delivery of" organ offers or "payment for" such services. Dr. Bynon's conduct, in fact, is alleged to have done the exact opposite. *See* Indictment ¶¶ 12-13, 15, 17 & 19 (allegedly false statements within UNET rendered patients "functionally ineligible" to receive organ offers).

Because the indictment fails to allege sufficiently (1) that Dr. Bynon made any statement in a matter involving a "health care benefit program," and (2) that he did so in connection with the "delivery of," or "payment for," health care benefits, items, or services, this Court should dismiss the indictment for this reason as well.

### V. The Indictment's Application of Section 1035(a)(2) to Dr. Bynon's Conduct Violates Due Process.

The Due Process Clause of the Fifth Amendment forbids criminalizing a defendant's behavior "that neither [a penal] statute nor any prior judicial decision [interpreting the statute] ha[d] fairly disclosed to be within its scope." *United States v. Lanier,* 520 U.S. 259, 266-67 (1997); *see also id.* at 266 ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). Thus, to be constitutionally applied to a defendant, "the statute, either standing alone or as construed, [must have] made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." *Id.* at 267 (emphasis added); *see also Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964) (prohibiting application of criminal trespass statute to civil rights sit-in demonstrators when neither the language of the statute nor past precedent gave adequate warnings that the conduct at issue was proscribed by statute). In assessing whether a criminal charge is vague, this Court must look at the charge from the perspective of an "ordinary person." *See, e.g.*,

---

The term "unwanted" organ offer is one used by UNOS itself. *See* https://web.archive.org/web/20260125005344/https://unos.org/news/getting-to-organ-offer-acceptance-faster/ (last visited May 4, 2026).

*Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) ("The standard is an objective one. . . . Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, . . . not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.") (citation and internal quotation marks omitted); *Kashem v. Barr*, 941 F.3d 358, 371 (9th Cir. 2019) (same).   Even if this Court were to apply a subjective standard to Dr. Bynon, the result would be the same – based on the widespread practice of "internal holds," particularly after UNOS's 2020 guidance.   At the relevant times charged in the indictment, Dr. Bynon could not have reasonably foreseen that § 1035(a)(2) criminalized his conduct.

Courts have applied these due process principles to cases in which the Government has attempted to predicate a federal criminal prosecution on a defendant's violation of a statute in a manner that does not give fair notice of criminal liability concerning the specific conduct in which the defendant engaged.   *See*, *e.g.*, *United States v. Hill*, Cr. No. 3:07-CR-289-M, 2010 WL 11538699, at *1 (N.D. Tex. Mar. 19, 2010) ("[T]his Court finds that a city code of ethics does not establish a legal duty whose violation is actionable under [18 U.S.C. § 1346, which prohibits 'honest services' fraud], and that the statute therefore did not give Defendants constitutional notice that conduct in violation of the Dallas City Code of Ethics was prohibited by federal criminal law."), *subsequent appeal on other grounds*, *sub nom. United States v. Reagan*, 725 F.3d 471 (5th Cir. 2013).   In *Hill*, the Government based a fraud charge on the defendants' violation of a municipal code of ethics, but the court concluded that the prosecution was constitutionally prohibited because that code did not provide sufficient notice of a criminal prohibition.

Allowing the instant prosecution to proceed based on a theory that Dr. Bynon violated 18 U.S.C. § 1035 by adjusting "donor matching criteria" in UNet – in order to effectuate an internal

16

hold based on medical judgment and consistent with UNOS's own advice – would be an unforeseeable, unwarranted, and dangerous judicial construction of that statute. In particular, deeming what Dr. Bynon did as a criminally "false," "fictitious," or "fraudulent" statement, representation, writing, document, or entry would be fundamentally unfair and violate due process. It would be an even more egregious deprivation of due process to allow the Government to prosecute Dr. Bynon for engaging in a bona fide medical judgment in accordance with UNOS's own guidance then in effect (which, as noted above, was only rescinded in April 2026). *Cf. United States v. Patel*, 485 Fed. App'x 702 (5th Cir. 2012);[23] *see also* H.R. REP. NO. 104-736, at 258

---

[23] In *Patel*, the Fifth Circuit opined that in an appropriate case, it would be problematic – as a matter of due process – to interpret 18 U.S.C. § 1347 to apply to a physician's bona fide medical judgment related to "medical necessity":

> Dr. Patel argues that Section 1347 is vague as applied to cardiac treatments for which medical necessity hinges on the judgment of physicians. He claims that judgments may be quite subjective and be based on observations that misdiagnose arterial blockage by a wide margin of error. ***These are not insubstantial concerns, as "all persons are entitled to be informed as to what the State commands or forbids***." *F.C.C. v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012) (quotation marks and citation omitted).

> We need not decide on this appeal whether the standard of "medical necessity" furnishes adequate notice for criminal liability beyond the facts of this case. Dr. Patel admitted in his testimony that medical necessity was personally intelligible as applied to the procedures underlying his convictions.

>> Q. [Government Attorney] Dr. Patel, would you agree with me then that lesions that are 30 percent and less, that those lesions should be treated medically and they shouldn't be stented? You agree with that statement, don't you?

>> A. [Dr. Patel] Yes. If you believe that lesions are less than 30 percent and not flow-limiting, they should be treated medically, yes.

> Thus, the concept of medical necessity meant something concrete for Dr. Patel, and he did not have to "guess at its contours." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991). To the extent, then, that Patel intentionally placed stents in arteries that were flowing properly and not more than 30 percent blocked, he had "ample notice that the conduct he engaged in was prohibited." *United States v. Cavalier*, 17 F.3d 90, 93 n. 5 (5th Cir. 1994); *see United States v. Daniels*, 247 F.3d 598, 600 (5th Cir. 2001).

485 Fed. App'x at 707 (emphasis added).

(Aug. 21, 1996) (stating that the related health care fraud statute, 18 U.S.C. § 1347, is "not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment"), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071.

Finally, because the government attempting to apply a criminal statute against a licensed medical professional based on his exercise of medical judgment in an objectively unreasonable manner, this Court should apply a heightened standard of scrutiny to Dr. Bynon's due process challenge to the indictment. *Cf. Connecticut v. Gabbert*, 526 U.S. 286, 291-92 (1999) ("[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation.").

At the very least, this Court should narrowly interpret § 1035(a)(2) under the rule of lenity to avoid a due process violation. *Cf. Skilling v. United States*, 561 U.S. 358, 405-10 (2010) (narrowly interpreting 18 U.S.C. § 1346 to avoid a due process violation).[24]

---

[24] The "rule of lenity" is "a sort of 'junior version of the vagueness doctrine,' . . . [which] ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss the indictment.  Dr. Bynon requests a hearing on this motion.

Respectfully submitted,

**KHALIL KINCHEN LLP**

/s/ *Samy Khalil*
Samy Khalil
Texas Bar No. 24038997
4200 Montrose Blvd., Suite 440
Houston, TX 77006
713.904.4477
samy@khalilkinchen.com

Brent Evan Newton
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, MD 20878
713.904.4477
brentevannewton@gmail.com

## **CERTIFICATE OF SERVICE**

On May 4, 2026, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ *Samy Khalil*
Samy Khalil