**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Crim. No. 4:26-cr-00023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENTIARY FRUITS**
**OF SEARCH WARRANT**

Dr. Steve Bynon, through his counsel, moves this Court to suppress the evidence that the Government obtained by searching his cellular telephone and also any evidence derived therefrom – as "tainted fruit of the poisonous tree"[1] – as a result of (1) information in Health and Human Services (HHS) Agent Raul Portillo's affidavit[2] in support of the search warrant application that was either deliberately false or misleading or was recklessly indifferent to the truth; and (2) the deliberate or reckless omission of information in the affidavit that, if included, would have negated probable cause. Agent Portillo's affidavit in support of that application is attached as **Exhibit A** (under seal).[3]

---

[1] *United States v. Mitchell*, 832 F. Supp. 1073, 1079 (N.D. Miss. 1993) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

[2] Although Agent Portillo is the agent who signed the affidavit submitted in support of the search warrant, numerous other law enforcement officials who worked on this case – including Assistant United States Attorneys Suzanne Elmilady, Sherin Daniel, Tina Ansari, and Jessica Feinstein; HHS OIG Special Agent Justin Bland; and FBI Agents Cooper Ferreira and Paul Nixon – were involved in investigating and interviewing the witnesses mentioned in Agent Portillo's affidavit and in providing information contained in the affidavit. Knowledge of each of these government officials (and any other officials who investigated Dr. Bynon and who were aware of relevant facts not included in the search warrant affidavit that, if included, would have defeated probable cause) is imputed to Agent Portillo. *See Franks v. Delaware*, 438 U.S. 154, 164 n.6 (1978); *see also United States v. Lakoskey*, 462 F.3d 965, 978-79 (8th Cir.2006) (recognizing that "courts have imputed . . . knowledge to affiants where the information is received from another government official") (citing cases).

[3] The Court has already unsealed the indictment and "supporting documents" in this case. *See* Dkt. 19. However, out of an abundance of caution, we redact the initials of any witnesses or patients referenced in

In support of this motion, Dr. Bynon would show the following:

## I.    The Relevant Facts

### A.  Agent Portillo's Investigation Spurred by a *New York Times* Article

This criminal case arose after a *New York Times* article, published on April 11, 2024, alleged improprieties by Dr. Bynon when he worked as Director of Abdominal Organ Transplantation and Surgical Director for Liver Transplantation at Memorial Hermann Hospital– Texas Medical Center (MHH-TMC) in Houston.  *See* Affidavit ¶ 18; *see also* Brian M. Rosenthal and Jessica Silver-Greenberg, *Texas Surgeon Is Accused of Secretly Denying Liver Transplants*, N.Y. TIMES (Apr. 11, 2024).  Soon after the article was published, a special agent with the Office of the Inspector General of the U.S. Department of Health and Human Services, Raul Portillo, and other federal law enforcement agents and prosecutors began interviewing some of Dr. Bynon's colleagues at MHH-TMC.  *See* Affidavit ¶ 19; *see also* **Exhibit B** (sealed) (FBI-302 reports of various witness interviews).  On May 31, 2024, Agent Portillo filed an application for a warrant to search Dr. Bynon's cellular phone.

In the affidavit, Agent Portillo alleged that there was probable cause for four different federal offenses: (1) Conspiracy to Commit Offense or to Defraud the United States (in violation of 18 U.S.C. § 371); (2) False Statements Related to Health Care Matters (in violation of 18 U.S.C. § 1035); (3) Retaliating Against a Witness, Victim, or Informant (in violation of 18 U.S.C. § 1513(e) & (f)); and (4) Obstruction of a Criminal Investigation of Health Care Fraud Offenses (18 U.S.C. § 1518(a)).  The ultimate indictment returned by the grand jury alleged only violations of 18 U.S.C. § 1035.

---

the search warrant affidavit, and we move to unseal the warrant application, including the search warrant affidavit, in full.  *See United States v. Sealed Search Warrants*, 868 F.3d 385 (5th Cir. 2017).

Agent Portillo's affidavit claimed that "there is probable cause to believe that BYNON illegally altered the *medical records of transplant patients* to make them ineligible to receive potentially lifesaving medical care." Affidavit ¶ 9 (emphasis added). The affidavit stated that the allegations against Dr. Bynon were made by a "group of anonymous . . . employees" of the University of Texas Health Science Center at Houston ("UT Health"). Those employees made the allegations to staff at the United Network for Organ Sharing ("UNOS"), a "private, non-profit organization that manages the nation's organ transplant system under contract with the federal government as authorized by 42 U.S.C. 121," after the employees' allegations were supposedly "ignored" and "concealed" by unnamed officials at UT Health. Affidavit ¶¶ 9, 11. The affidavit further alleged that, "[w]hen Bynon and others at UT Health became aware of this reporting, they acted to silence the witnesses with threats against their employment" – threats that, the affidavit alleged, were acted on when "UT Health demoted and non-renewed witnesses who have reported BYNON's activities *to the federal government*." Affidavit ¶ 9 (emphasis added).

Agent Portillo's affidavit further stated that, during the "investigation" in which Dr. Bynon supposedly threatened witnesses and retaliated against them for being "whistleblowers," Dr. Bynon was "under investigation by UNOS for UNet data manipulation." Affidavit ¶¶ 9, 40, 44. That investigation had begun in March 2024. Affidavit ¶ 46.

Agent Portillo's affidavit next described Dr. Bynon's alleged "illegally alter[ing]" of his patients' "records." In particular, the affidavit claimed that Dr. Bynon entered false data into "UNet," UNOS's computer system used to match organ donors with patients needing transplants (which includes a "waitlist" for patients). Affidavit ¶¶ 12-13. The affidavit stated that:

> Through UNet, a patient in need of an organ transplant has medical data entered in their medical record as part of the matching criteria to receive an organ. In addition to factors related to the patient's immunological system, parameters in UNet include physical parameters for the organ match such as the size and weight of

matching donor. These parameters contribute to the ability of the transplant recipient to be matched with a transplant donor and therefore the likelihood of a successful transplant. . . .

Affidavit ¶ 13.

The affidavit then set out allegations supposedly made by various medical professionals (identified only by the initials – ███ ., ██ ., ██████, ███. ██ ., and ███ .), who worked with Dr. Bynon. Affidavit ¶¶ 21-23, 25, 27-30, 32, 36-37 & 43. According to the affidavit, the allegations were that Dr. Bynon "manipulat[ed] UNet transplant matching criteria, specifically *patient weights and ages*, to effectively make liver failure patients ineligible to receive offers for livers." Affidavit ¶ 21 (emphasis added); *see also* Affidavit ¶ 22 (claiming that "BYNON was changing the *UNet patient criteria* to prevent patients from receiving offers for transplant livers unless BYNON was present to perform the surgery to control the surgery schedule at MHHS") (emphasis added); Affidavit ¶ 25 ("██ . did not think BYNON had monetary incentives to manipulate the *patients' UNet matching criteria.* However, ██ noted that BYNON enjoyed the patients' praise for getting them a liver, and ██ noted that BYNON preferred performing transplants for VIPs while avoiding performing transplants on patients he disliked.").[4]

---

[4] Agent Portillo's affidavit noted hospital records showing that Dr. Bynon performed more transplants than any other doctor in MHH-TMC's liver transplant program:

> Affiant is aware from conversations with other investigators, review of physician employment contracts from other investigations, and conversations with a physician with employment in the MHHS [Memorial Hermann Hospital System] system, that MHHS tracks the generation of hospital productivity in terms of revenue units [sic] (RVUs.) RVUs are utilized as a relative measure of physician work output for physicians practicing at MHHS. . . .

> Affiant has reviewed a UT Health Organ Transplant (OT) tracking spreadsheet (below) which contains summaries of the RVUs for UT Health who are contracted to provide OT services to MHHS. BYNON's personal RVUs are noted to be approximately double the next highest performing surgeon. BYNON's RVUs account for almost half of the UT Physician's OT total RVUs when compared with all other OT physicians employed by UT Health during the reporting period captured in the OT tracking spreadsheet.

4

Agent Portillo's affidavit also discussed a putative conspiracy between Dr. Bynon and certain UH Health officials to threaten and retaliate against hospital employees who reported Dr. Bynon to UNOS:

> • "During staff meetings about the ongoing issues and investigations regarding the organ transplant program, ██ . has indicated to ██ that he should provide only program information to UNOS investigators and not point fingers at any individual. ██ . also indicated to ██ . that there were better ways to go about change, insinuating that ██ . has been identified as someone who initiated the investigation by UNOS. ██ . conveyed to ██ . that ██ . wanted ██ . to understand that sometimes things were about systems, not individuals. About May 8, 2024, ██ . received an email from UT Health effectively demoting him and conveying all of his positional responsibilities to ██ . as part of an organizational restructuring of the UT Health transplant physicians." Affidavit ¶ 33.

> • "In early or mid-April 2024, ██ . was called into BYNON's office by ██ ., the nephrologist and surgical assistant. BYNON told ██ . that they have identified two potential whistleblowers and 'one lit off a missile and the second poured gasoline on it.' BYNON added that once the investigation cools down, 'we'll take care of them.' According to ██ ., BYNON and UT Health are actively attempting to identify who notified UNOS about the manipulations of the matching criteria." Affidavit ¶ 40.

To support the application for a search warrant for Dr. Bynon's cellular phone, Agent Portillo's affidavit included a screenshot of a text message sent by Dr. Bynon to another doctor as proof of his alleged crimes:

---

Affidavit ¶¶ 48-49.  An "RVU" is not a "revenue unit."  Instead, it stands for a "relative value unit."  *See* American Medical Association, "Understanding Relative Value Units (RVUs)" (Dec. 5, 2025), available at https://www.ama-assn.org/practice-management/cpt/understanding-relative-value-units-rvus.



The affidavit stated that: "Affiant has reviewed text messages sent by BYNON from 832-776-███. These messages include a text message [above] where BYNON acknowledges that he 'adjusted' patient ███ to prevent ███ from receiving any transplant offers even though BYNON had not reviewed ███ file to determine if this was appropriate." Affidavit ¶ 47.

## B. Dr. Bynon's Modification of Donor Acceptance Criteria

As explained in detail in Dr. Bynon's motion to dismiss the indictment, also filed today, UNOS's UNet included a relatively simple portal for transplant doctors to enter data about the "physical parameters" for a potential organ match, such as the age and weight of a donor (called

6

"donor acceptance criteria").   This portal included a drop-down menu for setting criteria, such as

a potential donor's minimum and maximum age:



During the relevant time period, Dr. Bynon adjusted the criteria for donors' ages and

weights in order to keep his patients "active" on the UNOS waitlist rather than formally classifying

them as "inactive" (called "Status 7")[5] based on their worsened medical conditions.  The only

alternative to adjusting the donor acceptance criteria – so as to preclude an organ match based on

a patient's condition and a consequent offer of a donated liver (that would have to be declined if

the patient was not ready for a transplant) – would be to classify a patient as "Status 7."  Yet

classifying a patient as Status 7 would adversely affect the patient's ability eventually to get a

donated organ in the future, when the patient's health had improved (and the patient can return to

"active" on the waitlist).  That is because the scoring that UNOS uses to determine a patient's

place on the waitlist is in part based on how long a patient has been "active" on the waitlist.  The

longer a liver patient has been active on the waitlist, the more favorable that patient's place on the

waitlist.  Conversely, being "inactive" (Status 7) lowers a patient's place on the waitlist after they

are reactivated on the wait list.[6]

---

[5] *See* Lissi Hansen *et al.*, *The Power of the Liver Transplant Waiting List: A Case Presentation*, 23 Amer.
J. Crit. Care 510 (Nov. 2014) (discussing "Status 7" for liver transplant patients),
https://pmc.ncbi.nlm.nih.gov/articles/PMC4377639/.

[6] UNOS, *Emergency actions help members protect patient safety and access to transplant during COVID-19*, June 29, 2020 (emphasis added),
https://web.archive.org/web/20200922133234/https://unos.org/news/emergency-actions-help-members-protect-patient-safety-and-access-to-transplant-during-covid-19/.

As also explained in the motion to dismiss, what Dr. Bynon did was entirely consistent with the practice explicitly endorsed by UNOS during the COVID-19 pandemic.  UNOS advised health care professionals who had patients with COVID-19 that "you have the option of either temporarily inactivating them [i.e., placing them on Status 7] *or* temporarily setting your screening criteria to make them ineligible for organ offers."[7]  UNOS then explained how to do so:  "The recommendation is to set the acceptable donor age acceptance criteria to 98 years (minimum) and 99 years (maximum)."  The benefit of doing so would allow patients "to continue to accrue waiting time [*i.e.*, maintain their 'active' status] but temporarily render them unable to receive organ offers . . . ."[8]  UNOS repeated this advice in June 2020: "Non-kidney transplant candidates do not accrue waiting time for a transplant if they are placed in an inactive status [i.e., Status 7].  For this reason, the OPTN [has] recommended that non-kidney transplant programs that opt to defer any offers for certain candidates due to COVID-19 *should not inactivate the candidate, but instead change their organ acceptance criteria*."[9]  This practice, which has occurred at transplant hospitals throughout the United States for reasons other than a patient's contracting COVID, is referred to as an "internal hold."

In short, what Dr. Bynon did was in accordance with UNOS's own guidance then in effect and followed by many other transplant doctors throughout the country.  Notably, as stated in the

---

[7] *See* UNOS, *COVID-19 Updates*, Apr. 7, 2020 (emphasis added), https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/.

[8] *Id.*

[9] UNOS, *Emergency actions help members protect patient safety and access to transplant during COVID-19*, June 29, 2020 (emphasis added), https://web.archive.org/web/20200922133234/https://unos.org/news/emergency-actions-help-members-protect-patient-safety-and-access-to-transplant-during-covid-19/.

motion to dismiss, it was not until *April 3, 2026*, that the Organ Procurement and Transplant

Network (OPTN) rescinded UNOS's 2020 guidance.

II.   **After Excising the False and Misleading Information in the Warrant Application and By Including Relevant Omitted Information, There Is Not Probable Cause.**

A. **The *Franks* Standard**

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156-57;[10] *see also Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring)

(describing *Franks* as applying to "false or misleading" information); *Hale v. Fish*, 899 F.2d 390,

---

[10] The Court further stated:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

*Id.* at 171-72.

9

398 (5th Cir. 1990) (same); *State v. Olson*, 726 P.2d 1347, 1352 (Ka. App. 1986) ("While perhaps true in a literal and abstract context, the statements in the affidavit certainly conveyed a false meaning to the judge who issued the warrants.").

The Fifth Circuit (like many other courts) has extended *Franks* to an "intentional or reckless *omission* of material facts from a warrant application . . . ." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (emphasis added). "To determine whether facts omitted from a warrant affidavit are material to the determination of probable cause, courts ordinarily insert the omitted facts into the affidavit and ask whether the reconstructed affidavit would still support a finding of probable cause." *Id.* "[R]eporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *United States v. Stanert*, 762 F.2d 775, 781, *as amended*, 769 F.2d 1410 (9th Cir. 1985). To allow a magistrate judge "to be mislead in such a manner could denude the probable cause requirement of all real meaning." *Id.* Therefore, a Fourth Amendment violation occurs where "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Id.*; *see also United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (quoting *Stanert*); *United States v. Boyce*, 601 F. Supp. 947, 952-54 (D. Minn.1985). "[R]ecklessness may be inferred when omitted information was clearly critical to assessing the legality of a search." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996), *aff'd on reh'g*, 91 F.3d 331 (2d Cir. 1996).

**B. Without the False and Misleading Statements and Omissions, Agent Portillo's Affidavit Lacked Probable Cause.**

As explained below concerning each of the four alleged criminal violations set forth in Agent Portillo's affidavit, there is no probable cause if (1) the false and misleading statements are excised, and (2) relevant omitted information is included.

### 1.  The Alleged § 1513(e) & § 1518 Violations

Because the false and misleading nature of the affidavit is most obvious with respect to the alleged violations of 18 U.S.C. §§ 1513(e) & § 1518, Dr. Bynon will first address Agent Portillo's affidavit with respect to those alleged violations.  Simply put, there is absolutely nothing in his affidavit that establishes probable cause that Dr. Bynon violated either statute.

A conviction under 18 U.S.C. § 1513(e) requires the government to prove that (1) the defendant knowingly took an action with intent to retaliate, (2) his action harmed the victim (including by interfering with the victim's employment), and (3) the retaliation was motivated by the defendant's truthful cooperation *with federal law enforcement officials*.  *See United States v. Stoker*, 706 F.3d 643, 646, 648 (5th Cir. 2013).  Similarly, 18 U.S.C. § 1518 makes it an offense if a person "willfully prevents, obstructs, misleads, delays or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense *to a criminal investigator*."  18 U.S.C. § 1518(a) (emphasis added).

Agent Portillo's affidavit did not allege that Dr. Bynon was aware of any federal law enforcement investigation at the time that he allegedly threatened to retaliate or retaliated against anyone for reporting his alleged misconduct to UT Health administrators or to UNOS.[11]   UNOS is a private entity, not a governmental entity.  *See Callahan v. United States Department of Health and Human Services*, 434 F. Supp.3d 1319, 1351-52 (N.D. Ga. 2020) (holding that UNOS is not a federal agency as opposed to private entity that contracted with a federal agency to monitor hospitals involved with organ transplants).  UNOS obviously has no law enforcement powers.

---

[11] Dr. Bynon adamantly disputes the affidavit's allegations that he threatened to retaliate or did retaliate against any colleague or hospital employee for reporting him to UH Health administrators or UNOS.  Yet that is beside the point concerning the alleged violations of § 1513(e) & § 1518, as there is not probable cause that Dr. Bynon threated or retaliated against anyone for reporting him to a federal law enforcement official.

The affidavit stated that:

A group of anonymous UT Health employees then reported these manipulations to a federally funded oversight agency (UNOS, below) initiating an oversight action and resulting in the opening of a federal criminal investigation. When BYNON and others at UT Health became aware of this reporting, they acted to silence the witnesses with threats against their employment. UT Health demoted and non-renewed witnesses who have reported BYNON's activities **to the federal government**. . . .

In early or mid-April 2024, ▮. was called into BYNON's office by ▮., the nephrologist and surgical assistant. BYNON told ▮. that they have identified two potential whistleblowers and "one lit off a missile and the second poured gasoline on it." BYNON added that once the investigation cools down, "we'll take care of them." According to ▮, BYNON and UT Health are actively attempting to identify **who notified UNOS** about the manipulations of the matching criteria.

Affidavit ¶¶ 9& 40 (emphasis added).

The statement in Affidavit ¶ 9 is false because UNOS is not the "federal government," and Agent Portillo knew it or at least acted in reckless disregard of the truth when he so stated under oath. Agent Portillo's affidavit gives the false impression that the alleged threats and retaliation related to the whistleblowers' reporting Dr. Bynon to federal law enforcement officials.

### 2.  The Alleged § 371 Violation

To the extent that Agent Portillo's affidavit alleged any "conspiracy," it was solely between Dr. Bynon and certain UT Health administrators – in their alleged retaliation against the whistleblowers. Affidavit ¶¶ 33 & 40. All other alleged criminal acts by Dr. Bynon described in the affidavit were committed by himself and, thus, could not constitute a conspiracy. For the same reason that the affidavit falsely alleged probable cause of 18 U.S.C. § 1513(e) & § 1518 violations by Dr. Bynon, the affidavit also falsely alleged probable cause of a violation of 18 U.S.C. § 371.

### 3.  The Alleged § 1035 Violation

The elements of § 1035 are: "(1) that [the defendant] falsified, concealed, or covered up a material fact by trick, scheme, or device, or made a materially false, fictitious, or fraudulent

12

statement or representation, or made or used any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; (2) that [the defendant] did so in connection with the delivery of or payment for health care benefits, items, or service[s] involving a health care benefit program; and (3) that [the defendant] did so knowingly and willfully." *United States v. Ramirez*, Criminal Action No. H-16-259-1, 2025 WL 3707567, at *3 (S.D. Tex. Dec. 21, 2025). The "willfulness" element means a defendant's knowledge that his conduct was *against the law*. *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 1.43 & 2.50 (2024).

Agent Portillo's affidavit stated that Dr. Bynon violated § 1035 by making "[f]alse [s]tatements" related to "[h]ealth [c]are [m]atters" by "illegally alter[ing] medical records of *transplant recipients* to make them ineligible to receive potentially lifesaving care." Affidavit ¶¶ 4 & 9 (emphasis added). The affidavit's allegations of a violation of § 1035 violated *Franks* in several ways.

First, Agent Portillo falsely characterized data entered in the donor criteria menu in UNOS's UNet portal as "medical records" of transplant recipients. The drop-down menu for donor acceptance criteria is merely a device used by UNOS to find matching donors based on the donor acceptance criteria provided. The drop-down menu thus serves as a "filter" for matching potential donors for transplant; it is not a "medical record" of any transplant patient.

Second, even assuming *arguendo* that the drop-down menu was a "medical record," the affidavit repeatedly mischaracterized the menu as being for data about "patient" criteria – rather than "donor" criteria. *See* Affidavit ¶ 21 (stating that Dr. Bynon "manipulat[ed] UNet transplant matching criteria, specifically **patient** weights and ages, to effectively make liver failure patients ineligible to receive offers for livers") (emphasis added); Affidavit ¶ 22 (claiming that "BYNON

was changing the ***UNet patient criteria*** to prevent patients from receiving offers for transplant livers unless BYNON was present to perform the surgery to control the surgery schedule at MHHS") (emphasis added); Affidavit ¶ 25 ("█. did not think BYNON had monetary incentives to manipulate the ***patients' UNet matching criteria.***") (emphasis added).  That characterization was entirely false, and Agent Portillo knew it or at least acted with reckless disregard of the truth.

Third, Agent Portillo's affidavit portrayed Dr. Bynon as having engaged in an "illegal" manipulation of donor matching criteria using the drop-down menu on the UNet portal when what Dr. Bynon did actually had been endorsed by UNOS as a legitimate practice and also was practiced by many other transplant doctors throughout the United States.  The affidavit's omission of that critically important fact itself violated *Franks*, as Agent Portillo either knew that information and deliberately failed to include it or acted in reckless indifference of the truth by failing to include it.

**Exhibit B** (sealed) contains two FBI-302 reports of witnesses (by initials only) interviewed by prosecutors and agents several weeks before Agent Portillo submitted his search warrant affidavit.  Those reports contain highly relevant information that was omitted from Agent Portillo's affidavit:

- █. and █.:  Executives at Memorial Hermann Health System who were involved in the internal investigation of Dr. Bynon – told prosecutors and agents on April 16, 2024, that the decisions to "modify" the donor acceptance criteria for the purpose of preventing offers of donated livers to transplant patients "[t]ypically . . . [were] made by a multidisciplinary team" of medical professionals and that Dr. Bynon allegedly engaged in misconduct by unilaterally "altering the [donor] matching criteria without consulting the committee [i.e., the multidisciplinary team]." 7/15/2024 FBI-302 Report of 4/16/2024 Interview of █. and █. (at pages 1-2).

- █:  One of the other transplant doctors at Memorial Hermann – told prosecutors and agents – on April 26, 2024 that, after █. joined the medical staff, Dr. Bynon "***indicated***" to █. that Dr. Bynon "had a way to change [transplant patients' ability to receive an offer for a donated liver] without triggering a notification for the patient."  6/3/2024 FBI-302

14

Report of 4/16/2024 Interview of ▮. (at page 2).  Conversely, in Agent Portillo's affidavit, he stated that Dr. Bynon "***confided***" in ▮. about how to change the transplant patient's status (Portillo Affidavit ¶ 27) – suggesting Dr. Bynon was acting nefariously by sharing a "confidence" about a practice that Dr. Bynon wished to keep secret.

Agent Portillo's affidavit clearly gives the impression that Dr. Bynon was acting secretly because he was doing something that was both in violation of medical ethics and was criminal. Yet the real issue that led to the hospital's internal investigation of Dr. Bynon (and his eventual ouster) was not that he had engaged in internal holds (by modifying donor acceptance criteria) but that the internal investigators believed that he had done so *unilaterally* with respect to certain patients – without getting the approval of a multidisciplinary team (called a "medical review board" or "MRB") that included other medical professionals.  The fact that such modifications of donor acceptance criteria regularly had been approved by multidisciplinary teams for other patients is compelling evidence that such a modification is not a violation of 18 U.S.C. § 1035 and, *a fortiori*, that Dr. Bynon did not act "willfully."[12]  Agent Portillo's affidavit was misleading by omitting the exculpatory information provided by ▮. and ▮. and by generally giving the impression that internal holds are criminal acts – just like his affidavit was misleading by omitting evidence that internal holds have been regular practice of other transplant programs across the country.  The affidavit portrays Dr. Bynon as a rogue doctor who made "false statements" in "medical records" of "transplant recipients" when, in fact, what he did was a common practice throughout the transplant community.

Fourth, the data entered by Dr. Bynon on the UNet drop-down menu was not a "false, fraudulent, or fictitious" statement or representation of fact.  It was simply an exercise of medical

---

[12] Whether a modification of donor acceptance criteria is done unilaterally by a transplant doctor or, instead, as the result of a "team" decision, it is the same thing – a modification of donor acceptance criteria.  It is not a crime.

judgment.  The magistrate judge was misled by Agent Portillo's affidavit to believe that Dr. Bynon was making "false, fraudulent, or fictitious" statements or representations of fact.

Agent Portillo's affidavit included a screen shot of a text message sent by Dr. Bynon to another doctor – in which Dr. Bynon said that he had "adjusted" (his quotes) a patient's donor matching criteria in the UNet portal pending determination of whether the patient needed a PET scan stress test[13] – as proof of Dr. Bynon's supposed knowledge of the improper nature of his internal holds.  Affidavit ¶ 47 ("Affiant has reviewed text messages sent by BYNON from 832-776-███. These messages include a text message (below) where BYNON acknowledges that he 'adjusted' patient ███ to prevent ███ from receiving any transplant offers even though BYNON had not reviewed ███'s file to determine if this was appropriate.").

The affidavit's inclusion of the text and Agent Portillo's description of Dr. Bynon's alleged medical impropriety – placing the internal hold without having looked at all of the patient's medical records – is particularly problematic.  As an initial matter, Agent Portillo is not a doctor (and certainly not a transplant doctor with decades of experience).  He was in no position to render medical judgments about whether Dr. Bynon acted improperly by placing the internal hold before fully reviewing all of the patient's medical information related to his heart condition.  Furthermore, if anything, the text demonstrates that Dr. Bynon used internal holds as part of the exercise of his medical judgment about whether a particular transplant patient should or should not receive organ offers at that time because of a serious potential medical condition that needed to be explored before a transplant offer could be accepted.

---

[13] A PET scan stress test "specifically looks at blood flow to the heart during stress to locate areas of decreased blood flow that could indicate blockages and other underlying heart conditions . . . ." "Preparing For a PET Stress Test," https://hvcmd.com/cardiac-imaging-testing-diagnostics/pet-exercise-stress-test.

Finally, Agent Portillo's affidavit contains no information or even an allegation that Dr. Bynon believed that his use of internal holds – even assuming *arguendo* that the text provided evidence that Dr. Bynon believed what he did was somehow improper – was *against the law*. Although law enforcement officers must be given "substantial leeway" in offering probable cause of a suspect's *mens rea*, there must be some proof of a suspect's *mens rea* to establish probable cause of an offense with a specific *mens rea*. *United States v. Sanny*, 701 F.Supp.3d 543, 550 (W.D. Tex. 2023) ("When law enforcement submits a probable cause statement to a magistrate, it generally must include minimum facts that establish the elements of the alleged offense. One such element is mens rea, where part of the determination is if there is sufficient evidence to support . . . that officers had probable cause to believe that the Defendant had the mens rea. While officers generally need to provide some evidence of an accused's mens rea, they are given substantial leeway because of the nature of most police work."). Agent Portillo's affidavit failed to offer such proof of willfulness and instead falsely implied that Dr. Bynon knew that he had acted improperly (in the affidavit's discussion of the text message). Agent Portillo acted knowingly or at least in reckless disregard of the truth.

## CONCLUSION

Through both false and misleading statements and also significant omissions, Agent Portillo's affidavit misled the magistrate judge into believing that there was probable cause of at least one of four specified federal offenses and that evidence of such offense(s) would be on Dr. Bynon's cellular phone. Because Dr. Bynon has made "a substantial preliminary showing" that Agent Portillo's affidavit contained false or misleading information and omissions that caused the magistrate judge to issue the search warrant, *Franks*, 438 U.S. at 156-57, this Court should conduct an evidentiary hearing on this motion.

This Court also should order – before the hearing – discovery of Agent Portillo's work product and communications made about his affidavit in support of the search warrant.

Respectfully submitted,

**KHALIL KINCHEN LLP**

/s/ *Samy Khalil*
Samy Khalil
Texas Bar No. 24038997
4200 Montrose Blvd., Suite 440
Houston, TX 77006
713.904.4477
samy@khalilkinchen.com

Brent Evan Newton
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, MD 20878
713.904.4477
brentevannewton@gmail.com

**CERTIFICATE OF SERVICE**

On May 4, 2026, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ *Samy Khalil*
Samy Khalil

18