**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIM. NO. H-26-023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**UNITED STATES' REPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING 42 C.F.R. § 482.94**

Defendant Stevenson Bynon, Jr. ("Bynon") moves to preclude the United States from introducing "evidence and testimony of 42 C.F.R. § 482.94" at trial. (Docket No. 91 at p. 7.) For the reasons set forth below, the Court should deny this motion.

## I. Factual Background

Bynon served as the Abdominal Organ Transplantation and Surgical Director for Liver Transplantation of Memorial Herman Health System ("MHHS") at the Texas Medical Center in Houston, Texas, from 2011 to 2024. During his tenure, he also served on the Multidisciplinary Review Board ("MRB") at MHHS, which determined a patient's eligibility for liver transplantation. This board consisted of hematologists, surgeons (at times including Bynon), nurses, transplant coordinators,[1] social workers, dietitians, and other health care professionals all working at the MHHS Transplant Program. The MRB reviewed the medical files belonging to the five patients identified in the indictment, concluding that liver transplantation was safe and appropriate for each patient.

[1] A transplant coordinator, often a registered nurse, is a health care professional who guides patients through every phase of the organ transplant process. Commonly, they serve as the patient's main point of contact, through initial evaluation, and waitlist logistics, to post-surgery follow-up.

A transplant coordinator then placed the patients on the national organ waitlist, entering their biographical information on a computer program maintained for this very purpose. The coordinators also identified the age and weight of potential donors. Shortly after the patients' placement on the waitlist, Bynon accessed their accounts and manipulated their donor criteria. According to Bynon, "he set the donor age and weight criteria (*e.g.*, at the weight and age of a small child) so as to preclude organ offers for an adult transplant patient." (Docket No. 29 at p. 4.) These parameters were false. He changed the criteria in secret, without informing the patients, their coordinator, the MRB, or any other member of the transplant team. Modifications to the donor criteria did not appear on the patient's medical chart, preventing peer review and withholding critical information from transplant candidates and their health care providers. Moreover, Bynon made no record in any patient file stating the reason why he altered donor criteria at the time he made the false statements. The false statements about donor criteria did not comply with the process of placing a potential recipient on hold, which is done by the MRB, is visible to providers, and is documented on the patient's medical chart.

On January 14, 2026, a grand jury returned an indictment charging Bynon with five counts of making a false statement relating to health care matters in violation of 18 U.S.C. § 1035. (Docket No. 1.) Bynon subsequently entered a plea of not guilty. (Docket No. 8.) Trial is set to commence on August 24, 2026. (Docket No. 73.)

**A. Federal Transplant Regulations**

Bynon falsified the donor criteria for five transplant patients, all of whom were Medicare beneficiaries. "The administration of the Medicare program is governed primarily by the Medicare regulations promulgated by the [Secretary of Health and Human Services] and codified in Title 42 of the Code of Federal Regulations." *Personacare of Warner Robins, Inc. v. Sebelius*, Case No.

09-221, 2019 U.S. Dist. LEXIS 95592, at *3 (M.D. Ga. Sept. 14, 2010). The regulation pertaining to the organ waitlist is set forth in 42 C.F.R. § 482.94 (hereinafter, "C.F.R. § 482.94"). This regulation provides that:

> (b) Standard: Waiting list management. Transplant programs must keep their waiting lists up to date on an ongoing basis, including:
>
> (1) Updating of waiting list patients' clinical information;
>
> (2) Removing patients from the program's waiting list if a patient receives a transplant or dies, or if there is any other reason the patient should no longer be on a program's waiting list; and
>
> (3) Notifying the OPTN no later than 24 hours after a patient's removal from the program's waiting list.
>
> (c) Standard: Patient records. Transplant programs must maintain up-to-date and accurate patient management records for each patient who receives an evaluation for placement on a program's waiting list and who is admitted for organ transplantation.
>
> (1) For each patient who receives an evaluation for placement on a program's waiting list, the program must document in the patient's record that the patient (and in the case of a kidney patient, the patient's usual dialysis facility) has been informed of his or her transplant status, including notification of:
>
> (i) The patient's placement on the program's waiting list;
>
> (ii) The program's decision not to place the patient on its waiting list; or
>
> (iii) The program's inability to make a determination regarding the patient's placement on its waiting list because further clinical testing or documentation is needed.
>
> (2) If a patient on the waiting list is removed from the waiting list for any reason other than death or transplantation, the transplant program must document in the patient's record that the patient (and in the case of a kidney patient, the patient's usual dialysis facility) was notified no later than 10 days after the date the patient was removed from the waiting list.
>
> (3) In the case of patients admitted for organ transplants, transplant programs must maintain written records of:
>
> (i) Multidisciplinary patient care planning during the transplant period; and
>
> (ii) Multidisciplinary discharge planning for post-transplant care.

42 C.F.R. § 482.92(b)-(c).

Bynon completed a Medicare revalidation application on June 30, 2016. *See* Attachment A. Section 14 of this application sets forth the statutory language and applicable penalties for various federal crimes, including 18 U.S.C. § 1035. *Id*. at p. 11. The application also includes a "certification statement," stating in pertinent part that the applicant agrees "to abide by the Medicare laws, regulations and program instructions that apply to me or [to the University of Texas Health Science Center at Houston]." *Id*. at p. 13. The Centers for Medicare and Medicaid Services ("CMS") approved Bynon's revalidation application on August 22, 2016. *See* Attachment B. The approval letter reiterates that "[providers] and suppliers enrolled in Medicare are required to ensure strict compliance with Medicare regulations, including payment policy and coverage guidelines." *Id*. at p. 2.

**B. The State Investigation and Report**

In April 2024, the Texas Department of Health and Human Services (hereinafter, "Texas HHS") investigated the organ transplant program at MHHS "to determine the hospital's compliance with Chapter 2 of the State Operations Manual, Appendix X [42 C.F.R. §§ 482.72-482.104]." (Docket No. 92 at p. 1.)[2] After an onsite visit at MHHS and interviews with members of the transplant program, Texas HHS concluded, *inter alia*, that the hospital was "not in compliance with § 482.94." *Id*. at p. 2. Essentially, Bynon "failed to properly inactivate individuals in the UNET electronic system and notify waitlisted patients. Instead, [Bynon] changed

---

2 The Organ Procurement Transplantation Network ("OPTN") conducted a separate investigation during the same timeframe. On April 3, 2024, the OPTN informed MHHS that:

> [An] urgent and severe risk to patient safety exists, and that the appropriate way to mitigate this patient safety risk is for [MHHS] to voluntarily long-term inactivate its liver transplant program. We request that the liver program remain inactive until the MPSC has time to review the outcome of the pending MPSC Leadership-directed peer visit to conduct an in-depth review of the program.

(Docket No. 96 at p. 8.) Consequently, MHHS deactivated the kidney and liver transplant programs on April 5, 2025. *Id*.

donor criteria in UNET to decrease donor recipient offers." *Id*. at p. 5.[3] Bynon informed Texas HHS investigators that:

> [He] was the only one who made the changes and no one else was involved, and he used this process to place the patients on an internal hold [. . . Bynon] confirmed that he made the changes to donor criteria without having an MRB meeting. [Bynon] stated that this was a 'shortcut' that he used instead of inactivating the patient from the waitlist. [This] was all done to ensure patients were safely transplanted. [Bynon] confirmed that he would hear about patient conditions from other staff members in conversations, and not always in MRB meetings and he would tell them he would take care of it. [Bynon] admitted it was 'all his fault,' and maybe he should have inactivated the patients from the waitlist.

*Id*. at pp. 10-11.

## II. Legal Standard

To sustain a conviction, the United States must prove that "(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) [he] did so knowingly and willfully." *United States v. Hamilton*, 37 F.4th 246, 260 (5th Cir. 2022) (citing *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017)); *see United States v. Crow*, Case No. 11-10956, 594 Fed. Appx. 285, 287 (5th Cir. 2012) (noting that Section 1035 requires that "a defendant act knowingly and willfully.") "[In] order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (internal quotation omitted) (citing *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see* Fifth Circuit's Pattern Jury Instructions (Criminal Cases) § 1.43 (2024) (Historically, the term "willfully" means an act that "was committed voluntarily and purposefully,

---

3 Bynon is referred to as the "Transplant Surgeon (M)." UNet is the technology used to match organ donors and patients in need of organs. UNet maintains a list of patients in need of transplants. *See* UNOS Technology, ("UNet[SM] links all 55 organ procurement organizations, 254 transplant hospitals and 150 histocompatibility labs in the U.S., and enables donation and transplant professionals to make lifesaving decisions with speed and efficiently.") (available at https://unos.org/technology/) (last visited May 24, 2026). "DonorNet" is the corresponding computer program for organ donors.

with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law."). "Intent may, and generally must, be proven circumstantially." *United States v. Stoke*r, 706 F.3d 643, 646 (5th Cir. 2013) (per curiam) (quotation omitted); *see United States v. Bank of New Eng., N.A.*, 821 F.2d 844, 854 (1st Cir. 1987) ("Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts.").

## III. Discussion

As a preliminary matter, evidence that Bynon violated C.F.R. § 482.94 (*i.e*. the Texas HHS report) is distinct from the regulation itself. His request is expansive, seeking to exclude "testimony or evidence about [C.F.R. § 482.94]." (Docket No. 91 at p. 4.) This prohibition would completely foreclose the United States from citing this regulation at trial. Because C.F.R. § 482.94 is probative of intent and provides context for the criminal charges in this case, Bynon's motion should be denied.

Bynon purports that this regulation is irrelevant because Section 1035 "does not criminalize failure to inform others of an alleged false statement or entry or a failure to update medical records to the alleged false statement or entry." *Id*. at p. 6. He then imposes an additional requirement on evidence of intent: The regulation must apply to "natural persons." *Id*. at p. 5. He cites no case or authority supporting the proposition that evidence of intent must be a mirror image of the offense charged in the indictment, or that a regulation must pertain to a natural person. Bynon also disputes the notion that he violated C.F.R. § 482.94, setting forth an argument regarding waitlist status based on his interpretation of the regulation. *Id.* at p. 8. Whether Bynon removed patients from the waitlist constitutes a factual question for the jury to consider, not a basis to exclude C.F.R. § 482.94.

Medicare regulations concerning organ transplantation (*i.e.* 42 C.F.R. § 482.94) demonstrate that Bynon willfully falsified donor criteria. Contrary to Bynon's assertions regarding the admissibility of C.F.R. § 482.94, courts routinely admit evidence of applicable regulations as evidence of intent. *See United States v. Parks*, 68 F.3d 860, 866-67 (5th Cir. 1995) (affirming the district court's denial of defendant's motion *in limine* to exclude bank regulations from trial, holding that this evidence was material to "the issue of intent or motive"); *United States v. Barnes*, 979 F.3d 283, 301 (5th Cir. 2020) (noting that Medicare regulations were "admitted into evidence without objection and provided to the jury" in a 18 U.S.C. § 1347 prosecution); *United States v. Njoku*, 737 F.3d 55, 66 (5th Cir. 2013) ("The circumstantial evidence, along with the testimony that she had direct access to patient's Medicare information and advanced training in confidentiality regulations, was sufficient to prove that Porter knew of the unlawful objective of recruiting Medicare beneficiaries and willfully joined the agreement with the intent to further that objective."); *United States v. Fogle*, Case No. 24-30229, 2025 U.S. App. LEXIS 11552, at *2-3 (5th Cir. May 13, 2025) (per curium) (holding that a "rational juror could have found that Fogle was dealing in firearms with the knowledge that her conduct was unlawful" in part because she "authored a blog post on gun regulations in the United States"); *United States v. Nowlin*, Case No. 14-20247, 640 Fed. Appx. 337, 344 (5th Cir. 2016) ("[Evidence] adduced at trial overwhelmingly supported a finding that she knowingly and willfully conspired to violate the Anti-Kickback Statute," including testimony that "Nowlin personally signed the Yellabone enrollment applications agreeing to comply with all relevant [Medicare and Medicaid] regulations"); *United States v. Akula*, Case No. 21-098, 2024 U.S. Dist. LEXIS 16658, at *8 (E.D. La. Jan. 31, 2024) ("[By] signing Canon's Medicare enrollment documents, [the defendant] agreed to abide by Medicare laws, regulations, and program instructions," which "strongly supports the jury's

finding" that the defendant "had the required intent to commit health care fraud"); *United States v. Starnes*, 583 F.3d 196, 212-13 (3rd Cir. 2009) (testimony regarding the defendant's familiarity with "the Code of Federal Regulations as they relate to [asbestos]" constituted evidence of his intent to violate 18 U.S.C. § 1001 (*i.e*. that he knew his "conduct was unlawful")); *United States v. Perry*, Case No. 15-4032, 659 Fed. Appx. 146, 154-55 (4th Cir. 2016) (noting that Medicaid regulations offered "background information to help prove that the Perrys acted with fraudulent intent"); *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("[Evidence] of departmental policies can be relevant to show intent in § 242 cases [. . .] the fact that [an officer] broke from his training could make it more likely that he acted willfully"); *United States v. Rashan*, Case No. 25-283, 2026 U.S. Dist. LEXIS 78238, at *23 (S.D.N.Y. Apr. 9, 2026) ("The Government may fairly argue that Rashan's alleged failure to timely create and maintain records of patient visits – in contravention of rules governing maintenance of medical records – is circumstantial evidence of his intent to defraud and his participation in the charged scheme.") (citing *United States v. Cristobal*, Case No. 23-6107, 2024 U.S. App. LEXIS 8380, at *3 (2d Cir. Apr. 8, 2024) ("[We] have allowed experts to testify on relevant regulations and industry standards as a basis to evaluate a defendant's conduct and intent.")).

The United States does not contend that a violation of C.F.R. § 482.94 is conclusive proof that Bynon is guilty of violating Section 1035. Indeed, Bynon cites *United States v. Christo,* 614 F.2d 486, 492 (5th Cir. 1980), for the proposition that a civil regulatory violation cannot "bootstrap" a criminal law violation. (Docket No. 91 at p. 5.) In *Christo*, the United States adduced evidence and argument concerning violations of a [civil regulation] in a criminal trial concerning the misapplication of bank funds. 614 F.2d at 488. The district court then provided instructions that "erroneously defined the legal standard of guilt" by allowing the jury to consider

the civil regulation "as an alternative standard of guilt." *Id*. at 491. These instructions "improperly [focused] the jury's attention to the prohibitions of the [civil regulation]." *Id.* at 492. That is not the situation here, where the case is in pretrial proceedings and the Court is considering whether relevant, probative evidence should be barred from being presented at trial.

The dispositive inquiry for the motion in limine is whether C.F.R. § 482.94 is admissible to show that Bynon possessed the requisite intent to violate Section 1035. The United States is not seeking to bootstrap a § 1035 conviction by citing a Medicare regulation. This evidence is material to intent and provides context for Bynon's false statements. *See United States v. Veasey*, 843 Fed. Appx. 555, 566-67 (5th Cir. 2021) (rejecting the defendant's claim that the admission of Medicare regulations "poisoned the proceeds" because "unlike *Christo*, the government did not attempt to prove a criminal violation solely by proving a violation of a civil regulation"); *United States v. Brown*, 553 F.3d 768, 790-91 (5th Cir. 2008) (rejecting the defendant's argument that the United Staes "used the [Texas Pharmacy Laws and Regulations] to reshape the standards for criminal liability," concluding that these regulations were probative of the defendant's state of mind). Furthermore, a limiting instruction would obviate any risk of "bootstrapping" a Section 1035 conviction. *See United States v. Goland*, 959 F.2d 1449, 1454 (9th Cir. 1991) (noting that the district court instructed the jury that "violations of regulations or civil statutes without more are not crimes, and such violations if any occurred, are not necessarily violations of criminal law [. . .] you may consider violations of civil statutes as you would any other evidence in determining whether or not [the defendant] had the required specific intent to violate the law charged in this indictment.").

A pretrial disposition regarding the admissibility of C.F.R. § 482.94 is appropriate because this regulation constitutes evidence of Bynon's intent to violate Section 1035. However, the United

States requests that the Court reserve on the admissibility of the Texas HHS report. This report may prove relevant for impeachment purposes, or to rebut a defense witness' testimony, or for other purposes.

## IV. Conclusion

For the reasons set forth above, the United States requests that the Court deny Bynon's motion to exclude 42 C.F.R. § 482.94 and the Texas Department of Health and Human Servies Report from evidence.

Respectfully Submitted,

AARON F. REITZ

United States Attorney

Southern District of Texas

By: */s/ Amanda Alum*

Amanda Alum
Suzanne Elmilady
Sherin Daniel
Anthony Franklin
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9000

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been delivered on counsel of record via ECF upon filing.

*/s/ Amanda Alum*
Amanda Alum
Assistant United States Attorney