**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 4:26-cr-00023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**DEFENDANT'S SECOND MOTION FOR A BILL OF PARTICULARS**

Pursuant to Federal Rule of Criminal Procedure 7(f), Dr. Steve Bynon, through his counsel, moves this Court for an order requiring the government to provide the defense a bill of particulars concerning the indictment's allegation that Dr. Bynon made a false, fraudulent, or fictitious statement or entry in violation of 18 U.S.C. § 1035(a)(2). In support of this motion, Dr. Bynon would show the following:

## I.
## Background

The indictment charges Dr. Bynon with five federal felonies – all violations of 18 U.S.C. § 1035(a)(2) during the time period of February 2023 through March 2024 – for adjusting "donor matching criteria"[1] regarding donor age and weight in UNOS's UNet system to preclude offers of donated livers for his patients. The indictment alleges that these adjustments of donor age and weight criteria in the UNet system constituted "false," "fraudulent," or "fictitious" statements or entries under § 1035(a)(2).

[1] Although the indictment describes Dr. Bynon's adjustments of "donor matching criteria," UNOS and the transplant community describe them – more accurately – as "donor *acceptance* criteria" or "organ *acceptance* criteria." *See* UNOS, "COVID-19 Updates: April 7, 2020," https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/ (emphasis added). As has been noted in prior filings, Dr. Bynon referred to these adjustments as "internal holds" – a term used by others in the transplant community throughout the country.

In its May 29, 2026 "trial brief," the government gave notice of its theory of falsity (using the example of one of the five transplant patients mentioned in the indictment):

> The day after [transplant patient] [AP]'s placement on the waitlist, Bynon logged into UNet to manipulate his donor criteria…. These manipulations stated that [AP] could only receive a liver donation from a person with the following profile: age, 0 – 8 years old; weight, 70 lbs. – 300 lbs. ***This statement is a lie***. [AP] was eligible to receive offers from adult donors, just as the MRB had determined the previous day. Bynon informed no one of this unilateral manipulation, including [AP] and his transplant coordinator. [AP] continued to receive medical care as though he were active on the waitlist, services that MHHS billed to Medicare, when he had been effectively stripped of the possibility of receiving a donor organ because of Bynon's manipulations.
>
> According to Bynon, the donor criteria manipulations constitute an "internal hold." (Docket No. 29 at p. 8.) He contends that internal holds were necessary to suspend organ offers for ineligible patients, a determination he made without input from the MRB or notification to the patient. The applicable policies from OPTN and MHHS do not contemplate or even reference the phrase "internal hold." Moreover, an "internal hold" does not trigger the patient notification requirements set forth in OPTN and MHHS policy. ***Evidence presented at trial will establish that the "internal hold" argument is an incredulous justification for making false statements in connection with the delivery and payment of health care benefits***. …
>
> Bynon avers that his patients "were suffering from health conditions or had other circumstances that rendered them not to be in an appropriate position to undergo a transplant (but, in [his] medical judgment, each patient had the potential to improve to a future point in time when a transplant would be possible – which is why he simply did not deactivate them from the waitlist)." (Docket No. 29 at p. 4.) Bynon manipulated donor criteria in secret without discussing the basis of these modifications with anyone. Furthermore, Bynon made no notation in his patients' charts setting forth the reason for their inactivation. Accordingly, the '[']health conditions," ambiguous "circumstances," and other post hoc justifications proffered by Bynon were entirely unknown to his patients. [RO], [PP], [CC], [OF], and [AP] had no recourse to remedy whatever obstacle that, in Bynon's mind, prevented transplantation. They could have completed additional medical treatments at MHHS or transferred to another transplant program. Or, they could have elected to spend their final days at home surrounded by family and friends instead of opting for the transplantation surgery. Bynon's manipulations were akin to installing a fire alarm but disabling the sound. A fire erupts and triggers the alarm, but the occupants of the building are oblivious and remain inside despite the impending threat posed by the conflagration. Like the silent fire alarm, Bynon lured his patients into a state of complacency ***by lying about the profiles of suitable***

> ***donors***. The false statements made by Bynon resulted in thousands of dollars that MHHS billed to Medicare. …

ECF No. 96,[2] at 6-7, 10-11 (emphasis added).

In addition, the government's trial brief contended that:

> Bynon maintains that he placed his patients on an "internal hold." (Docket No. 29 at p. 8.) ***MHHS and UNOS do not sanction this procedure***. ***It is a disfavored practice that was once employed by a discrete subsect of hospitals***. … Bynon invokes the "internal hold" procedure to defend his actions, ***but he failed to comply with the procedure by not notifying his patients and inactivating their status for prolonged periods of time***. The Government's evidence at trial will show that Bynon abused this procedure to the detriment of his patients.

ECF No. 96, at 13, 15 (emphasis added).

Finally, the trial brief stated:

> The Government anticipates that Bynon will argue that his statements were contextually true, claiming that: (1) he merely followed the COVID-19 newsletter; (2) that Bynon exercised his medical judgment; and (3) that Bynon placed his patients on an "internal hold." The Government also expects that Bynon will assert that the donor criteria manipulations were verbal acts rather than statements subject to verification. …. ***The Government will prove that Bynon's statements were literally and contextually false***. The jury will then decide if Bynon lied by stating that "his adult-aged patients actually needed the organs of a small child."

ECF No. 96, at 16-17 (emphasis added).

At the June 1, 2026 hearing on Dr. Bynon's motion to dismiss the indictment, counsel for the government stated:

> When Dr. Bynon accessed the computer program to input the donor criteria, the screen said, "donor acceptance criteria." ***These were affirmative misrepresentations about the patients that are set forth in the indictment***. ***For each of the five patients, Dr. Bynon stated that they required an organ from a child, and we are arguing that this is the statement that is false***.

6/1/2026 Tr. at 27 (emphasis added).

[2] The government originally filed its trial brief under seal at ECF No. 53. It has since filed that pleading, unsealed and redacted, at ECF No. 96. This motion references the unsealed version.

In response to questions from this Court about the significance of UNOS's April 2020 guidance, counsel for the government stated:

> **MS. ALUM**: The question is whether the Covid newsletter permitted Bynon to manipulate the donor criteria in the manner that he did. And we will argue that that guidance was inapplicable to these five patients.
>
> **THE COURT**: Because the Covid emergency had ended?
>
> **MS. ALUM**: Well, and none of the patients were diagnosed with Covid or had Covid-related health issues. … [W]e would argue that that newsletter only relates to Covid-related health concerns.

6/1/2026 Tr. at 29-30.

Counsel for the government further argued at that same hearing that:

> **MS. ELMILADY**: Your Honor, but the false statement in this situation that Dr. Bynon made was it affected the medical service, which is the crux of this case. Messing with the donor criteria basically affects the medical service he did not receive – they did not receive, whether it was a he or she, whichever one the patients were, and asserting that fact by adjusting the donor criteria then becomes a false statement in relation to a healthcare benefit. And what we're going to see is that –
>
> **THE COURT**: You mean it would have been okay if Dr. Bynon had said, this patient is too ill at the present time to receive an organ?
>
> **MS. ELMILADY**: Yes. ***But they weren't***. And the MRB decided that they weren't, and the MRB said this patient should be listed. Everybody agreed, and even Dr. Bynon agreed, in that meeting with those folks. And we have evidence and we have patient records that suggest that. Turning around unilaterally within a 24- to 48-hour period and changing it without telling the patient, without telling the staff, having a patient go in for a three- to four-month period, undergoing heart catheters, colonoscopies, scans. Every day that patient is waiting with her backpack hoping she's going to get a call because she thinks she's on the waitlist, undergoing medical services –
>
> **THE COURT**: Okay.
>
> **MS. ELMILADY**: I'm sorry.
>
> **THE COURT**: You're making a jury speech.
>
> **MS. ELMILADY**: No, I'm so sorry.

**THE COURT**: You're not really talking about –

**MS. ELMILADY**: I'm trying to explain is the false statement occurred for the benefits for the lack of the healthcare benefit, which was a lack of an organ. And during that interim period, where the false statement was made, where the patient thought that they were on the waitlist, that false statement caused that patient to undergo treatments at the hospital that – for just to stay on the waitlist. It wasn't for their health. It wasn't for them to get better. It was just to stay on the waitlist.

6/1/2026 Tr. at 32-33 (emphasis added).

Returning to the "literal" versus "contextual" falsity distinction, counsel for the government stated:

**MS. ALUM**: And we argue that the falsity of the statements alleged in the indictment are not contingent on how donor – I mean, it is evidence that's relative to this case, but the falsity and how others interpret it are two different issues.

**THE COURT**: It takes interpretation to understand whether something is true or false, especially since you're talking about ***implied assertions***.[3] So I'm not – I don't think I'm following your argument.

**MS. ALUM**: Well, the statements –

**THE COURT**: But do clarify.

**MS. ALUM**: Yes, Your Honor. The statements in this case were explicit statements that the patients required an organ from a small child. And context is relevant but on the face of it we argue that those are ***literal false statements***.

**THE COURT**: And the defense is saying maybe literally false, but in context it was justifiably false.

6/1/2026 Tr. at 46 (emphasis added).

Finally, counsel for the government addressed the issue of Dr. Bynon's point that he exercised medical judgment in placing the internal holds:

---

[3] *See United States v. Briggs*, 939 F.2d 222, 225-27 (5th Cir. 1991) (reversing bank-fraud conviction under 18 U.S.C. § 1344(a) based on *Williams v. United States*, 458 U.S. 279 (1982), and *United States v. Medeles*, 916 F.2d 195 (5th Cir. 1990), which vacated a similar conviction premised on the notion that by depositing checks, defendant Medeles "implicitly represented" that they were good).

> **MR. FRANKLYN**: … [N]ow this has become a case about the defendant saying that he … was using his medical judgment and objective criteria for the patients in reaching a medical judgment determination [about placing the internal holds] …. And just so the Court is clear, ***what we anticipate happening is we're actually going to show the absence of the factors that defendant said contributed towards his medical judgment taking place.***[4]

6/1/2026 Tr. at 57-58 (emphasis added).

In this Court's order denying Dr. Bynon's motion to dismiss the indictment, this Court reasoned that the evidence at that juncture did not foreclose the possibility that the government could prove a contextually or literally "false" statement by Dr. Bynon:

> To the extent Dr. Bynon argues that no additional evidence could change the meaning (or lack thereof) of a donor-acceptance-criteria adjustment, the court is not persuaded. Dr. Bynon argues that altering a patient's donor-acceptance criteria does not make a factual statement but merely anticipatorily rejects donor offers. (*See* Docket Entry No. 44 at 5 (citing UNOS, UNet Offer Filters, https://unos.org/technology/offer-filters/ (last visited May 18, 2026))). Such rejections are not statements, according to Dr. Bynon, but are instead acts similar to a "homeowner who wishes to avoid receiving offers on his or her home [by] placing the price so high that no buyer will make an offer," (Docket Entry No. 29 at 12 n.19), or an artist who offers his art for sale at a price so high that no one would purchase it, (Docket Entry No. 44 at 8). But Dr. Bynon's argument does not foreclose proof that by offering to sell a home or an artwork at a certain price, the sellers implicitly made a false statement about the value of the home or artwork. … If a homeowner lists a home, or an artist offers to sell a work, on a platform that requires list prices to accurately reflect the value of what is offered, then offering an inaccurate price could be a false statement. ***Similarly, if UNOS requires doctors to set donor-acceptance criteria that accurately reflect their patients' medical needs, then Dr. Bynon's inaccurate donor-acceptance criteria for specific patients, which allegedly sought child donors, could be a false statement about those patients, all of whom were adults***. …[5]

---

[4] Dr. Bynon attaches as **Sealed Exhibit A** his expert report, submitted by Dr. Sophoclis Alexopoulos, dated August 4, 2026. That report, which includes Dr. Alexopoulos's CV, presents a very different picture than the one portrayed by the government's comments.

[5] Dr. Bynon attaches as **Sealed Exhibit B** his expert report, submitted by Dr. Jesse Schold, dated August 5, 2026. (Dr. Bynon notes that the version produced to the government on August 4 did not have pagination, so we reproduced the same report dated August 5, with pagination.) That report, which includes Dr. Schold's CV, provides helpful factual context concerning how the donor acceptance parameters within the UNet system actually work. *See* Schold Report, at 3-4, 6-11.

> Dr. Bynon argues that the United States is "stuck in its erroneous belief that Dr. Bynon made factual representations about his patients in UNet when he adjusted donor criteria." (Docket Entry No. 44 at 4 n.4). ***But a statement about potential donors can communicate facts about the potential recipient***. ***If a doctor sets the donor criteria to require liver donors, the doctor's actions may imply that the patient is ill in a way that requires a new liver***. In some contexts, the doctor's actions may not support such a "clear" "implied representation." ... Because the issue is contextual, it is not amenable to resolution on a motion to dismiss. …
>
> The parties will likely present evidence at trial about the UNOS guidance, policies, and donor-acceptance criteria and how Dr. Bynon and other professionals applied them. (See Docket Entry Nos. 51, 52, 53, 55). The court cannot make preliminary findings and conclusions about core trial disputes, especially on an incomplete record. …
>
> By setting donor-acceptance criteria for a particular patient, a doctor may state an opinion about what organ donors are medically appropriate for that patient at that time. That opinion could be false if the doctor did not subjectively believe that the selected donor-acceptance criteria were medically appropriate. … ***The United States may try to prove that Dr. Bynon made a false statement with evidence showing that: (1) by setting the donor-acceptance criteria, Dr. Bynon stated an opinion "that his adult-aged patients actually needed the organs of a small child" when (2) he did not subjectively believe that opinion to be true. (Docket Entry No. 43 at 8 n.2). Or the United States may try to prove that: (1) the donor-acceptance criteria communicated that Dr. Bynon believed "his patients were not healthy enough to accept a transplant" when (2) he knew or thought they were "healthy enough to do so." (Id. at 9 n.3). Although Dr. Bynon's medical judgments are largely insulated from § 1035 liability, narrow triable factual issues remain***.
>
> For these reasons, the court denies Dr. Bynon's motion to dismiss the indictment because he did not make a false statement

*United States v. Bynon*, __ F. Supp. 3d __, 2026 WL 1595296, at *6 & n.3 (S.D. Tex. June 3, 2026) (emphasis added).

At the June 8, 2026 scheduling conference, the government's announced theory of its case was that Dr. Bynon's internal holds were false statements or entries because they were "contextually" false – insofar as Dr. Bynon's adjustments were conveying the message that the five transplant patients were not "medically … capable of withstanding the transplant procedure, surviving, and thriving" when, in fact, they were. Tr. of June 8, 2026 Scheduling Conference at 7

("Tr."). In announcing this position, counsel for the government repeatedly promised this Court that the government would offer expert testimony to support this theory of falsity:

> **MR. FRANKLYN**: … [O]f course we can't definitively prove what [Dr. Bynon] knew [when he placed the internal holds]; we can only prove, like the Court said, contextually, and contextually, yes, the evidence will show that there was no documented change in the medical records or anything else that would suggest a changing of the health condition for these patients when Dr. Bynon changed the medical criteria.
>
> **THE COURT:** Well, is the Government going to prove at trial, or try to prove at trial, that each of the five patients were, in fact, healthy enough to accept a transplant at the time that this internal hold, whatever label you want to put on it, was in effect, and that Dr. Bynon thought they were healthy enough to accept the transplant?
>
> **MR. FRANKLYN:** Yes. When the medical review board collectively decided that they were at the point where they should be on the transplant list there was no change. And, again, the only reason I'm saying "healthy" is because – yeah, they're technically not healthy to be on the list, of course, and so but they were eligible for the transplant at that point in time. …
>
> **THE COURT:** Okay. ***And you'll have a medical expert to opine as to that***?
>
> **MR. FRANKLYN:** ***Yes, Your Honor. Yes***.
>
> **THE COURT:** ***For each of the five patients, you're going to have a medical expert saying Dr. Bynon's adjustment of the criteria was wrong, not just false, but wrong because, in fact, medically they were – they were capable of withstanding the transplant procedure, surviving, and thriving?***
>
> **MR. FRANKLYN:** ***Yes, ma'am***.[6]

6/8/2026 Tr. at 6-7 (emphasis added).

[6] At the same hearing, however, the government began retreating. Asked whether its expert would in fact testify that the patients would have survived and thrived, the government conceded it was "not sure we can offer an expert who will say they would have thrived," and acknowledged the question was "tricky." 6/8/2026 Tr. at 11. This Court immediately identified the significance of the answer: "I think that's Dr. Bynon's point, that it's tricky." *Id.*

Counsel for the government then stated that the government also would offer a separate expert witness to testify about UNOS and its relevance to the government's theory of falsity:

> **THE COURT**: So you're going to have one expert talk about the medical condition of the patients and the other expert talk about how UNOS works. Is that accurate?
>
> **MS. ELMILADY**: UNOS and HRSA, and the way that things are input into the system, and what is the – [UNOS's April 2020] guidance will come up, of course, the Covid guidance, and, you know. So we'll provide the report to the Court so you could understand the full capacity of what they're going to discuss as well.
>
> **THE COURT**: Okay. Hang on. So you got two separate experts[?]
>
> **MR. FRANKLYN**: Yes.

6/8/2026 Tr. at 13.

After the June 8th hearing, the government designated Dr. Matthew Cooper and Dr. Raymond Lynch as its experts.

Now, several weeks later, after receiving Dr. Bynon's *Daubert* motions and expert reports, the government has announced that it will ***not*** call its two experts during its case-in-chief. ECF Nos. 116 & 118. The government has reneged on its commitments made to this Court on June 8th – that experts would prove (1) patient by patient, that Dr. Bynon's adjustments were "false" because the patients were "capable of withstanding the transplant procedure" and "surviving" (but perhaps not "thriving"), and (2) OPTN/UNOS policy prohibited Dr. Bynon's internal holds.

## II.
## The Government's Textually Unmoored and Shifting Theory of Falsity Confirms the Need for a Bill of Particulars

The need for particulars is highlighted by the government's own difficulty in identifying what "statement" Dr. Bynon supposedly made and why it is "false." The only entries Dr. Bynon made in the UNet system are the standardized UNOS donor-acceptance parameters — including the field labeled "Maximum acceptable donor age." Those entries are not a representation about

any patient's medical condition. On their face they are an exclusionary instruction: they preclude offers above the selected age. Setting a "[m]aximum acceptable donor age" of "8" no more asserts that a patient "needed the organ of a small child" than setting that field to "80" asserts that the same adult patient "needed the organ of an eighty-year-old." The field literally *excludes* everything above the "maximum" age and asserts nothing about what lies below it.

The government's theory of falsity depends entirely on rewriting those screening entries. To manufacture a "false statement," the government converts the phrase "Maximum acceptable donor age" into the very different proposition—that Dr. Bynon represented that "his adult-aged patients actually needed the organs of a small child." Not one word of that supposed statement appears anywhere in the UNOS donor-acceptance criteria. The government has, in effect, drafted the statement it intends to prove "false" and then attributed it to Dr. Bynon.

The incoherence of that approach is exposed by its own logic. The companion field — "Minimum acceptable donor age," set at "0 months" — never changed. If entering a maximum of "8" is an assertion that the patient "needed" a child's organ, then every criteria range beginning at "0 months" carries the same implication regardless of the maximum: a range of 0 months to 80 years would simultaneously "state" that the adult patient "needed" the organ of an eighty-year-old, an eight-year-old, an eight-month-old, and an eight-week-old. That result demonstrates that the criteria are not assertions susceptible to "truth" or "falsity" analysis at all. The only rational literal reading is exclusionary — screening out offers above the selected maximum.

This is not an academic quarrel; it is the reason the defense cannot presently identify the charge it must meet. The government has variously characterized the same entries as "literally" false, "contextually" false, "both," "affirmative misrepresentations about the patients," and "explicit statements." It promised expert proof that the five patients were "capable of withstanding

the transplant procedure" and "surviving," and that OPTN/UNOS policy prohibited internal holds — then withdrew both experts from its case-in-chief. *See* ECF Nos. 116 & 118. What remains is a theory of falsity untethered from the entries actually made and unsupported by the evidence the government represented it would offer. Rule 7(f) exists to require the government, in precisely these circumstances, to commit to a definite theory — literal or contextual, and on what factual basis — so that Dr. Bynon is not left to guess.[7]

## III.
## Legal Argument

"The purposes of a bill of particulars are to obviate surprise at trial, enable the defendant to prepare his defense with full knowledge of the charges against him, and to enable double jeopardy to be pled in case of a subsequent prosecution." *United States v. Mackey*, 551 F.2d 967, 970 (5th Cir. 1977). This Court has discretion to require the government to disclose a bill of particulars. *Id.; accord United States v. Boswell*, 109 F.4th 368, 383-84 (5th Cir. 2024).

In view of the government's repeated moving of the goal posts in this case, Dr. Bynon is entitled to know – before the trial begins – the legal and factual bases supporting the government's theory of how Dr. Bynon made "false," "fraudulent," or "fictitious" statements or entries in the UNet system. At this point, the defense cannot ascertain what it must defend against in the government's case-in-chief: "Literal" falsity? "Contextual" falsity? Both? And based on what legal theory and on what factual basis? Without offering the promised expert testimony in its case in chief about (1) the five patients' medical conditions and (2) OPTN/UNOS policy about the use

[7] Dr. Bynon does not, by this motion, seek a ruling on falsity. Whether the criteria adjustments are "statements" or "entries" susceptible to a truth/falsity analysis, and whether — if they are — they are "literally true" rather than "literally false," are matters Dr. Bynon will press in his forthcoming renewed motion to dismiss.

of internal holds, the prosecution appears to have fundamentally changed its theory of falsity (yet again) – but has not given any indication of the legal and factual bases of that new theory.

Under these highly unusual circumstances, the defense is entitled to a sufficiently detailed statement from the prosecution before trial – now nearly two weeks away – about (1) its specific theory of falsity and (2) how it will prove it without offering any of the promised expert testimony in its case in chief.

## CONCLUSION

For these reasons, this Court should order the government to provide the defendant with a bill of particulars setting forth the factual and legal bases of Dr. Bynon's putative "false, fraudulent, and fictitious" statements and entries when he allegedly violated 18 U.S.C. § 1035(a)(2) as set forth in the indictment. In addition, for the reasons stated in the Certificate of Conference, Dr. Bynon seeks leave of the court to file this Second Motion for a Bill of Particulars.

Respectfully submitted,

/s/ *Samy Khalil*
Samy Khalil
Texas Bar No. 24038997
John Kinchen
Texas Bar No. 00791027
**KHALIL KINCHEN LLP**
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
713.904.4477
samy@khalilkinchen.com
john@khalilkinchen.com

Brent Evan Newton
Attorney at Law
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, Maryland 20878
202.975.9105
brentevannewton@gmail.com

*Attorneys for Dr. Steve Bynon*

## CERTIFICATE OF CONFERENCE

On August 7, 2026, I conferred with counsel for the government, who said that it could not take a position on this motion without reviewing the motion first. Undersigned counsel takes that to mean that the government presumptively opposes this motion. Counsel for the government also noted that Federal Rule of Criminal Procedure 7(f) provides that a defendant may "move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits." Accordingly, Dr. Bynon seeks leave of the Court to file this motion.

/s/ *Samy Khalil*
Samy Khalil

## CERTIFICATE OF SERVICE

On August 7, 2026, I served a copy of this pleading via ECF to counsel for the government.

/s/ *Samy Khalil*
Samy Khalil