**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 4:26-cr-00023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**<u>DEFENDANT'S OMNIBUS MOTION IN LIMINE</u>**

Dr. Steve Bynon, through counsel, respectfully moves in limine for a series of related orders directed at a single risk: that this jury will be invited to decide the case on sympathy, outrage, and the assumption that a crime occurred, rather than on the elements the government must prove.

This is a false-statement prosecution. To convict, the government must prove beyond a reasonable doubt that Dr. Bynon (1) made knowing and willful false statements (2) material to a health care benefit program (3) in connection with the delivery of or payment for health care benefits, items, or services. *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017); *see* 18 U.S.C. § 1035(a)(2). The charged statements are five entries of donor age and weight criteria into UNOS's UNet system between February 2023 and March 2024. Nothing about those elements turns on how the five patients or their families felt, what became of them medically, or what a professional committee concluded about the Memorial Hermann liver program months after the charged conduct ended.

The government's own theory confirms that the patients had no part in the charged conduct. Its trial brief emphasizes that Dr. Bynon "informed no one of this unilateral manipulation, including [the patient] and his transplant coordinator," and that his reasons were "entirely unknown to his patients." ECF No. 96 at 6, 10. The patients did not make, hear, see, or participate in the entries at issue. They cannot testify to them.

What the patients and their families can do is make the jury feel something – and the government's pretrial disclosures show that is precisely the plan. Its witness list designates each patient as "Victim" and, for the counts involving patients who have since died, substitutes a "Relative of Victim" and a "Friend of Victim." ECF No. 125 at 2 (Witnesses 12-17). Its exhibit list offers a photographic portrait of each of the five patients. ECF No. 90 at 3 (Exhibits 35-39). Its trial brief tells the jury the patients "had no recourse," that they "could have elected to spend their final days at home surrounded by family and friends," and that Dr. Bynon "lured his patients into a state of complacency." ECF No. 96 at 10-11. And it has reserved the right to put before the jury the findings of OPTN's Membership and Professional Standards Committee (MPSC) – an outside body's after-the-fact assessment of Dr. Bynon's conduct.

This Court has already recognized the danger and acted on it once, entering a limine order "precluding counsel, the parties, and witnesses from mentioning the patients' subsequent adverse health events, transplants, or deaths, and evidence that Dr. Bynon made certain medical decisions unilaterally, without first approaching the bench outside the venire's or the jury's presence and obtaining leave to do so." *United States v. Bynon*, ___ F. Supp. 3d ___, 2026 WL 1595296, at *13 (S.D. Tex. June 3, 2026), ECF No. 62 at 26. The orders requested here give that ruling practical effect and close the avenues by which the excluded material would otherwise reach the jury.

The government superseded on August 12, 2026, adding two paragraphs directed at the willfulness element. Superseding Indictment ("SSI") ¶¶ 20-21. Those paragraphs do not weaken the requests below; they sharpen them. Paragraph 20 re-pleads the allegation that the criteria changes were "made unilaterally by BYNON," which is one of the two categories of allegation this Court's limine order already covers. And paragraph 21 commits the government, for the first time, to a theory of willfulness built entirely on undisclosed departure from institutional policy and

practice – a theory in which the patients' outcomes, their families' losses, an outside committee's after-the-fact conclusions, and any suggestion of personal financial gain play no part.

Specifically, Dr. Bynon asks the Court to enter orders:

(1) limiting the five patients and their relatives to relevant matters within their personal knowledge, and precluding them from offering opinions of their own regarding medical suitability for transplantation, testimony about their post-adjustment medical course or outcomes, victim-impact testimony, and characterizations of Dr. Bynon's conduct or motive;

(2) precluding testimony or argument about what a patient would have done had he or she been told of the criteria adjustments;[1]

(3) excluding the photographic portraits of the five patients, Government Exhibits 35–39;

(4) precluding the government, its counsel, and its witnesses from referring to the patients as "victims" in the presence of the venire or the jury;

(5) precluding witnesses from characterizing the UNet entries as "lies" or "deception";

(6) excluding evidence and argument concerning the 2024 OPTN MPSC review and the inactivation of the Memorial Hermann liver transplant program;

(7) excluding evidence and argument that Dr. Bynon was autocratic, vindictive, retaliatory, or intimidating toward colleagues and staff, or that his program suffered from a culture of intimidation or retaliation;

(8) precluding any suggestion that Dr. Bynon acted for personal financial gain absent a proffer outside the jury's presence;

---

[1] Notably, even patients who are "inactivated" formally via Status 7 are not required under OPTN policy to be notified. *See* Health Services and Resources Administration (UNOS's Policy Department), *Public Comment Proposal Require Patient Notification for Waitlist Status Changes*, Oct. 2025, https://www.hrsa.gov/optn/policies-bylaws/public-comment/require-patient-notification-for-waitlist-status-changes (accessed Aug. 15, 2026).

(9) and precluding argument that Memorial Hermann's billing to Medicare constituted a financial "fraud" on Medicare.

In support, Dr. Bynon would show the following:

## I.
## The Court Should Limit the Testimony of the Five Patients and Their Relatives to Matters Within Their Personal Knowledge

The government has listed six lay witnesses drawn from the five charged counts: two patients identified as "Victim," a third patient, a "Friend of Victim," and two "Relative[s] of Victim." ECF No. 125 at 2. Their testimony should be confined to matters they actually perceived that bear on an element of § 1035(a)(2). None exists.

First, the patients have no personal knowledge of the charged act. The charged "statement" is a criteria-adjustment into UNet. A patient does not make that entry, is not shown it, and – on the government's own account – is not told of it. ECF No. 96 at 6, 10. A witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. No patient can supply that foundation, because there is nothing about the entries the patients perceived.

Second, the patients and their relatives are not competent to opine on the disputed medical question at the center of the case. Whether a given patient was, at a given moment in 2023 or 2024, an appropriate candidate to accept a liver offer is a specialized medical judgment. It is the question the government has retained a medical expert to address. *See* ECF No. 89. A patient's belief that he was "ready" for a transplant, or a relative's belief that a transplant would have saved her family member, is not "rationally based on the witness's perception" and rests squarely on "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(a), (c). Rule 701(c) was added in 2000 "to eliminate the risk that the reliability requirements

set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendments. The patients and their families have not been designated as experts and could not be qualified as such.

Third, testimony about what happened to the patients after the adjustments is already excluded. This Court held that "the probative value of evidence of the patients' deaths or adverse health events is substantially outweighed by its prejudicial impact," and that evidence of subsequent transplants elsewhere is substantially outweighed by "its prejudicial impact, confusion of the issues, and undue delay through minitrials on the patients' health after they left Dr. Bynon's care . . . ." 2026 WL 1595296, at *12, ECF No. 62 at 25-26. A patient called to the stand cannot describe his medical course from 2023 forward without traversing that ruling, and a relative called in place of a deceased patient cannot testify at all without the jury drawing the excluded inference.

Fourth, no lay witness may characterize Dr. Bynon's conduct or state of mind. Whether Dr. Bynon acted deceptively, indifferently, or for an improper reason is the willfulness element. It is not something a patient perceived. Testimony that Dr. Bynon "lied to me," "didn't care," or "was hiding something" is argument disguised as factual testimony, and it invades the jury's province. Fed. R. Evid. 602, 701(a); *cf.* Fed. R. Evid. 704(b) (barring even a qualified expert from stating an opinion on "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged," because "[t]hose matters are for the trier of fact alone"). What Rule 704(b) denies an expert, Rule 701 does not supply to a layperson.

Finally, the composition of the government's witness list is itself a Rule 403 problem. For the counts involving patients who are alive, the government calls the patient. For Counts 3 and 5, it calls a relative. ECF No. 125 at 2. The jury does not need to be told why the substitution

occurred; the asymmetry accentuates it. The government thus proposes to communicate, through the structure of its case, the very fact this Court excluded under Rule 403.

The SSI does not change this analysis. Its new paragraphs allege that the criteria changes were "not disclosed to the patients" and refer to "the lack of transparency to fellow physicians, staff and patients." SSI ¶¶ 20-21. To the extent the government contends those allegations make patient testimony necessary, they do not. Non-disclosure is provable through other means, including medical records and the members of the transplant team – the people the government says "reasonably would have expected to know about it." *Id.* ¶ 20.

Dr. Bynon therefore requests an order limiting the testimony of the five patients and their relatives to matters within their personal knowledge that are *relevant* to an element of the charged offense, and excluding: (a) opinions on a patient's medical suitability for, or likely benefit from, transplantation; (b) testimony concerning a patient's medical course, deterioration, transplantation, or death after the criteria were adjusted; (c) testimony concerning the emotional, financial, or familial consequences of those events; and (d) characterizations of Dr. Bynon's knowledge or motive. To the extent the government contends that any of these witnesses possesses personal knowledge relevant to an element, it should identify that testimony in advance so that its admissibility and prejudice may be resolved outside the presence of the jury.

## II.
## The Court Should Preclude Testimony and Argument About What the Patients Would Have Done Had They Been Told

The government's trial brief previews a distinct theory of harm built entirely on counterfactuals. It tells the Court that the patients "had no recourse to remedy whatever obstacle that, in [Dr.] Bynon's mind, prevented transplantation"; "[t]hey could have completed additional medical treatments at MHHS or transferred to another transplant program"; "[o]r, they could have

elected to spend their final days at home surrounded by family and friends instead of opting for the transplantation surgery." ECF No. 96 at 10–11. It closes the passage with an extended metaphor about a silent fire alarm and a burning building. *Id.* at 11.

That material should not reach the jury through any witness, and the government should not be permitted to argue it in voir dire or opening.

**A. What a patient would have chosen is not an element.**

Section 1035(a)(2) asks whether a person made a knowing and willful false statement, material to a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. What a patient would have chosen in a hypothetical world in which he possessed information he never had is not falsity, is not the statutory connection, and is not willfulness. Nor does it bear on the element of materiality ***in this case***, which is measured objectively by whether a statement has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995), in turn quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). The decisionmaking body here is ***Medicare*** – not the patient. The SSI confirms the point. Its new paragraphs plead non-disclosure as a circumstance from which the jury may infer intent – not patient reliance, patient decision-making, or patient harm as elements to be proved. SSI ¶¶ 20-21.

**B. What a patient would have chosen is speculation.**

A witness may testify to what he perceived. Fed. R. Evid. 602. He may offer an opinion only if it is "rationally based on [his] perception." Fed. R. Evid. 701(a). No one perceives a road not taken. Asking a patient what he "would have done" had he known of an internal hold in 2023 asks him to construct, from three years' hindsight and the knowledge that he is testifying for the

prosecution, a decision he never actually faced. That is not evidence of anything. It is a "victim impact" statement in search of a crime that the prosecution must affirmatively prove.

It cannot be given in a form that complies with this Court's existing order. A patient cannot explain what he would have done differently without explaining what in fact happened to him instead. A relative cannot testify that her family member would have chosen to "spend [his] final days at home" without telling the jury that he died. The government's counterfactual theory is, functionally, a delivery mechanism for the outcome evidence this Court excluded. 2026 WL 1595296, at *12, ECF No. 62 at 25-26.

### C. The prejudice is extreme.

"Spend their final days at home surrounded by family and friends" is not a fact to be proved. It is a closing argument about death, delivered from the witness stand by the people who lost someone. Rule 403 squarely forbids it. *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997).

Dr. Bynon requests an order precluding the government, its counsel, and its witnesses from eliciting or arguing what any patient or family member would have done, decided, or chosen had the donor-acceptance criteria adjustments been disclosed to them.

## III.
## The Court Should Exclude the Photographs of the Patients

The government's exhibit list includes a "Photographic Image" of each of the five patients. ECF No. 90 at 3 (Exhibits 35-39). Those exhibits should be excluded under Rules 401, 402, and 403.

The photographs prove nothing. Identity is not in dispute. No count turns on recognizing a face, and the government has not suggested that any witness will be asked to identify anyone from a photograph. The patients are identified in the indictment, in the UNet records, and in the Memorial Hermann charts the government has already listed as exhibits. *See* ECF No. 90 at 2-3

(Exhibits 12-13, 16-17, 20-23, 26-27). A portrait adds no fact of consequence. Fed. R. Evid. 401, 402.

What the photographs do is give the jury five faces to hold in mind while it decides whether a surgeon committed a crime. That is their entire function, and it is an improper one. "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief*, 519 U.S. at 180 (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C.App., p. 860). Where an exhibit has no probative value at all, *any* risk of unfair prejudice is enough to require exclusion under Rule 403.

The concern is underlined here for two reasons. First, the government has already labeled each patient a "Victim," and a photograph is the most efficient – and inflammatory – possible vehicle for that label. Second, as to the patients who have died, admitting an in-life portrait accomplishes indirectly what this Court's limine order forbids directly. 2026 WL 1595296, at *13 (ECF No. 62 at 26). If the government articulates some genuine identification purpose, Dr. Bynon will stipulate to the identity of each patient, which removes any conceivable need for the exhibits.

## IV.
## The Court Should Preclude Use of the Term "Victim"

The government's witness list does not describe these individuals as patients or witnesses. It describes them as "Victim – Count 1," "Victim – Count 2," "Relative of Victim – Count 3," "Victim – Count 4," "Friend of Victim – Count 4," and "Relative of Victim – Count 5." ECF No. 125 at 2. The label is not incidental; it is affixed count by count.

The label presupposes that, even if Dr. Bynon knowingly and willfully made a false statement (he did not), a cognizable harm followed. Federal law confirms as much: a "crime victim" is "a person directly and proximately harmed as a result of ***the commission of a Federal offense*** . . . ." 18 U.S.C. § 3771(e)(2)(A) (emphasis added). Whether "the commission of a Federal

offense" occurred is what is at issue at trial – no more, no less. The term therefore carries within it the conclusion the jury is empaneled to reach. To let the government and its witnesses use it before the jury has decided anything is to assume that conclusion, and to do so in the voice of the party carrying the burden of proof.

That is a due process problem, not merely a stylistic one. The government must prove every element beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 364 (1970), and the Due Process Clause "must be held to safeguard 'against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.'" *Taylor v. Kentucky*, 436 U.S. 478, 486 (1978) (quoting *Estelle v. Williams*, 425 U.S. 501, 503 (1976)). The Supreme Court has "declared that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Id.* at 485. The presumption of innocence does that work by "caution[ing] the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced." *Id.* at 484–85 (quoting 9 J. Wigmore, Evidence § 2511 (3d ed. 1940)). A label that announces, every time a witness is called, that a crime was committed and that this person was its casualty can't be reconciled with that principle. And Rule 403 forbids it: the term carries no probative value a neutral reference lacks, and its tendency to "suggest decision on an improper basis" is what the Rule exists to check. *Old Chief*, 519 U.S. at 180.

A district court in the Fifth Circuit recently observed that "reference to an individual as a 'victim' is unfairly prejudicial as it 'encourage[s] the jury to find guilt from improper reasoning,' *i.e.*, due to the implication that a crime has already been committed by" the defendant. *United*

*States v. August*, 590 F. Supp. 3d 972, 976 (W.D. Tex. 2022) (quoting *United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005)); *see also United States v. Hollington*, 2023 WL 4315747, at *8 (M.D. Fla. 2023) ("Because [the defendant] is not charged with crimes against the patients, the Government's use of the term continually throughout trial risks unduly prejudicing" the defendant).

The requested relief is modest and costs the government nothing. Neutral references are readily available: the patients' names, "the patients" or "the individuals." Dr. Bynon requests an order directing the government, its counsel, and its witnesses to refrain from referring to the five patients as "victims" in the presence of the venire or the jury; directing counsel to instruct its witnesses accordingly before they testify; and directing the government to serve an amended witness list that removes the designation, so that the label is not published to the jury with the trial exhibits.

## V.
## The Court Should Preclude Witnesses from Characterizing the UNet Entries as "Lies" or "Deception"

The government's vocabulary in its pretrial filings is unmistakable. Of a single criteria adjustment it writes: "This statement is a lie." ECF No. 96 at 6. Throughout, the entries are made "in secret"[2] by Dr. Bynon, by which he "lured his patients into a state of complacency by lying about the profiles of suitable donors." *Id.* at 6, 10–11.

The government – perhaps – may be entitled to argue that characterization to the jury in closing, ***after the evidence is in***. It is not entitled to have its witnesses testify to it. The difference

[2] Interestingly, the government apparently intends to limit Dr. Bynon's ability to counter its "secretive" argument. Rather than recognizing the obvious relevance to his defense (*see* ECF No. 55 at 6-14 (sealed); ECF No. 97 at 6-14 (redacted)), it intends to exclude any reference to patients outside of the five in the indictment showing there was no "grand secret." *See* **Exhibit A**, at #6 (Aug. 13, 2026 email from AUSA S. Elmilady to defense counsel). Indeed, when asked early on in this case for precisely this information,

matters. A fact witness may describe what an entry said, when it was made, what the system did in response, and what the witness observed. He or she may not tell the jury that the entry was "a lie," a "manipulation," or an act of "deception." Each of those words is a conclusion on a contested element – falsity or intent – expressed as though it were an observation. *See* Fed. R. Evid. 602, 701(a); *cf.* Fed. R. Evid. 704(b) (in a criminal case, an expert "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," because "[t]hose matters are for the trier of fact alone").

In particular, the government will call FBI Special Agent Cooper Ferreira as its case agent. ECF No. 125 at 1 (Witness 8). Juries give particular weight to a testifying case agent, and the temptation for such a witness to narrate and characterize rather than describe is well known. *See United States v. Haines*, 803 F.3d 713, 731-32, 734 (5th Cir. 2015) (addressing the risks that arise when a case agent testifies in a dual fact and expert capacity); *cf.* Fed. R. Evid. 701 advisory committee's note to 2000 amendments (describing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997), as holding that "law enforcement agents testifying that the defendant's conduct was consistent with that of a drug trafficker could not testify as lay witnesses"). The government will also call four former Memorial Hermann and UT Health physicians and two former transplant coordinators. ECF No. 125 at 1–2 (Witnesses 1-5, 18). They are fact witnesses, and the government has not designated any as an expert.

That designation controls what they may say. The 2000 amendment "does not distinguish between expert and lay witnesses, but rather between expert and lay testimony," and "makes clear that any part of a witness's testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the

---

the government insisted that such material did not constitute *Brady* evidence. *See* **Exhibit B** (Apr. 10, 2026 email from AUSA S. Daniel to defense counsel). The government appears poised to persist in that position.

corresponding disclosure requirements of the Civil and Criminal Rules." Fed. R. Evid. 701 advisory committee's note to 2000 amendments. So if any of these witnesses is asked whether Dr. Bynon's entries were false, improper, or contrary to accepted transplant practice, the question calls for testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). The government has neither disclosed such opinions under Rule 16 nor carried its burden of demonstrating "to the court that it is more likely than not" that the conditions of Rule 702(a)–(d) are satisfied. Fed. R. Evid. 702. The amendment exists precisely to prevent a party from "evad[ing] the expert witness disclosure requirements set forth in ... Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee's note to 2000 amendments.

Dr. Bynon requests an order (a) precluding the government's witnesses from characterizing the donor-acceptance-criteria adjustments as "lies," "lying," "manipulations," "deception," or "fraud," or from opining or speculating that Dr. Bynon acted improperly, deceptively, or with knowledge of wrongdoing; (b) directing counsel to instruct its witnesses accordingly; and (c) precluding counsel from using those characterizations during voir dire and opening statement, before any evidence has been received. Nothing in this request limits the government's ability to (properly) argue from the evidence in closing.

## VI.
## The Court Should Exclude Evidence and Argument Concerning the 2024 MPSC Review and the Inactivation of the Memorial Hermann Program

In March 2024 – at the end of the charged period – OPTN received an anonymous report concerning the Memorial Hermann liver transplant program. What followed was an administrative peer-review process: correspondence from UNOS to Memorial Hermann on March 22, 2024; an "informal discussion" before the MPSC on March 28, 2024, including recorded committee

deliberations; the program's voluntary inactivation on April 10, 2024; a site visit by OPTN peer-review volunteers in May 2024; a written review report; and a final letter to Memorial Hermann in September 2024. The government has listed the resulting materials as Exhibits 4-10 and 44. ECF No. 90 at 1, 4. Its expert notice describes the MPSC as having "substantiated unusual patterns of changes to donor acceptance criteria for liver waitlist candidates" and expressed "strong concerns about the conduct of Dr. Bynon." ECF No. 89 at 6.

Dr. Bynon has separately moved to exclude expert testimony transmitting these findings. ECF Nos. 99, 103. He now moves in limine to exclude the underlying exhibits and any testimony about the review, from any witness, for four independent reasons.

**A. The MPSC's findings are inadmissible hearsay.**

The MPSC's conclusions are out-of-court statements that the government would offer for their truth – that Dr. Bynon's criteria changes were "unusual," unjustified, and cause for "strong concern." Fed. R. Evid. 801(c), 802. No exception applies. Rule 803(8)(A)(iii) admits "factual findings from a legally authorized investigation" only "in a civil case or ***against*** the government in a criminal case." The Rule affirmatively forecloses the use the government contemplates here.

**B. Admitting the findings through a witness who did not make them would violate the Confrontation Clause.**

If the government seeks to place the MPSC's conclusions before the jury through a witness who did not participate in the review, it runs directly into *Smith v. Arizona*, 602 U.S. 779 (2024). A witness may not serve as a conduit for an absent declarant's testimonial statements offered for their truth. *Id.* at 783, 800; *see Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Neither Dr. Lynch nor Dr. Cooper conducted the interviews, observed the site visit, or evaluated the underlying records; neither can "simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d

179, 197 (2d Cir. 2008) (citing *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)). The same is true of any fact witness asked to relate what the committee concluded.

**C. The findings post-date the charged conduct and shed no light on Dr. Bynon's state of mind.**

The SSI charges conduct from February 2023 through March 2024. Every step of the MPSC process – the report, the discussion, the inactivation, the site visit, the findings – occurred after that period. A committee's retrospective assessment cannot have informed what Dr. Bynon knew or intended when he made the entries, and it therefore cannot be probative of the willfulness element. Fed. R. Evid. 401, 402.

Nor is Memorial Hermann's voluntary inactivation of its liver program probative of anything Dr. Bynon did. That was an institutional decision by a hospital system facing regulatory and reputational scrutiny, made by people other than the defendant, for reasons the jury would have to guess at. Offering it as evidence invites precisely the inference Rule 403 forbids: that because an institution reacted, an individual must be guilty.

**D. The SSI's new allegations do not make the findings admissible.**

Paragraph 21 of the SSI alleges that Dr. Bynon's actions were not undertaken "pursuant to, or in good-faith compliance with, any identified transplant policy" from Memorial Hermann, the University of Texas Health Science Center, HRSA, CMS, or OPTN, or "stated in 42 Code of Federal Regulations Part 482 Subpart E." The government may read that paragraph as a warrant to prove what those policies required by putting the MPSC's conclusions before the jury. It is not.

Policies prove their own content. What Memorial Hermann's and OPTN's policies required during 2023 and early 2024 is established by the policies themselves, which the government has already listed as exhibits. *See* ECF No. 90 at 1-4 (Exhibits 1-3, 11, 33, 42, 45). A peer-review committee's 2024 assessment of one program's conduct is not evidence of what

those documents said, and it is not a conclusion the government may import from another proceeding in which he had no right to confront anyone.

The Court should also note what paragraph 21 now places at the center of the case. That paragraph expressly invokes 42 C.F.R. Part 482, Subpart E – which is the subject of Dr. Bynon's pending motion in limine. *See* ECF No. 91. The disposition of that motion governs here as well. If the government may not prove alleged violations of Part 482, Subpart E directly, it may not prove them indirectly through an administrative committee's findings about them.

**E. Rule 403 independently requires exclusion.**

Telling this jury that MPSC reviewed *this* conduct and expressed "strong concerns about the conduct of Dr. Bynon" does not help it decide whether a false statement was made. It tells the jury that the question has already been answered by people who know more than it does. That is the paradigm of "decision on an improper basis." *Old Chief*, 519 U.S. at 180.

Furthermore, testing the findings would require a trial within the trial: what evidence the committee reviewed, what standard it applied, what procedures it followed, who spoke to it, what Memorial Hermann told it and why, and what role the anonymous report played. This Court has already identified "confusion of the issues[] and undue delay through the presentation of patient-specific minitrials" as reasons to exclude related evidence. ECF No. 62 at 26. The same reasoning applies here.

**F. The government's conditional intentions are not a substitute for a ruling.**

The government has told the Court that any "testimony regarding causation and the 2024 [MPSC] investigation will depend on Bynon's case-in-chief," ECF No. 118 at 1, 4, 6, and that the relevance of the MPSC investigation "is contingent on the defendant's case-in-chief," ECF No.

116 at 5, 9. That is not a concession; it is a reservation. Dr. Lynch remains designated, his report remains operative, and the exhibits remain on the government's list.

Moreover, a stated intention – especially in this case – binds no one and is revocable at will; only an order provides the certainty the parties need to try this case. Second, the government's premise – that Dr. Bynon's defense will unlock this material – is wrong as a matter of law. Evidence that is inadmissible hearsay, that violates the Confrontation Clause, and that fails Rule 403 does not become admissible because the defendant puts on a case. This Court has already made the related point in declining to defer the *Daubert* hearing on the government's experts: the government "cannot use rebuttal 'as a continuation of the case-in-chief,'" and "cannot delay calling Dr. Lynch and Dr. Cooper until rebuttal to testify as to issues that are clearly central to, and likely to be raised in, the government's case in chief." ECF No. 124 at 1–2 (quoting *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991)).

Dr. Bynon requests an order excluding Government Exhibits 4 –10 and 44, and precluding the government, its counsel, and its witnesses from referring to the 2024 MPSC review, its findings or conclusions, the OPTN site visit or review report, or the inactivation of the Memorial Hermann liver transplant program, without first approaching the bench outside the presence of the venire and the jury and obtaining leave of Court.

## VII.
## The Court Should Exclude Evidence and Argument That Dr. Bynon Was Autocratic, Vindictive, or Intimidating Toward Colleagues and Staff

Alongside the charged conduct, the government has assembled a substantial body of material about what it was like to work with Dr. Bynon. The anonymous report that began the 2024 review asserts that "[s]everal surgeons have left the program over the past few years reportedly due to vindictive behavior from Dr. Bynon," that "Liver Patient selection conferences

operate as a total autocracy, with no flexibility of indications/contraindications or advocacy from hepatology," and that complications are "processed in an opaque manner." ECF No. 96 at 7-8 (quoting Gov't Ex. 4). The OPTN's public statement about the review recites "a culture of intimidation and retaliation for reporting potential problems." ECF No. 99 at 4. And the government's case-in-chief list is composed almost entirely of former colleagues—four former Memorial Hermann and UT Health transplant physicians and a former transplant coordinator—together with their text messages and e-mails. ECF No. 125 at 1; ECF No. 90 at 2 (Gov't Exs. 14, 18, 19, 25).

Dr. Bynon does not ask the Court to sanitize the record. The witnesses who worked with him may describe what they saw and did: what a criteria field showed, what was said at a selection conference, what they were told and when, and what the charts and the UNet records reflect. What he asks is that the government not be permitted to prove, or to argue, that he was a domineering or frightening man to work for, and to invite this jury to convict him for it. It is also classic hearsay.

First, none of it bears on an element. The government must prove a knowing and willful false statement, material to a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. *Dailey*, 868 F.3d at 330; *see* 18 U.S.C. § 1035(a)(2). Whether Dr. Bynon was difficult to work for appears nowhere in those elements. Evidence that does not make a fact of consequence more or less probable is not relevant, Fed. R. Evid. 401, and irrelevant evidence is not admissible, Fed. R. Evid. 402. It is

Second, this is character evidence, and Rule 404(a)(1) forbids it. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). A jury told that Dr. Bynon ran his selection conferences as "a total autocracy," and that colleagues feared retaliation for raising

concerns, is being asked to reason in precisely the way the rule forbids: that a man who treats people that way is the kind of man who would falsify a record. That inference is a natural one, which is why the rule prohibits it.

Third, to the extent the government offers particular episodes—a surgeon who resigned, a confrontation at a conference, a text message about how Dr. Bynon treated someone—Rule 404(b)(1) bars them independently. "Evidence of any other … ***wrong[] or act*** is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1) (emphasis added). Nor could such evidence be offered for a permitted purpose without notice. Rule 404(b)(3) requires the prosecutor to "provide reasonable notice of any such evidence that the prosecutor intends to offer at trial," to "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose," and to "do so in writing before trial." Fed. R. Evid. 404(b)(3)(A)-(C). The government has served no such notice as to any workplace conduct.

Fourth, Rule 403 requires exclusion even if some modicum of relevance could be identified. The probative value of "he was hard to work for" on the question whether a number entered in a donor-criteria field was a knowing and willful false statement is negligible. Its capacity to prejudice is not. This is evidence carrying "an undue tendency to suggest decision on an improper basis" – here, the jury's dislike of the defendant. *Old Chief*, 519 U.S. at 180. And the collateral cost would be multiple employment-law disputes within a putative criminal trial: who left and why, who complained and about what, what the institution did in response, and who remains aggrieved. This Court has already identified "confusion of the issues[] and undue delay" as reasons to exclude related evidence in this case. ECF No. 62 at 26.

Dr. Bynon does not suggest that these witnesses are beyond examination about their own attitudes toward him. Bias is always relevant. *United States v. Abel*, 469 U.S. 45 (1984). If a former colleague harbors animus, that is a proper subject of cross-examination, and it is Dr. Bynon's to pursue. The government, however, may not build an affirmative criminal case out of how its witnesses felt about their former boss.

Dr. Bynon requests an order precluding the government, its counsel, and its witnesses from offering evidence, testimony, or argument that Dr. Bynon was autocratic, vindictive, retaliatory, abusive, or intimidating toward colleagues or staff; that his program suffered from a "culture of intimidation" or from retaliation against those who raised concerns; that colleagues feared him or left the program because of him; or that he was otherwise difficult or domineering to work with—absent a proffer outside the presence of the jury and leave of Court.

## VIII.<br>The Court Should Preclude Unsupported Suggestions<br>of Personal-Financial Motive

Motive is not an element of § 1035(a)(2), but it is often the most powerful thing a jury hears. Until this week, the government had never committed to any explanation for why Dr. Bynon adjusted the criteria. This Court said as much in granting his motion for a bill of particulars, finding that "the government's theory of willfulness has been opaque throughout the pretrial proceedings" and that the record "provides inadequate information as to the basis for the allegations that Dr. Bynon acted with a criminal intent." ECF No. 126 at 2–3.

The government has now answered. On August 12, 2026, the grand jury returned a superseding indictment adding two paragraphs that the government describes as its response to this Court's order. Those paragraphs identify its theory of willfulness, and that theory is one of undisclosed departure from policy and practice: that Dr. Bynon acted "unilaterally," after board

approval, without a documented change in the patient's condition, in the absence of any authorizing policy, and without telling the patients, the transplant committee, or his colleagues. SSI ¶¶ 20-21. Personal financial gain appears nowhere in it. Neither does any other pecuniary motive.

Having elected that theory before the grand jury, the government should be held to it. A defendant is entitled to defend the case actually charged. Where the government has now specified the circumstances from which it will ask the jury to infer criminal intent, an unpleaded suggestion at trial that Dr. Bynon was motivated by money would be unsupported, unfairly prejudicial, and destructive of the very purpose for which this Court ordered particulars.

Argument and insinuation are not evidence, and a prosecutor may not invite the jury to infer an inflammatory motive the record does not support. A suggestion of personal financial gain would have no probative value on any element and would carry an acute risk of inducing a verdict on an improper basis. Fed. R. Evid. 401, 403.

Dr. Bynon therefore requests an order precluding the government, its counsel, and its witnesses from suggesting in the presence of the venire or jury that he adjusted donor-acceptance criteria for personal financial gain, unless it first proffers, outside the jury's presence, a good-faith evidentiary basis for the suggestion and obtains leave of Court.

## IX.
## The Court Should Preclude Argument That Memorial Hermann's Medicare Billing Is Harm Caused by Dr. Bynon

The government's trial brief closes its account of the charged conduct this way: "The false statements made by Bynon resulted in thousands of dollars that MHHS billed to Medicare." ECF No. 96 at 11. Its exhibit list includes insurance billing data for the charged patients and Medicare enrollment records. ECF No. 90 at 3 (Exhibits 28, 29, 34). Dr. Bynon anticipates that the

government will attempt to characterize that billing as the harm his conduct caused. It should not be permitted to do so. Section 1035(a)(2) contains no loss element, no restitution component, and no requirement of financial harm to anyone. The SSI charges no scheme to defraud, alleges no loss amount, and does not allege that Dr. Bynon submitted, caused the submission of, or profited from a single claim.

The government of course may prove that Medicare is a "health care benefit program" within the meaning of the statute, as this Court has held the indictment adequately alleges. ECF No. 62 at 16–17. That is a status question, and it can be established through the custodial witnesses and enrollment records the government has already listed. What it may not do is convert a false-statement case into an uncharged health-care-fraud case by inviting the jury to conclude that Dr. Bynon cost the taxpayers money. Evidence framed that way risks conviction for uncharged conduct and carries obvious potential to inflame. Fed. R. Evid. 401, 403; *cf.* Fed. R. Evid. 404(b)(1).

Dr. Bynon requests an order precluding the government, its counsel, and its witnesses from characterizing Memorial Hermann's billing to Medicare, or any payment by Medicare or a private insurer, as a loss, a harm, or an injury caused by Dr. Bynon's conduct.

## X.
## Conclusion

The government is entitled to try the case it charged. It is not entitled to try it on sympathy, or a financial-fraud theory it has never alleged. Every order requested here leaves the government free to prove each element of § 1035(a)(2) through the UNet records, the medical records, and the percipient witnesses who actually observed the conduct at issue. What the orders take away is only the material that has no bearing on those elements and significant, undue potential to displace them.

For the foregoing reasons, Dr. Bynon respectfully requests that the Court grant this omnibus motion in limine in each of its ten parts and enter the orders requested herein.

Respectfully submitted,

/s/ *Samy Khalil*
Samy Khalil
Texas Bar No. 24038997
John Kinchen
Texas Bar No. 00791027
**KHALIL KINCHEN LLP**
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
713.904.4477
samy@khalilkinchen.com
john@khalilkinchen.com

Brent Evan Newton
Attorney at Law
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, Maryland 20878
202.975.9105
brentevannewton@gmail.com

*Attorneys for Dr. Steve Bynon*

**CERTIFICATE OF CONFERENCE**

On August 13, 2026, I conferred with counsel for the government, who stated it was opposed to each of these requests.

/s/ *Samy Khalil*
Samy Khalil

**CERTIFICATE OF SERVICE**

On August 15, 2026, I served a copy of this pleading via ECF to counsel for the government.

/s/ *Samy Khalil*
Samy Khalil