**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 4:26-cr-00023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

## DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT

Dr. Steve Bynon, through his counsel, respectfully moves this Court to dismiss the government's superseding indictment ("SSI"), which was returned on August 12, 2026 (ECF No. 128).

The SSI lays bare the irreparable problems with the government's unconstitutional prosecution of Dr. Bynon. On August 11, 2026, this Court granted Dr. Bynon's motion for a bill of particulars on the willfulness element,[1] concluding that "the government's theory of willfulness has been opaque throughout the pretrial proceedings," and ordered the government to "identify the specific statute or regulation that the government contends supports that element." ECF No. 126, at 3-4. The government responded by returning the SSI. Its new paragraphs 20 and 21 identify no statute or specific regulation and make only a general reference to 42 C.F.R. Part 482, Subpart E ("Requirements for Specialty Hospitals"). Instead of identifying any specific ***law*** that Dr. Bynon willfully violated when he did the internal holds, the SSI instead alleges that Dr. Bynon's conduct was not undertaken pursuant to "any identified transplant ***policy***" of five named institutions and agencies, and that he departed from "institutional custom, accepted clinical practice, or legitimate

[1] The "willfulness" element of 18 U.S.C. § 1035 requires proof beyond a reasonable doubt that a defendant knew that his conduct *was against the law*. *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 1.43 & 2.50 (2024).

exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician," without documenting his reasons and without telling others. SSI ¶ 21 (emphasis added).

Those are vague allegations of negligence and of non-disclosure of such negligence, or even professional misconduct. They are the elements of a malpractice claim – "a malpractice case, with a criminal consequence," as this Court has described the government's theory (Transcript of June 8, 2026 Scheduling Conference, at 25 ("6/8/2026 Tr.")) – and not of a violation of 18 U.S.C. § 1035(a)(2). Given the opportunity, on this Court's order, to name the ***law*** that Dr. Bynon knew he was breaking, the government has (finally) admitted that there is no such law.

Dr. Bynon thus moves this Court to dismiss the SSI based on developments that have occurred since this Court rendered its decision denying his motion to dismiss the original indictment. *United States v. Bynon*, __ F.Supp.3d __, 2026 WL 1595296, at *11-*12 (S.D. Tex. June 3, 2026). Because this Court's June 3, 2026 order was interlocutory, this Court may reconsider it based on the intervening developments that have clarified the legal and factual bases of the government's theory of prosecution. *See, e.g.*, *United States v. Good*, Cr. Action No. 25-196, 2025 WL 2613628, at *3 (E.D. La. Sept. 10, 2025).

This Court invited that course. At the June 8, 2026 scheduling conference, counsel advised the Court that the government's newly disclosed trial theory "fully supports our argument that it is unconstitutional for these charges to be brought against Dr. Bynon under the peculiar circumstances of this case," and stated that he would "re-urge that motion, at least the last ground, in light of what has been said today." 6/8/2026 Tr. at 24. The Court replied: "I will certainly consider that." *Id.* The Court thereafter staggered the parties' expert disclosures precisely because of "all the fair notice issues raised on the part of the defense," 6/8/2026 Tr. at 36, and observed

that "when the expert designations have been submitted and reports, that may be when the defense raises some of these issues again," 6/8/2026 Tr. at 35. When counsel confirmed that the schedule should accommodate "re-urging our motion to dismiss before the August 24th trial date," the Court responded, "That's okay." 6/8/2026 Tr. at 37. The government's expert disclosures are now complete, it has superseded its indictment, and this motion follows.[2]

This motion is limited to two issues: (1) whether the SSI states a viable offense; and (2) whether the SSI should be dismissed under the void-for-vagueness doctrine. Dr. Bynon does not re-urge (yet expressly preserves) any other arguments this Court previously resolved as matters of law. Dr. Bynon addresses only the grounds this Court left open, the grounds created by the government's post-order disclosures and other developments, and the grounds supplied by the superseding indictment itself.

In support of this motion, Dr. Bynon would show the following:

## I.
## Background

In addition to the facts set forth herein, Dr. Bynon adopts his original motion to dismiss (ECF No. 29); his motion in limine to preclude the government from offering evidence of 42 C.F.R. § 482.94 (ECF No. 91); his motions for bills of particulars concerning the Government's theory of willfulness and falsity (ECF Nos. 93 & 120); and his two *Daubert* motions (concerning Dr. Raymond Lynch and Dr. Matthew Cooper), the government's responses to those two motions, and Dr. Bynon's joint reply (ECF Nos. 99, 103, 116, 118 & 127). Dr. Bynon also relies on this Court's

[2] Notably, Dr. Lynch's untimely submitted rebuttal report (provided after the Court's mandated deadline of August 11) also cites no such law, and the regulations he cites are wholly inapposite in that none of them specifically proscribes the conduct at issue. The rebuttal report is dated August 10, but it was not provided to the defense until 445 p.m. on August 12.

August 11, 2026 Memorandum and Opinion granting his motion for a bill of particulars on the willfulness element. ECF No. 126.

The original indictment charged Dr. Bynon with five federal felonies – all violations of 18 U.S.C. § 1035(a)(2) during the time period of February 2023 through March 2024 – for adjusting "donor matching criteria"[3] regarding donor age and weight criteria adjustments in UNOS's UNet system to preclude offers of donated livers for his patients ("internal holds"). On August 11, 2026, this Court granted Dr. Bynon's motion for a bill of particulars on the willfulness element and ordered the government to identify the specific statute or regulation supporting it. ECF No. 126. The grand jury returned a superseding indictment the next day, adding new paragraphs 20 and 21.

### A. Incontrovertible, Compelling Evidence Demonstrates that the Widespread Use of Internal Holds Was Not Prohibited by UNOS, OPTN, and HRSA Before April 2026.

During the relevant time period charged in the indictment (2023 and 2024), transplant programs were led to believe by UNOS and OPTN – which were in a "public-private partnership" with HRSA (a federal agency of HHS)[4] – that there was nothing improper (and certainly nothing illegal) about using internal holds. As previously shown, UNOS itself – with the approval of

[3] Although the original indictment describes Dr. Bynon's adjustments of "donor matching criteria," UNOS and the transplant community describe them – more accurately – as "donor acceptance criteria" or "organ acceptance criteria." *See* UNOS, "COVID-19 Updates: April 7, 2020," https://web.archive.org/web/20200410120409/https://unos.org/news/covid-19-updates-april-7-2020/. The superseding indictment now uses the phrase "donor acceptance" criteria. SSI ¶ 21.

As has been noted in prior filings, Dr. Bynon referred to these adjustments as "internal holds" – a term used by others in the transplant community throughout the country. As discussed *infra*, OPTN and HRSA have used the expressions "ineffective listing criteria" or "ineffective listing parameters" for the practice of adjusting donor acceptance criteria for the purpose of precluding organ offers.

[4] *Callahan v. United States Department of Health and Human Services Through Azar*, 434 F. Supp.3d 1319, 1328 (N.D. Ga. 2020). Because prior filings have provided the full names of HHS, HRSA, OPTN, and UNOS, only the abbreviations for those entities are used here.

OPTN[5] – recommended the practice of internal holds in April 2020 during the early days of the COVID-19 pandemic. That guidance was not rescinded until April 2026 – nearly three months after Dr. Bynon was indicted and more than two years after the conduct at issue – when OPTN, at the direction of HRSA, publicly stated that:

> In April 2020, during the COVID-19 emergency, the OPTN issued guidance permitting transplant programs to temporarily implement waitlist screening criteria. This approach enabled candidates to keep accumulating waiting time even if they were not eligible to receive organ offers at that moment. These criteria included setting donor age limits to a minimum of 98 years and a maximum of 99 years.
>
> The COVID-19 public health emergency has ended. ***Moving forward***, transplant programs must return to using the OPTN-approved procedures to temporarily inactivate candidates. This is critical to ensure patient safety and system integrity. ***It is inappropriate to continue to use excessively narrow donor acceptance criteria or other screening parameters to effectively render a candidate ineligible for organ offers.***

HRSA, *Discontinuation of COVID-Era Practice Regarding: Waitlist Screening Parameters* (Apr. 3, 2026) (emphasis added), https://www.hrsa.gov/optn/news-events/news/discontinuation-covid-waitlist-screening-parameters. That official government announcement necessarily implies that it was "appropriate" to do so before April 3, 2026.

Internal documents obtained via subpoena from OPTN show that [redacted] stated that: [redacted] **Exhibit B** [redacted] (emphasis added).[6] [redacted]

---

[5] **Exhibit A** [redacted]

[6] [redacted]

[redacted] **Exhibit C** (emphasis added). [redacted] it is clear that, before April 2026, UNOS, OPTN, and HRSA failed to give transplant professionals notice or even guidance that the use of internal holds to preclude organ offers (in lieu of Status-7 inactivation) was not "appropriate" or [redacted] Nor did UNOS, OPTN, or HRSA indicate to transplant professionals that internal holds were only permitted when a patient had COVID or that the only way to do an internal hold was to adjust the minimum and maximum ages for donor acceptance criteria to 98 and 99 years.

Such a widespread belief by transplant professionals throughout the country is evident [redacted]. For instance, Brianna Doby, MPH Chief, Organ Transplant Branch (Acting) Division of Transplantation of HRSA, wrote Dr. John Magee, M.D., President of OPTN, in a publicly-available December 18, 2025 letter.[7] It demonstrates the widespread practice of internal holds at organ transplant centers throughout the country.

After discussing the use of internal holds at an unidentified heart transplant program, the letter noted that HRSA had conducted a "preliminary review of OPTN data to determine whether

---

[redacted] HRSA hosts much of OPTN's institutional infrastructure directly, including the OPTN Board of Directors' meetings, agendas, and public communications run through HRSA's own website, www.hrsa.gov/optn. *See generally* HRSA, *Organ Procurement and Transplantation Network (OPTN) Modernization*, https://www.hrsa.gov/optn-modernization (Mar. 2023).

[7] That letter, which is attached as **Exhibit D**, is available at https://www.hrsa.gov/sites/default/files/hrsa/optn/2025-12-18-letter-to-optn-ineffective-listing-parameters.pdf.

other instances currently exist of patients waitlisted for [all types of] organ transplants with parameters that might be inconsistent with receiving offers of donated organs ('potentially ineffectively listed')." **Exhibit D**, at 1. That "preliminary review" showed (as a snapshot) that, as of September 1, 2025, 32 different organ transplant centers had a total of 104 potentially "ineffectively listed" parameters for organ donations. *Id.* at 2. The letter also noted a prior study in 2024 and 2025 in which it was found that the "donor age range of 98 to 99" appeared in over 700 active registrations across 16 centers. *Id.* at 2.

The letter then cited UNOS/OPTN's April 2020 guidance to transplant centers during the early days of the COVID pandemic and stated the following: "As the analysis presented above shows, despite the COVID-19 context of the April 2020 communication, ***this potentially ineffective listing practice has continued well beyond the immediate emergency of the pandemic***." *Id.* at 2-3 (emphasis added). The letter stated that the "April 2020 communication remained on the OPTN website until at least September 8, 2024" and that "***HRSA is unaware of any guidance provided by the OPTN to members on the permissibility (or lack thereof) of ineffective listing practices [i.e., internal holds] post-pandemic***." *Id.* at 3 (emphasis added).

The letter continued: "All of the centers' responses to the 2024 MPSC [OPTN's Membership and Professional Standards Committee] investigation asserted that patients were intentionally ineffectively listed so that they would accrue wait time while they were unable to receive a transplant. However, despite centers' best intentions, unintentional patient harm was observed in at least one instance." *Id.* at 3.

The letter concluded by stating that, "[g]iven the implications of potentially ineffective listing for the safety of patients awaiting transplant, system functionality, and public trust, HRSA

[redacted]

[redacted]

[redacted]

[redacted] *See* **Exhibit B**

[8] The letter was not provided to the defense by the government. It is not known whether any member of the prosecution team (including HHS or FBI special agents) was aware of this clearly relevant letter.

[9] *See* **Exhibit E** [redacted] **Exhibit F** [redacted]

[redacted] (emphasis added); *see also* **Exhibit I** [redacted];[10] *see also* **Exhibit G**, at 4 [redacted]

Notably, at the June 8, 2026 scheduling conference, counsel for the government stated:

> And as the Government said several times, if this were a case where Dr. Bynon had put in what the [UNOS 2020] guidance suggested, i.e., 98 to 99 [years of age], we completely acknowledge this would be an entirely different case, and that's actually not what he put in, as the Court has seen several times from the parties.

6/8/2026 Tr. at 4. The government's position is at odds with [redacted] Is the government seriously taking the position that [redacted] were [redacted] violations of 18 U.S.C. § 1035(a)(2)?

Significantly, in the SSI, the new paragraphs on the willfulness element charge that Dr. Bynon acted "willfully" because his internal holds "did not follow … accepted clinical practice,

[10] **Exhibit I** [redacted]

or legitimate exercise of the professional judgment and direction ordinarily afford to a similarly situated transplant physician." SSI ¶ 21.

**B. Ordered to Identify the Statute or Regulation Supporting the Willfulness Element, the Government Superseded the Original Indictment – and Identified None.**

On August 11, 2026, this Court granted Dr. Bynon's motion for a bill of particulars on the willfulness element. ECF No. 126. The Court found that "the present record provides inadequate information as to the basis for the allegations that Dr. Bynon acted with a criminal intent," *id.* at 2, and that "the government's theory of willfulness has been opaque throughout the pretrial proceedings," *id.* at 3. The Court explained why particularization mattered: Dr. Bynon "needs to know which regulations he allegedly violated so he can prepare legal—not just factual—defenses to the government's allegations," and "[b]oth efficiency and fairness require that Dr. Bynon have this information so that he can raise in advance his challenges to those regulation-related allegations." *Id.* The Court ordered the government to "submit a filing that will explain 'whether the "willfulness" allegations in the indictment are based solely on Dr. Bynon's alleged non-compliance with § 482.94 and, if not, [] identify the specific statute or regulation that the government contends supports that element.'" *Id.* at 4.

The grand jury returned a superseding indictment the following afternoon. Counsel for the government advised defense counsel that "[p]aragraphs 20 and 21 were added to address the Court's order to the willfulness element requested by the defense in their Bill of Particulars," and that the government "believe[s] the superseding indictment will address the Court's order filed yesterday." **Exhibit J** (Aug. 12, 2026 e-mail from counsel for the government to the Court's case manager and defense counsel). The two new paragraphs of the SSI read in full:

> 20. BYNON knew the patients (listed in Counts 1-5 of this Indictment) had been approved/listed for liver transplantation. BYNON intentionally took deliberate

> action to change the patient's donor-acceptance. The changes, made unilaterally by BYNON, occurred after the transplant committee/board approval for a liver transplant for patients listed in Counts 1-5 of this Indictment. The new parameters intentionally placed by BYNON were so restrictive that suitable donors would be screened out and the patients stopped receiving offers. There was no documented change in the patient's condition supporting the newly restrictive criteria. The change was not disclosed to the patients, transplant committee, or other people who reasonably would have expected to know about it.
>
> 21. BYNON's actions were not undertaken pursuant to, or in good-faith compliance with, any identified transplant policy from Memorial Hermann, University of Texas Health Science Center, Health Resources and Services Administration, Center for Medicare Services, Organ Procurement and Transplantation Network, or stated in 42 Code of Federal Regulations Part 482 Subpart E – Requirements for Specialty Hospitals. BYNON's actions did not follow institutional custom, accepted clinical practice, or legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician. To the extent the governing policies permitted clinical judgment or professional leeway, that discretion did not authorize the physician to use donor-acceptance criteria as an undisclosed means of nullifying a transplant decision already reached through the established approval/review board process. The absence of documented clinical justification, the departure from established procedures, the failure to obtain or seek appropriate review, the lack of transparency to fellow physicians, staff and patients, and the secretive nature of Bynon's material alterations capable of eliminating transplant offers are circumstances supporting a reasonable inference that the false statements, related to patients in Counts 1-5 of this Indictment, were created intentionally and deliberately and materially influenced the opportunity for a liver transplant.

SSI ¶¶ 20-21 (appearing under the new heading "Knowing and Willful False Statements Affecting Liver-Transplant Allocation").

Paragraphs 20 and 21 do not identify a statute. Nor do they identify any *specific* regulation. Paragraph 21 names five *entities* – Memorial Hermann, the University of Texas Health Science Center, HRSA, CMS, and OPTN – and alleges that Dr. Bynon's conduct was not undertaken pursuant to "any identified transplant ***policy***" from any of them. Naming the institutions that had a "policy" does not identify "the specific statute or regulation" this Court ordered the government to identify. ECF No. 126 at 4. And, as discussed below, alleging a violation of a "policy" – as

opposed to the clear language of a statutory or regulatory prohibition – only makes Dr. Bynon's vagueness claim even stronger.

The SSI's single citation to the Code of Federal Regulations is to an entire subpart – "42 Code of Federal Regulations Part 482 Subpart E – Requirements for Specialty Hospitals" – and it, too, appears in the negative. The government does not allege that what Dr. Bynon did violated Subpart E. It alleges that what he did was ***not authorized by it***. The distinction is important. There is obviously a substantial difference, from the perspective of knowingly breaking the law, between (1) acting contrary to a sufficiently clear legal prohibition in a statute or regulation, and (2) acting in a manner that is merely not "authorized" by a law or regulation (where there is silence about the specific conduct at issue).

The new paragraphs also do not allege that Dr. Bynon ***knew*** that what he was doing was against the law – the very essence of "willfulness." What they allege is that he acted without authorization in the "policies" and also that he acted contrary to "institutional custom, accepted clinical practice, or legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician," without documenting his reasons and without telling others.

Finally, it is significant that the charging paragraphs for Counts One through Five do not incorporate paragraph 21. They reallege and incorporate only "Paragraphs 1 through 20 of this Indictment." *See* SSI ¶ 22. The paragraph in which the government placed the whole of its new "willfulness" pleading is therefore not even part of the charges that the grand jury returned.

## II.
## Legal Argument

Based on several intervening developments since June 3, 2026, Dr. Bynon urges this Court to reconsider its order denying his motion to dismiss the indictment on two of the grounds in that

motion: (1) the (now superseding) indictment fails to state an offense concerning two of the essential elements (falsity and willfulness); and (2) it vaguely charges an impermissibly novel violation of 18 U.S.C. § 1035(a)(2) that violates the Due Process Clause. The superseding indictment has exacerbated the problems identified in the original indictment.

**A. The Superseding Indictment Does Not Allege a Viable Falsity Element.**

The superseding indictment fails to allege a "false" statement or entry – an essential element of 18 U.S.C. § 1035(a)(2). In particular, Dr. Bynon's internal holds – his adjustment of donor acceptance criteria to preclude organ offers – are not false assertions of fact. In this Court's June 3, 2026 order rejecting Dr. Bynon's argument that, as a matter of law, his internal holds did not constitute an assertion of fact, the Court stated that:

> Dr. Bynon's threshold argument is that adjusting his patients' donor-acceptance criteria did not make a statement or representation that is capable of being true or false. … Dr. Bynon argues that adjusting a patient's donor criteria on a donor-matching service simply prevents that patient from receiving donor offers until the criteria are reset and does not communicate any facts capable of being true or false about that patient. …. Because the court cannot resolve the legal issue Dr. Bynon raises without a "trial of the facts surrounding the commission of the alleged offense," [*United States v.*] *Flores*, 404 F.3d [320,] 325 [(5th Cir. 2005]) …, pretrial dismissal is inappropriate. …
>
> Whether an act makes a statement or representation capable of being true or false is fact dependent. The relevant precedent begins with *Williams v. United States* [458 U.S. 279 (1982)]. The Supreme Court held that a defendant who deposited several checks from accounts with insufficient funds to cover the checks did not make a false statement within the meaning of 18 U.S.C. § 1014. *Williams*, 458 U.S. at 283-84. The United States had secured a conviction on the theory that by depositing the bad checks, the defendant had falsely represented that the accounts had enough money to cover the checks. *Id*. at 283. The Court reversed "because the defendant's course of conduct did not involve the making of a false statement for the simple reason that a check is not a factual assertion at all, and therefore cannot be characterized as true or false." *Thompson*, 604 U.S. [408,] 416 [(2025)] (internal quotations omitted) (quoting *Williams*, 458 U.S. at 284).
>
> Dr. Bynon argues that undisputed facts that can be judicially noticed compel a ruling in his favor. (See Docket Entry No. 29 at 10–13; Docket Entry No. 44 at 3–9). But each of the *Williams* rulings on which Dr. Bynon relies issued after a

conviction. *See, e.g.*, *Williams*, 458 U.S. at 280; *Blankenship*, 382 F.3d at 1116; *Waechter*, 771 F.2d at 980. Although the court can make preliminary factual findings on a motion to dismiss, *Flores*, 404 F.3d at 324 n.6, a motion to dismiss in a criminal case does not impose on the government a burden of production before trial, *see United States v. Ambers*, 416 F.2d 942, 943 (5th Cir. 1969) (a motion to dismiss an indictment is not the proper vehicle to raise a sufficiency-of-the-evidence challenge). The parties continue to gather information that may be presented as evidence at trial. For example, the court recently issued a subpoena, at Dr. Bynon's request, for additional documents relating to UNOS policies and procedures about donor-acceptance criteria and internal holds. (Docket Entry Nos. 51, 52). There is no procedural mechanism to close the factual record before the United States rests its case at trial.

To the extent Dr. Bynon argues that no additional evidence could change the meaning (or lack thereof) of a donor-acceptance-criteria adjustment, the court is not persuaded. Dr. Bynon argues that altering a patient's donor-acceptance criteria does not make a factual statement but merely anticipatorily rejects donor offers. (*See* Docket Entry No. 44 at 5 (citing UNOS, UNet Offer Filters, https://unos.org/technology/offer-filters/ (last visited May 18, 2026))). Such rejections are not statements, according to Dr. Bynon, but are instead acts similar to a "homeowner who wishes to avoid receiving offers on his or her home [by] placing the price so high that no buyer will make an offer," (Docket Entry No. 29 at 12 n.19), or an artist who offers his art for sale at a price so high that no one would purchase it, (Docket Entry No. 44 at 8). But Dr. Bynon's argument does not foreclose proof that by offering to sell a home or an artwork at a certain price, the sellers implicitly made a false statement about the value of the home or artwork. See Shah, 44 F.3d at 294 ("[A] promise may amount to a 'false, fictitious or fraudulent' statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform."). If a homeowner lists a home, or an artist offers to sell a work, on a platform that requires list prices to accurately reflect the value of what is offered, then offering an inaccurate price could be a false statement. ***Similarly, if UNOS requires doctors to set donor-acceptance criteria that accurately reflect their patients' medical needs, then Dr. Bynon's inaccurate donor-acceptance criteria for specific patients, which allegedly sought child donors, could be a false statement about those patients, all of whom were adults***.

The UNOS COVID-19 guidance on which Dr. Bynon relies illustrates the point. The guidance instructed doctors to "set the acceptable donor age acceptance criteria to 98 years (minimum) and 99 years (maximum)" if the doctor decides that their "individual transplant candidates should not receive organ offers ... due to issues relating to COVID-19." (Docket Entry No. 53 at 66). In light of this guidance, a doctor setting the donor-acceptance criteria "to 98 years (minimum) and 99 years (maximum)" communicates to UNOS that the doctor's "individual transplant candidates should not receive organ offers ... due to issues relating to COVID-19." (Id.). Under the "announced policies," the donor-acceptance-criteria adjustments

> communicate the "factual assertion[]" that, due to COVID-19 or some other reason, the patient is not healthy enough – at least at the time – for an organ transplant. *See Waechter*, 771 F.2d at 979. ***The parties will likely present evidence at trial about the UNOS guidance, policies, and donor-acceptance criteria and how Dr. Bynon and other professionals applied them***. (See Docket Entry Nos. 51, 52, 53, 55). The court cannot make preliminary findings and conclusions about core trial disputes, especially on an incomplete record. *See Flores*, 404 F.3d at 324 n.6. Dr. Bynon may, of course, raise the issue again after the United States presents its evidence at trial, or after evidence is closed, or after the jury returns its verdict. *See* Fed. R. Crim. P. 29(a)-(b). . . .
>
> For these reasons, the court denies Dr. Bynon's motion to dismiss the indictment because he did not make a false statement.

*United States v. Bynon*, __ F. Supp. 3d __, 2026 WL 1595296, at *4-*7 (S.D. Tex. June 3, 2026) (emphasis added).

Since the Court's denial, the government obtained the SSI, which provides an additional reason for dismissing it for failing to allege sufficiently the falsity element. Paragraphs 20 and 21 were added to particularize willfulness, but the government drafted them to do double duty: paragraph 21 concludes that the recited circumstances support "a reasonable inference that the false statements, related to patients in Counts 1-5 of this Indictment, were created intentionally and deliberately and materially influenced the opportunity for a liver transplant." The government has thus now set out everything it contends supports the inference that Dr. Bynon's entries were false and that he knew it. Nothing in those paragraphs identifies a willfully false statement when made.

In addition, as noted above, the charging paragraphs[11] for Counts One through Five do not incorporate paragraph 21. The counts reallege and incorporate only "Paragraphs 1 through 20 of

[11] The "charging paragraph" of the indictment is the portion that "sets forth the gravamen of the offense," including the essential elements of the charged offense. *United States v. DePalma*, 461 F. Supp. 778, 798 (S.D.N.Y. 1978). The charging paragraph of an indictment is what matters in assessing the adequacy of the charge and the sufficiency of the evidence. *Cf. United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991) ("In determining whether there has been a variance between pleading [i.e., the required elements]

this Indictment." SSI ¶ 22. That omission matters, because paragraph 21 is where the government placed the whole of its new pleading: the allegation that Dr. Bynon's conduct was not undertaken pursuant to any identified policy of Memorial Hermann, UTHealth, HRSA, CMS, or OPTN; the allegation that he departed from "institutional custom, accepted clinical practice, or legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician"; and the concluding allegation that the recited circumstances "support[] a reasonable inference that the false statements … were created intentionally and deliberately." None of it is incorporated into the critical charging paragraphs that the grand jury returned.

Paragraph 20 – the one new paragraph that the charging paragraphs do incorporate – alleges only that Dr. Bynon knew that his patients had been listed for transplantation; that he "intentionally took deliberate action" to change their donor-acceptance parameters; that he did so "unilaterally" and after board approval; that the new parameters "were so restrictive that suitable donors would be screened out"; that "[t]here was no documented change in the patient's condition supporting the newly restrictive criteria"; and that "[t]he change was not disclosed to the patients, transplant committee, or other people who reasonably would have expected to know about it." Paragraph 20 does not allege that Dr. Bynon made a false statement. It does not allege that he knew any statement to be false. It solely alleges an undocumented and undisclosed clinical decision – which is to say, it alleges malpractice, and not a violation of § 1035(a)(2).

The superseding indictment identifies what it says is false: the donor adjustments parameters themselves. The count table describes the "Description" of each charged statement as a "Medical Record" and the "Nature of Falsity" as "Donor matching criteria." Superseding Indictment, Counts One through Five (SSI ¶ 23). The allegedly false statement is therefore the

---

and proof, it is the charging paragraphs that are to be examined.") (citation and internal quotation marks omitted).

donor-acceptance parameters that Dr. Bynon entered for the five patients listed in the indictment. That identification is fatal to the viability of the superseding indictment.

Section 1035(a)(2) reaches a "materially false, fictitious, or fraudulent statement[] or representation[]" and a "materially false writing or document." The predicate of each is a statement that misdescribes something. The superseding indictment does not allege that any UNet entry by Dr. Bynon misdescribed anything. It alleges that Dr. Bynon "intentionally took deliberate action to change the patient's donor-acceptance" parameters and that "[t]he new parameters intentionally placed by [Dr. Bynon] were so restrictive that suitable donors would be screened out." SSI ¶ 20. Both propositions are true, and the record of them is accurate: the parameters recorded in UNet were the parameters that Dr. Bynon in fact set. A record that faithfully reports what a physician directed is not a false writing; it is a true one. The government's quarrel is with the clinical decision that the record accurately memorializes, not with the record.

Because the SSI fails to allege the falsity element, this Court should dismiss it.

**B. The Superseding Indictment Does Not Allege a Viable Willfulness Element.**

Paragraph 20 alleges that Dr. Bynon "intentionally took deliberate action" to change the parameters, and paragraph 21 concludes that the entries "were created intentionally and deliberately." Of course they were. A transplant surgeon does not alter donor-acceptance criteria by accident. But § 1035(a)(2) does not punish deliberate acts; it punishes a statement the speaker knows to be false, made ***willfully*** – that is, with knowledge that the conduct was unlawful. *See Fifth Circuit Pattern Jury Instructions (Criminal Cases)* 1.43 & 2.50 (2024); Govt's Resp. in Opp, to Def.'s Mot. in Limine Regarding 42 C.F.R. 482.94, ECF No. 108 at 5 ("In order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.") (quoting *Bryan v. United States*, 510 U.S. 135, 137 (1994) and citing Instruction 1.43). The SSI conflates the intent to perform an act with the intent to violate the law, and nowhere

alleges the latter. It does not allege that Dr. Bynon believed the parameters he entered misdescribed his patients, that he understood any entry to be false when he made it, and that he knew that entering restrictive parameters was against the law.

Paragraph 21 appears to allege willfulness when it states:

> BYNON's actions were not undertaken pursuant to, or in good-faith compliance with, ***any identified transplant policy*** from Memorial Hermann, University of Texas Health Science Center, Health Resources and Services Administration, Center for Medicare Services, Organ Procurement and Transplantation Network, or stated in 42 Code of Federal Regulations Part 482 Subpart E – Requirements for Specialty Hospitals. BYNON's actions did not follow ***institutional custom***, ***accepted clinical practice***, or ***legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician***. To the extent the governing policies permitted clinical judgment or professional leeway, that discretion did not authorize the physician to use donor-acceptance criteria as an undisclosed means of nullifying a transplant decision already reached through the established approval/review board process. The absence of documented clinical justification, the departure from established procedures, the failure to obtain or seek appropriate review, the lack of transparency to fellow physicians, staff and patients, and the secretive nature of Bynon's material alterations capable of eliminating transplant offers are circumstances supporting a reasonable inference that the false statements, related to patients in Counts 1-5 of this Indictment, were created intentionally and deliberately and materially influenced the opportunity for a liver transplant.

SSI ¶ 21 (emphasis added).

"[A]ny identified transplant policy," "institutional custom," "accepted clinical practice" (including those governing the "legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician") are not sources of ***positive law*** that legally proscribed Dr. Bynon's conduct. They are – to use a word aptly used by late Justice Scalia[12] – gobbledygook, which gave no fair warning to Dr. Bynon that he was violating the law when he did the internal holds. Even if policy were somehow sufficient notice, [redacted]

[12] *See, e.g.*, *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 130 n.3 (2008) (Scalia, J., dissenting).

[redacted]

[redacted] Indeed, Dr. Bynon is now aware of [redacted]

[redacted] **Exhibit K** [redacted]

[redacted]

Because the SSI fails to allege the willfulness element, this Court should dismiss it.

**C. The Government's Prosecution of Dr. Bynon Violates Due Process.**

In this Court's June 3, 2026 order, this Court rejected Dr. Bynon's due process claim primarily on the ground that the pretrial factual record was undeveloped and that the parties disputed key facts:

> Dr. Bynon argues that the indictment charges violate these principles because he participated in a "widespread practice" and exercised his "medical judgment." (Docket Entry No. 29 at 16-19). He argues that there is no "prior judicial decision," "official guidance," "regulatory notice," or "other governing source" that stated that his conduct "(endorsed by the transplant system's own governing body) was criminally proscribed." (Docket Entry No. 44 at 13).

***Dr. Bynon's arguments do not warrant pretrial dismissal because they rely on disputed factual issues*. *The United States disputes that internal holds are widespread, that Dr. Bynon complied with the stated policy of internal holds, and that Dr. Bynon's use of internal holds reflected appropriate medical judgment.*** (Docket Entry Nos. 37, 53). Dr. Bynon has vigorously contested the United States's assessment of the facts and the inferences to draw from them. (Docket Entry Nos. 44, 55).

Taking the indictment allegations as true for the purposes of this motion, its charges do not violate the Due Process Clause. The Fifth Amendment prohibits novel statutory constructions, *Lanier*, 520 U.S. at 266, not novel prosecutions. "Due process is not ... violated simply because the issue is a matter of first impression." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002) (first citing *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995); and then citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). A "novel fact pattern alone does not invoke the rule of lenity." *United States v. Suchowolski*, 838 F.3d 530, 534 (5th Cir. 2016) (citing *United States v. Shabani*, 513 U.S. 10, 17 (1994)). Courts "may apply a statute to novel conduct so long as the plain text permits." *United States v. Pacilio*, 85 F.4th 450, 460 (7th Cir. 2023). The United States violates due process when it relies on a "construction of a criminal statute [that] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (quoting Jerome Hall, *General Principles of Criminal Law* 61 (2d ed. 1960)).

The present record does not show that the prosecution crosses that threshold. Section 1035 has distinct elements, clear terms, and enforceable limits. The court has used well-defined legal principles to interpret the "plain text" of the statute and apply its meaning to the allegations in the indictment. *Pacilio*, 85 F.4th at 460; *see Suchowolski*, 838 F.3d at 534. To the extent the United States's allegations potentially pose fair-notice concerns – for example, by criminalizing bona fide medical opinions, *see Patel*, 485 F. App'x at 707 – the court has identified relevant, pre-existing case law that shows how the indictment allegations do not transgress the Due Process Clause's boundaries. *See Omnicare*, 575 U.S. at 184 (explaining that an opinion can be false if the person who states the opinion does not subjectively hold it); *see also Paulus*, 894 F.3d at 277; *AseraCare*, 938 F.3d at 1297. The court's "interpretation of the statute" does not "create traps" for health-care professionals. *Snyder v. United States*, 603 U.S. 1, 15 (2024); *see also Pacilio*, 85 F.4th at 460 (finding no notice issues because "the wire and commodities fraud statutes" had "long been held to encompass" implied representations and misleading omissions).

Dr. Bynon's arguments are not that § 1035 now means something new. It is that he is being prosecuted for: (1) medical judgments that he does not think are statements under the statute; and (2) following guidance that he alleges UNOS, and competent transplant professionals, generally followed. In his words, "[c]riminal

liability cannot attach to conduct that the private entities chosen by the Government to help implement organ transplants had affirmatively endorsed at the time of the conduct." (Docket Entry No. 44 at 12).[7] Dr. Bynon highlights that, under the United States's theory, tens of thousands of doctors who followed UNOS's guidance and industry practice are federal felons and that UNOS is a criminal enterprise because it conspired with or aided and abetted transplant professionals across the country. (Docket Entry No. 44 at 6, 12; Docket Entry No. 55 at 3). Those arguments may have traction, ***but on this record, they do not show a due process violation***.

Criminal liability can attach to accepted industry practice. *See Smith v. United States*, 188 F.2d 969, 970 (9th Cir. 1951) ("Custom, involving criminality, cannot justify a criminal act."); *United States v. Brookshire*, 514 F.2d 786, 789 (10th Cir. 1975) ("[C]ustom and usage involving criminality do not defeat a prosecution for violation of a federal criminal statute."); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) ("Even a universal industry practice may still be fraudulent."). But industry practice is often relevant to a defendant's *mens rea*. For example, in *United States v. Riley*, the United States argued that a district court appropriately excluded evidence of industry practice condoning the activity that the jury found was fraudulent. *See* 550 F.2d 233, 236 (5th Cir. 1977). The Fifth Circuit accepted as a general matter that "practice is not an absolute defense to criminality," but it reversed the defendant's conviction because evidence of the practice was crucial to showing that he acted without the requisite intent to injure and defraud. *See id.* at 236-38. …

In addition, the court cannot conclude on the indictment allegations that the possible implications of the prosecution's theory for other health-care professionals pose due-process issues. Although courts should be wary of interpreting federal statutes to criminalize commonplace conduct, *see Snyder*, 603 U.S. at 14-17, § 1035 is unlikely to criminalize the conduct that Dr. Bynon argues is commonplace. Language is contextual. *See Thompson*, 604 U.S. at 419-20 (Alito, J., concurring). When many people consistently use words or actions to communicate a particular fact or concept, those words or actions take on that meaning. ***In this case, the jury will hear evidence of the context and practice surrounding Dr. Bynon's conduct. If the evidence shows that "adjusting" donor criteria to put a temporary internal hold on a transplant recipient is as widespread as Dr. Bynon claims, then the evidence may show that there is a unique contextual meaning to what otherwise could be a literal statement (or no statement at all) about what organ donations a patient needs***. *See Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 489 (5th Cir. 2014) ("Industry custom ... helps the trier of fact to understand the meaning of the words used."). ***The evidence could then show that, under custom and practice, Dr. Bynon and other transplant professionals made statements that were true to those in the industry, even if they were false (or meaningless) to a wide audience that does not understand the relevant context. (See Docket Entry No. 43 at 7–8). In such a case, no criminal liability would attach to Dr. Bynon, other transplant professionals, or UNOS.***

For these reasons, the prosecution does not violate the Due Process Clause.

*Bynon*, 2026 WL 1595296, at *10-*13 (emphasis added).

Developments since this Court denied Dr. Bynon's original motion to dismiss provide a firm basis for this Court to reconsider its original denial of the motion and rule that the SSI violates the Fifth Amendment's Due Process Clause. The combination of three things – (1) the incontrovertible proof that Dr. Bynon's internal holds were not prohibited by UNOS, OPTN, and HRSA policy when he did them; (2) the government's reliance on a purported medical "expert" who has challenged Dr. Bynon's internal holds as lacking "medical justification" and falling below the *standard of care* in medicine (and the corresponding allegations in ¶ 21 of the superseding indictment); (3) the government's novel legal theory about "willfulness" (rooted in "policies," "customs," and standard of "accepted clinical practice" – as opposed to positive law, SSI ¶ 21) – makes this case so outside the acceptable norm of prosecutions under § 1035(a)(2) that the government should not be permitted to force Dr. Bynon to endure a trial.

This Court has already characterized the government's trial theory – in the government's own terms. After hearing the government describe its proof, the Court stated: "now that we know what the Government is planning on proving, which is essentially … that Dr. Bynon committed malpractice as well as – and that was part and parcel of the – of the charged conduct. And this is a malpractice case, with a criminal consequence, as the Government has described it to me." 6/8/2026 Tr. at 25. When the government protested, the Court did not retreat: "it is not only a medical malpractice case, but, as you just acknowledged, it certainly has elements of a medical malpractice case." *Id.* at 26. The government itself conceded the danger, stating that it "understand[s] … the concern that potentially what the Government is alleging potentially could

… open the floodgates to any and all malpractice being potentially considered criminal. And I think the Court is right to have that position." *Id.* at 27.

The SSI now makes that characterization the government's own. It is one thing for a court to infer a malpractice theory from the government's proffer; it is another for the government to plead it explicitly. Paragraph 21 alleges, as the very measure of criminality, that Dr. Bynon's conduct "did not follow institutional custom, accepted clinical practice, or legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician." That is the standard of care. It is the same yardstick a plaintiff would plead in a negligence action, and it is now the yardstick by which the government proposes to convict a physician of five federal felonies.

There are three reasons why the prosecution of Dr. Bynon based on the superseding indictment violates due process.

**1. The Widespread Practice of Internal Holds Before April 2026 Was Not Prohibited by UNOS, OPTN, and HRSA.**

As clearly demonstrated in the "Background" section, *supra*, the use of internal holds for reasons other than patients with COVID was not clearly prohibited under the policies of UNOS, OPTN, and HRSA. It was not until April 2026 that the practice was deemed "inappropriate" by HRSA and OPTN. Therefore, it would be fundamentally unfair to permit the government to prosecute Dr. Bynon for his conduct in 2023 and 2024.

**2. The Theory of the Prosecution Ultimately Rests on a Medical Malpractice Case.**

During the early pretrial phase of this case, the defense contended that the government was wrongly seeking to make a medical malpractice case into a federal criminal prosecution, which the government denied. Developments since that time have borne out our claim.

The SSI compounds the problem by measuring Dr. Bynon's state of mind by asking whether his conduct comported with what is "ordinarily afforded to a similarly situated transplant physician" – the reasonable-physician standard. SSI ¶ 21. The Supreme Court has held that such an objective standard cannot substitute for the subjective *mens rea* a criminal statute demands when the defendant is a physician acting within the scope of his practice. In *Ruan v. United States*, 597 U.S. 450 (2022), the Court rejected the contention that a physician's authorization could be judged by what a reasonable doctor would have done, holding that the statute's scienter requirement applies to the authorization element and that the government must prove the defendant knew or intended that his conduct was unauthorized. *Id.* at 457. An objective standard, the Court explained, would improperly "turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable doctor,' not on the mental state of the defendant himself or herself." *Id.* at 465. That is precisely what paragraphs 20 and 21 propose here.

In *United States v. Patel*, 485 Fed. Appx. 702 (5th Cir. 2012), the Fifth Circuit opined that in an appropriate case, it would be problematic – as a matter of due process – to interpret a related statute, 18 U.S.C. § 1347, to apply to a physician's medical judgment related to "medical necessity" because such an application of the statute would raise vagueness concerns:

> Dr. Patel argues that Section 1347 is vague as applied to cardiac treatments for which medical necessity hinges on the judgment of physicians. He claims that judgments may be quite subjective and be based on observations that misdiagnose arterial blockage by a wide margin of error. ***These are not insubstantial concerns, as "all persons are entitled to be informed as to what the State commands or forbids***." *F.C.C. v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012) (quotation marks and citation omitted).

485 Fed. App'x at 707 (emphasis added). The Fifth Circuit rejected Dr. Patel's due process challenge because it concluded that he had fair notice that his medical judgments about purported

"medical necessity" – so as to justify payments for medically unnecessary procedures – was contrary to the unquestionable objective standard of care at issue (by Dr. Patel's own admission):

> We need not decide on this appeal whether the standard of "medical necessity" furnishes adequate notice for criminal liability beyond the facts of this case. Dr. Patel admitted in his testimony that medical necessity was personally intelligible as applied to the procedures underlying his convictions.
>
> > Q. [Government Attorney] Dr. Patel, would you agree with me then that lesions that are 30 percent and less, that those lesions should be treated medically and they shouldn't be stented? You agree with that statement, don't you?
> >
> > A. [Dr. Patel] Yes. If you believe that lesions are less than 30 percent and not flow-limiting, they should be treated medically, yes.
>
> Thus, the concept of medical necessity meant something concrete for Dr. Patel, and he did not have to "guess at its contours." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991). To the extent, then, that Patel intentionally placed stents in arteries that were flowing properly and not more than 30 percent blocked, he had "ample notice that the conduct he engaged in was prohibited." *United States v. Cavalier*, 17 F.3d 90, 93 n.5 (5th Cir. 1994); *see United States v. Daniels*, 247 F.3d 598, 600 (5th Cir. 2001).

485 Fed. Appx. at 707 (emphasis added).

Conversely, Dr. Bynon's practice of using internals holds was not contrary to any well-established medical standard of care. Indeed, it found support both in UNOS's 2020 guidance (that was not rescinded by OPTN and HRSA until 2026) and also in the widespread practice of other transplant programs around the country that used internal holds to preclude organ offers long after the COVID pandemic ended. At the very least, the practice was in a gray area of what was medically permissible. Prosecuting Dr. Bynon under 18 U.S.C. § 1035 in 2026 based on something that was not objectively contrary to a clearly established standard of care in 2023 and 2024 violates due process.

Significantly, § 1035 does not use the terms such as "accepted clinical practice," "medically justified," or "medically necessary." Instead, the government seeks to incorporate such

vague standards into its theory that Dr. Bynon made false statements or entries when he used internal holds in an allegedly medically "unjustified" or "unnecessary" manner.[13]

Under an objective "standard of medicine" during the relevant time period (2023-2024) – even assuming *arguendo* that were proper standard under § 1035(a)(2) – it is fundamentally unfair to permit the government to prosecute Dr. Bynon. It is particularly problematic that the theory of prosecution turns on the application of vague standards imported from the medical context into the legal context when there was no clearly articulated guidance from either the government or leaders in the transplant community about the use of internal holds for reasons other than patients with COVID.

The June 8, 2026 hearing confirmed that the government cannot articulate the objective standard it says Dr. Bynon transgressed. Asked whether it would present an expert to testify that each patient was medically able to survive and thrive after a transplant at the relevant time, the government answered that it was "not sure we can offer an expert who will say they would have thrived," and explained that the question is "tricky." 6/8/2026 Tr. at 11. This Court immediately identified the significance of that answer: "I think that's Dr. Bynon's point, that it's tricky." *Id.* A standard that the prosecution's own retained experts cannot apply with confidence is not a standard capable of giving fair notice to the physicians governed by it; it is an invitation to engage in 20/20 hindsight.

[13] "Medical justification" means "the explanation or reasoning used to support a medical decision, treatment plan, or insurance coverage determination. It provides the 'why' behind choices…." Patient Better, "What is Justification in Healthcare? https://patientbetter.com/glossary/justification/ (last visited Aug. 12, 2026). "Medically necessary" means: "Health care services or supplies needed to diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine." "Medically Necessary," https://www.healthcare.gov/glossary/medically-necessary/ (last visited Aug. 12, 2026).

The absence of any ascertainable standard is confirmed by the difficulty of instructing a jury. This Court advised the parties that it would devote a full day to the charge, which "will not be simple to draft," because "[t]here's no real good pattern here." 6/8/2026 Tr. at 33. When no pattern instruction exists – and the court must instead construct from scratch the legal standard by which a physician's clinical judgment becomes a federal felony – that is the very vice against which the void-for-vagueness doctrine guards.

The SSI has made things even worse. Rather than identify the ***positive law*** that Dr. Bynon violated, the superseding indictment demonstrates its absence. Paragraph 21 alleges that his actions were "not undertaken pursuant to, or in good-faith compliance with, any identified transplant policy from" five named institutions and agencies, "or stated in 42 Code of Federal Regulations Part 482 Subpart E." It does not say which provision of Subpart E addresses donor-acceptance parameters at all. It does not say, because there is none. Paragraph 21 then drafts the missing rule itself: "To the extent the governing policies permitted clinical judgment or professional leeway, that discretion did not authorize the physician to use donor-acceptance criteria as an undisclosed means of nullifying a transplant decision already reached through the established approval/review board process." That sentence is an admission twice over – that the governing policies did confer clinical discretion, and that the limitation the government seeks to enforce appears nowhere but in its own charging instrument. A physician cannot willfully violate a standard that the government must compose after the fact in order to state it. *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007) ("This is not a case in which the business subject to the Act had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took. Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC ….").

### 3. The Government Cannot Identify a Statute or Regulation that Gave Dr. Bynon Fair Notice that His Internal Holds (Even Assuming *Arguendo* that They Were False Statements or Entries) Were Unlawful.

When ordered to name the statute or regulation in this Court's order granting Dr. Bynon's motion for a bill of particulars about the willfulness element, the government has pleaded that there is none. SSI ¶ 21. This Court granted Dr. Bynon's motion for a bill of particulars precisely so that he could "prepare legal – not just factual – defenses to the government's allegations," and so that the government's "regulation-related allegations" could be tested by "legal challenges" in advance of trial. ECF No. 126, at 3. The government's answer to that order was the SSI. Its answer identifies no statute and no (pertinent) regulation. Paragraph 21 alleges only that Dr. Bynon's actions were "not undertaken pursuant to, or in good-faith compliance with, any identified transplant ***policy*** from Memorial Hermann, University of Texas Health Science Center, Health Resources and Services Administration, Center for Medicare Services, Organ Procurement and Transplantation Network, or stated in 42 Code of Federal Regulations Part 482 Subpart E – Requirements for Specialty Hospitals." Naming five institutions that might have had a "policy" is not identifying a policy (and certainly not a statute or regulation), and citing an entire subpart of the Code in the negative is not identifying a regulation that fairly warned Dr. Bynon that his conduct was unlawful. There is nothing for Dr. Bynon to challenge, because the government has identified nothing to challenge. And the paragraph in which the government said even this much is not incorporated into the counts. *See* SSI ¶ 22.

Assuming the superseding indictment refers to 42 C.F.R. § 482.94[14] – as the regulation which Dr. Bynon's willfully violated when he allegedly made false statements or entries in

[14] Although the superseding indictment does not cite this specific provision, it has been mentioned in the discovery provided by the government and appears within 42 C.F.R. Part 482, Subpart E ("Requirements for Specialty Hospitals") – which is cited in ¶ 21 of the superseding indictment.

violation of § 1035(a)(2) – that would not cure the due process violation. "Due process requires that before a criminal sanction or significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or the regulation that makes such a sanction possible." *County of Suffolk v. First Am. Real Estate Solutions*, 261 F.3d 179, 195 (2d Cir.2001) (citing, *inter alia*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C.Cir.1995) (reviewing EPA enforcement action and holding that EPA could not assess fine where the plaintiff did not have fair warning of the EPA's interpretation of unclear regulation)).

Section 482.94 did not provide such fair notice. That provision applies to *hospitals'* transplant programs; it does not apply to individual medical professionals like Dr. Bynon. More importantly, Dr. Bynon could not reasonably have foreseen that he would face criminal liability under § 1035(a)(2) for his role in Memorial Hermann's alleged violation of the administrative regulation in § 482.94. Furthermore, as explained in Dr. Bynon's motion in limine concerning § 482.94, Dr. Bynon's adjustments of donor age and weight criteria ***did not violate, or cause Memorial Hermann to violate***, § 482.94. *See* ECF No. 91, at 4-11.

Paragraph 21's enumeration of the "policies" of the five entities also does not cure the due process violation. Two of the five entities the government names are OPTN and HRSA. As shown above, OPTN – together with UNOS – affirmatively recommended the use of internal holds in April 2020; that guidance remained on the OPTN website until at least September 8, 2024; and neither OPTN nor HRSA declared the practice "inappropriate" until April 3, 2026, more than two years after Dr. Bynon's last internal hold. *See supra* Part I.A. [redacted] **Exhibit D**, at 3.

Willfulness under § 1035(a)(2) requires proof beyond a reasonable doubt that Dr. Bynon knew his conduct was against the law when he did the internal holds in 2023 and 2024. If the United States – with the grand jury's subpoena power and after a two-year investigation and a prosecution team consisting of four federal prosecutors, an HHS special agent, and an FBI special agent – cannot name the statute or regulation that clearly prohibited Dr. Bynon's internal holds, then no transplant surgeon reading the United States Code or the Code of Federal Regulations in 2023 and 2024 could have found it either. It simply does not exist.

What paragraphs 20 and 21 supply in place of a legal prohibition is a list of alleged professional shortcomings – no contemporaneous documentation, no disclosure to the committee, no conformity with what a similarly situated physician would ordinarily do. For the reasons already given, a departure from institutional protocol does not equate to knowledge of illegality. This Court has said so. *See* 6/8/2026 Tr. at 34 ("Concealment could . . . simply mean that it was, perhaps, against the accepted procedures or protocols of the medical review board. It doesn't equate to unlawfulness by any means."). The government cannot fill the space that a statute or regulation should fill with a claim that Dr. Bynon practiced medicine differently than his colleagues would have.

**4. The Scienter Element in Section 1035(a)(2) Does Not Foreclose a Due Process Challenge.**

In this Court's order denying Dr. Bynon's original motion to dismiss, this Court stated:

> Dr. Bynon's ability to use UNOS guidance and industry practice to argue that he did not knowingly and willfully make a false statement abates his fair-notice concern. *See Wooden v. United States*, 595 U.S. 360, 378-79 (2022) (Kavanaugh, J., concurring) (explaining that a "fair notice" defense may be needed "if a federal criminal statute does not contain a 'willfulness' requirement"); *United States v. Gonzalez*, 857 F.3d 46, 54 (1st Cir. 2017) ("Generally, criminal statutes provide that notice by including an element of mens rea ...."); *United States v. Crow*, 504 F. App'x 285, 287 (5th Cir. 2012) (per curiam) ("The requirement that a defendant

> act willfully or purposefully largely vitiates the objection that a statute criminalizes conduct a defendant did not know was wrongful."). …

*Bynon*, 2026 WL 1595296, at *11-*12.

While recognizing the precedent cited by this Court, Dr. Bynon notes the Supreme Court has stated that a statute's scienter element "***may mitigate*** a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 499 (1982) (emphasis added). The Court did not rule out the possibility of a case in which a statute with a scienter element can be applied in a vague manner. Dr. Bynon's case is one of them.

The Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010), shows that a scienter element will not always save a statute from being vague. The underlying statute in *Skilling*, 18 U.S.C. § 1343, had a scienter element – the specific intent to defraud. And as the Supreme Court noted, 18 U.S.C. § 1346 defines "scheme or artifice to defraud" as including a scheme to defraud someone of the "intangible right of honest services." The Court in *Skilling* avoided invalidating "honest services" under the Due Process Clause by narrowly construing it to be limited to "core" deprivation of "honest services" – bribes and kickbacks; otherwise, the statute raised the "due process concerns underlying the vagueness doctrine." *Id.* at 408.

Alternatively, even assuming *arguendo* that the willfulness element in § 1035(a)(2) is sufficient mitigate a "fair notice" concern, fair notice is simply one of ***three*** distinct bases for the Supreme Court's void-for-vagueness doctrine. The Supreme Court has identified two other rationales for invalidating vague criminal statutes: (1) they encourage arbitrary enforcement of the law by executive branch officials and arbitrary application of the law by judges and juries; and (2) they violate the separation-of-powers doctrine by leaving it to the judicial branch to give meaning to a statute's vague terms in authoritative judicial decisions. *See* David Kwok, *Is*

*Vagueness Choking the White-Collar Statute*, 53 GA. L. REV. 495, 500-01 (2019) (discussing the different rationales for the Supreme Court's void-for-vagueness doctrine); Carissa Byrne Hessick, *Vagueness Principles*, 48 ARIZ. ST. L. J. 1137, 1140-44 (2016) (same).

The second reason is particularly relevant in Dr. Bynon's case. As the Supreme Court in *Beckles v. United States*, 580 U.S. 256 (2017), stated:

> Laws that regulate persons or entities . . . must be sufficiently clear that those enforcing the law do not act in an arbitrary or discriminatory way. . . . An unconstitutionally vague law [also] invites arbitrary enforcement in this sense if it leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.

*Id.* at 266 (citations and internal quotation marks omitted).

The government in Dr. Bynon's case is arbitrarily prosecuting him under § 1035(a)(2), particularly in view of the widespread practice of internal holds around the country identified by OPTN. There has been no other case in this country's history in which a medical professional has been prosecuted under § 1035(a)(2) for anything close to what Dr. Bynon did. It would be fundamentally unfair to permit the government to use § 1035(a)(2) against Dr. Bynon in such a novel, unforeseeable manner.

The superseding indictment is itself compelling evidence of arbitrariness. Ordered to identify the statute or regulation that supplies the willfulness element, the government named none. It supplied instead a list of circumstances and professional shortcomings and asked that a "reasonable inference" of criminal intent be drawn from them. SSI ¶ 21. Those same circumstances are present, [redacted] *See* **Exhibit G**. Making an example of Dr. Bynon – on a flimsy factual basis and a ***non-existent*** legal basis – is the very type of arbitrary enforcement the vagueness doctrine forbids. The theory of the prosecution rests on a standard so unfixed that it "leaves judges and jurors free to decide … what is prohibited and what

is not in each particular case." *Beckles*, 580 U.S. at 266. That is not how criminal law should work.

## CONCLUSION

For these reasons, this Court should reconsider its June 3, 2026 order based on intervening developments and dismiss the superseding indictment.

Respectfully submitted,

/s/ *Samy Khalil*
Samy Khalil
Texas Bar No. 24038997
John Kinchen
Texas Bar No. 00791027
**KHALIL KINCHEN LLP**
4200 Montrose Blvd., Suite 440
Houston, Texas 77006
713.904.4477
samy@khalilkinchen.com
john@khalilkinchen.com

Brent Evan Newton
Attorney at Law
Texas Bar No. 00788115
19 Treworthy Road
Gaithersburg, Maryland 20878
202.975.9105
brentevannewton@gmail.com

*Attorneys for Dr. Steve Bynon*

## CERTIFICATE OF SERVICE

On August 14, 2026, in order to comply with the protective orders in place, I filed this motion under seal and sent it to the government via email. I will also file an unsealed, redacted version on the public record.

/s/ *Samy Khalil*
Samy Khalil