**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **Case No. 4:26-cr-023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**UNITED STATES' REPSONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

The United States of America, through its undersigned counsel, respectfully files this response in opposition to defendant John Stevenson Bynon, Jr. (hereinafter, "Defendant" or "Bynon")'s motion to dismiss the superseding indictment. (Docket No. 135.) For the reasons set forth below, the motion should be denied.

## I. PROCEDURAL BACKGROUND

On January 14, 2026, a grand jury returned an indictment charging Defendant with five counts of making a false statement relating to health care matters in violation of 18 U.S.C. § 1035. (Docket No. 1.) Bynon concedes that "he set the donor age and weight criteria (*e.g*., at the weight and age of a small child) so as to preclude organ offers for an adult transplant patient." (Docket No. 29 at p. 4.) The criteria that Bynon set as to donors' age and weight for multiple transplant patients was false. These false statements, made in secret and undisclosed to the patients' medical care team by Bynon, resulted in patients continuing to receive medical care as though they were eligible to receive an organ donation, even though Bynon ensured that they would not receive any such donation. As a result of Bynon's false statements, patients were denied life-saving procedures without ever being informed that they were, essentially, rendered ineligible to receive a transplant.

To sustain a conviction on the Section 1035 counts, the United States must prove that

"(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) [he] did so knowingly and willfully." *United States v. Hamilton*, 37 F.4th 246, 260 (5th Cir. 2022) (citing *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017)). Bynon subsequently entered a plea of not guilty. (Docket No. 8.) On May 4, 2026, Bynon moved to dismiss the indictment for failure to state an offense. (Docket No. 29) (citing Fed. R. Crim. P. 12(b)(3)(B)(v)). He purports that "donor acceptance criteria are not 'facts' capable of being objectively 'true' or 'false.'" *Id.* at p. 10. The Court denied Bynon's motion to dismiss, holding in pertinent part that, "[whether] an act makes a statement or representation capable of being true or false is fact dependent." *United States v. Bynon*, Case No. 26-023, 2026 U.S. Dist. LEXIS 125562, at *10 (S.D. Tex. June 3, 2026). Moreover, the Court held that the United States:

> May prove that Dr. Bynon made a false statement with evidence showing that: (1) by setting the donor-acceptance criteria, Dr. Bynon stated an opinion "that his adult-aged patients actually needed the organs of a small child" when (2) he did not subjectively believe that opinion to be true [. . .] Or the United States may try to prove that: (1) the donor-acceptance criteria communicated that Dr. Bynon believed "his patients were not healthy enough to accept a transplant" when (2) he knew or thought they were "healthy enough to do so."

*Id*. at *21. The parties subsequently engaged in extensive motion practice in anticipation of an August 24, 2026 trial date. (Docket No. 73.)

On August 11, 2026, the Court granted Bynon's motion for a bill of particulars. (Docket No. 126.) In so doing, the Court ordered the United States to explain "whether the 'willfulness' allegations in the indictment are solely based on Dr. Bynon's alleged non-compliance with [42 C.F.R. § 482.94] and, if not, identify the specific statute or regulation that the government contends

supports that element." *Id*. at p. 4.[1] A grand jury returned a superseding indictment on August 12, 2026, setting forth the following allegations:

> BYNON knew the patients (listed in Counts 1-5 of this Indictment) had been approved/listed for liver transplantation. BYNON intentionally took deliberate action to change the patient's donor-acceptance. The changes, made unilaterally by BYNON, occurred after the transplant committee/board approval for a liver transplant for patients listed in Counts 1-5 of this Indictment. The new parameters intentionally placed by BYNON were so restrictive that suitable donors would be screened out and the patients stopped receiving offers. There was no documented change in the patient's condition supporting the newly restrictive criteria. The change was not disclosed to the patients, transplant committee, or other people who reasonably would have expected to know about it.
>
> BYNON's actions were not undertaken pursuant to, or in good-faith compliance with, any identified transplant policy from Memorial Hermann, University of Texas Health Science Center, Health Resources and Services Administration, Center for Medical Services, Organ Procurement and Transplantation Network, or stated in 42 Code of Federal Regulations Part 482 Subpart E – Requirements for Specialty Hospitals. BYNON's actions did not follow institutional custom, accepted clinical practice, or legitimate exercise of the professional judgment and discretion ordinarily afforded to a similarly situated transplant physician. To the extent the governing policies permitted clinical judgment or professional leeway, that discretion did not authorize a physician to use donor-acceptance criteria as an undisclosed means of nullifying a transplant decision already reached through the established approval/review board process. The absence of documented clinical justification, the departure from established procedures, the failure to obtain or seek appropriate review, the lack of transparency to fellow physicians, staff and patients, the secretive nature of Bynon's material alternations of eliminating transplant offers are circumstances supporting a reasonable inference that the false statement, related to patients in Counts 1-5 of this Indictment, were created intentionally and deliberately and materially influenced the opportunity for a liver transplant.

---

[1] Violation of a specific Medicare regulation is not an element of a Section 1035 offense. *Cf United States v. McGill*, Case No. 12-112, 2016 U.S. Dist. LEXIS 63950, *32-34 (E.D. Pa. May 13, 2016) (holding that the "Court was not required to instruct the jury as to any particular Medicare regulation concerning the provision of hospice services" because "Defendant was not was not convicted of violating any one particular Medicare regulation, but rather the health care fraud statute, 18 U.S.C. § 1327. Accordingly, the focus of any due process and vagueness analysis must be § 1347, not the Medicare regulations"). Failure to comply with regulations may constitute evidence of intent. Evidence of willfulness "is usually circumstantial." *United States v. Miller*, 520 F.3d 504, 509 (5th Cir. 2008) (quoting *United States v. Bishop*, 264 F.3d 535, 550 (5th Cir. 2001)). The Fifth Circuit has further held that willfulness may be established by, *inter alia*, "any conduct, the likely effect of which would be to mislead or to conceal." *United States v. Sertich*, 879 F.3d 558, 565 (2018) (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943)).

(Docket No. 129 at pp. 8-9.) The superseding indictment constitutes the explanation that this Court ordered the United States to provide in a Bill of Particulars: It refers to the regulations and policies that support the willfulness element.

On August 14, 2016, Bynon moved to dismiss the superseding indictment. (Docket No. 135.) This motion resurrects the same failed arguments that this Court previously rejected. Bynon seeks summary dismissal of the superseding indictment based on an incomplete factual record in advance of trial, citing "incontrovertible, compelling evidence" as if the parties were submitting statements of uncontested facts in a civil matter. *Id*. at p. 4. He also contends that the superseding indictment is deficient because it "fails to allege the willfulness element." *Id*. at p. 19. A motions hearing and pretrial conference occurred on August 18, 2026. (Docket No. 146.) The Court subsequently took Bynon's motion to dismiss the superseding indictment under advisement and ordered the United States to file a response by September 2, 2026. (Docket No. 151.)

## II. FACTUAL BACKGROUND

Five patients received referrals from their primary physicians to seek treatment at Memorial Herman Health System ("MHHS") at the Texas Medical Center.[2] These patients suffered from liver disease, a condition that may, in certain circumstances, require an organ transplant procedure. Bynon served as the Director of Abdominal Organ Transplantation and Surgical Director for Liver Transplantation of MHHS. The Medical Review Board ("MRB") at this hospital—comprised of several doctors, specialists, and medical support personnel[3]—

---

[2] The physician network at MHHS is primarily comprised of doctors who are employed by The University of Texas Health Science Center at Houston ("UTHealth"). MHHS serves as the primary teaching hospital for the McGovern Medical School at UTHealth.

[3] The MRB is a multidisciplinary body, consisting of hematologists, surgeons, nurses, transplant coordinators, social workers, dietitians, and other health care professionals all working at the MHHS Transplant Program. A transplant coordinator, often a registered nurse, is a health care professional who guides patients through every phase of the organ transplant process. Commonly, they serve as the patient's main point of contact, through initial evaluation, and waitlist logistics, to post-surgery follow-up. The MRB will either accept or decline the liver transplant candidate. If

analyzed patient records, assessing a battery of medical and psychiatric examinations to determine whether these patients were eligible for transplantation.

After the MRB approved each patient for the procedure, a transplant coordinator entered information on a computer program designed to match candidates with prospective donors. Transplant coordinators listed patients pursuant to hospital policy that specified default donor criteria. The default criteria is expansive, encompassing a broad range of prospective donors: Age, 0-75 or 80 years old (local and import, respectively); Weight, 70-300 pounds.[4] The donor criteria guidance from this policy is set forth below:

**Liver Donor Acceptance Criteria**
**Donor Characteristics**

| | |
|---|---|
| Minimum acceptable donor age: | Local: 0 Months<br>Import: 0 Months |
| Maximum acceptable donor age: | Local: 80 Years<br>Import: 75 Years |
| Minimum acceptable donor weight: | 70 lbs |
| Maximum acceptable donor weight: | 300 lbs |
| Maximum acceptable donor BMI: | |
| Accept DCD donor? | Local: Yes<br>Import: No |

the candidate is declined, the MRB will identify the issues that render the candidate ineligible for transplantation at that time with recommendations to resolve those issues.

[4] The local-import distinction concerns the location of the donated organ. "Organ transplants are most successful when preservation and transport time are short. The matching system considers the distance between donor and transplant hospitals. In general, local candidates get organ offers before those listed at more distant hospitals." *See* UNOS, "How does UNOS save lives?" (available at https://unos.org/transplant/how-we-match-organs/) (last visited Aug. 30, 2026).

This "UNet" computer program[5] is maintained on a platform separate and distinct from the patient's medical chart, also known as "Transchart."[6] Thus, a routine review of Transchart would not reveal the patient's donor criteria unless a member of the transplant team affirmatively entered this information on the chart.

After data for the five patients in question was entered by the transplant coordinator, Bynon unilaterally and covertly falsified donor criteria without informing those patients or his colleagues at MHHS. To illustrate, the MRB determined that patient A.P. was eligible for a liver transplant. His coordinator entered the default criteria. Bynon then modified this criteria within approximately 24 hours of A.P.'s placement on the waitlist: Age, 0 – 8 years old; weight, 70 – 300 pounds.[7] Essentially, he misrepresented the MRB's decision regarding transplant eligibility by restricting donor criteria to such a degree that these patients received no offers.

Bynon made no contemporaneous notes setting forth his rationale for manipulating donor criteria and in effect deactivating these patients as donor recipients, nor did he explain to anyone why these patients languished on the waitlist for extended periods of time. Accordingly, Bynon's motivations and reasons for deactivating liver transplant patients are subject to speculation and

---

[5] UNet is a technology used to match organ donors and patients in need of organs. UNet maintains a list of patients in need of transplants. *See* UNOS Technology, ("UNet[SM] links all 55 organ procurement organizations, 254 transplant hospitals and 150 histocompatibility labs in the U.S., and enables donation and transplant professionals to make lifesaving decisions with speed and efficiently.") (available at https://unos.org/technology/) (last visited May 24, 2026). "DonorNet" is the corresponding computer program for organ donors. The UNET computer program has its own log in system for the entry of donor acceptance criteria such entries are considered part of a patient's medical chart. The footprint for logging into the program is specific for each patient.

[6] MHHS medical charts are referred to as Transcharts.

[7] Liver donation from a child to an adult patient is feasible, but extremely rare. For example, "27831 adults underwent liver transplantation" from May 2007 through December 2012, Evelyn K. Hsu, Michael L. Shaffer *et al*., Analysis of Liver Offers to Pediatric Candidates on the Transplant Wait List, Gastroenterology, 2017; 153, 988-995 (available at https://www.gastrojournal.org/article/S0016-5085(17)35870-5/fulltext) (last visited August 30, 2026). Of this amount, "1667 (5.6%) were transplanted with livers from donors <18 years of age. Of the 1667 adults transplanted with livers from children [. . .] age of a graft <18 years of age allocated to an adult was 15 years (IQR 13, 17). The median age of an adult recipient of these grafts was 55 years." *Id*. "[Children] essentially are first in line for other children's organs." *See* UNOS, "How does UNOS save lives?"

post hoc justification. This lack of transparency negates the theory that Bynon exercised clinical judgment. If Bynon genuinely believed that patients were ineligible, failing to identify the issues preventing transplantation only deprived patients and MHHS staff of critical information and potentially important and necessary medical treatment.

The evidence that the United States intends to present at trial will prove that no medical concern or complication justified the use of restrictive donor criteria. For example, on April 13, 2012, Bynon deactivated every patient (*i.e.* 57 people previously approved for transplantation by the MRB) on the waitlist in the same manner as the five patients named in the superseding indictment. *See* Dr. Raymond J. Lynch, Assessment of the Liver Transplant Waitlist Practices involving Memorial Herman Health System (OPTN Code TXHH)/Dr. John Stevenson Bynon, pgs. 13 and 21 (June 7, 2026). It strains credulity to suggest that clinical judgment justified the summary deactivation of every patient on the same day. On May, 9, 2012, Byon abruptly reversed course, rescinding the restrictive donor criteria for every transplant patient on the waitlist. The chart set forth below is a summation of these modifications:

**Figure 9: Waitlist parameter changes for adult liver transplant candidates at TXHH, April-May 2012.**




*Id*. at p. 21.

Indeed, Bynon was the only member of the transplant team to deactivate patients by entering restrictive donor criteria. He cites instances of "internal holds" to legitimize his actions,

implying that his peers routinely restricted donor criteria. However, Bynon's own statements belie this assertion. During an OPTN investigation, Bynon stated:

> I fully admit that I manipulated weight and age listings in our liver transplant waiting list to limit organ offers in certain patients at certain times. **This was used as a mechanism by me and only me for internal hold on.**

Informal Discussion Video (Mar. 28, 2026) (10:35 through 10:54) (emphasis added). A MHHS representative confirmed that Bynon:

> With no notice or awareness for Memorial Herman, created his own system of making improper criteria change in UNet where he would change the donor age and weight, effectuating inactivating status for liver transplant candidates rather than placing the candidate on the inactive status and formally notifying the patient. Our investigation, as we've gone through it, indicates that no other physician, or person had engaged in this practice in the liver transplant program for the 12 months that are under consideration in your letter [. . .] We recognize that this practice is well outside the parameters, of what is permitted by OPTN and UNOS, and not aligned with practice that we have in our program.

*Id*. (5:14 through 6:24).[8] The following section cites the relevant regulations and policies.

**A. Liver Transplantation Policies and Regulations**

Liver transplantation "is the definitive treatment for end stage liver disease (ESLD), or the point at which liver dysfunction is irreversible and can only be corrected by the replacement of the damaged organ." Lynch, Assessment of the Liver Transplant Waitlist Practices involving Memorial Herman Health System (OPTN Code TXHH)/Dr. John Stevenson Bynon, pg. 4. This procedure is governed by a myriad of statutes and regulations.

Congress enacted the National Organ Transplant Act in 1984 ("NOTA"), assigning oversight of organ procurement and allocation to the Secretary of the United States Department of Health and Human Services ("HHS"). *See* 42 U.S.C. §§ 273-274e; *Donor Network W v. Kennedy*, Case No. 25-140, 2026 U.S. Dist. LEXIS 50032, at *2 (D. Nev. Mar. 10, 2026) (noting that the

[8] The United produced a video of the March 28, 2024 informal discussion to Bynon and the Court.

NOTA is a "broad federal policy that addresses the backlog of people in need of organs by encouraging organ donation and distributing donated organs equitably and efficiently"). The Health Resources and Services Administration ("HRSA") is an agency within the HHS, responsible for organizing and administrating "organ procurement activities." 42 U.S.C. § 274c.

HHS subsequently created the Organ Procurement Transplantation Network ("OPTN"). 42 C.F.R. § 121.3(c)(1). The OPTN is led by a board of directors with representatives from "organ procurement organizations ["OPOs"], transplant centers, voluntary health associations, and the general public." 42 U.S.C. §§ 274(a)-(b)(1)(B). This entity maintains "a national list of individuals who need organs [. . .] through the use of computers and in accordance with established medical criteria." 42 U.S.C. §§ 274(b)(2)(A)(i)-(iii). The United Network for Organ Sharing ("UNOS") is a private non-profit organization, serving as the sole OPTN contractor since 1986. *Callahan v. United States HHS Through Alex M. Azar II*, Case No. 19-1783, 2024 U.S. Dist. LEXIS 245145, at *7 (N.D. Ga. July 8, 2024). The relevant provisions from the Code of Federal Regulation and the UNOS terms of use are set forth below.

| | |
|---|---|
| **42 C.F.R. § 482.90** | **Condition of participation: Patient and living donor selection.**<br><br>The transplant program must use written patient selection criteria in determining a patient's suitability for placement on the waiting list or a patient's suitability for transplantation.[9] If a program performs living donor transplants, the program also must use written donor selection criteria in determining the suitability of candidates for donation.<br><br>(a) Standard: Patient selection. Patient selection criteria must ensure fair and non-discriminatory distribution of organs.<br><br>(1) Prior to placement on the program's waiting list, a prospective transplant candidate must receive a psychosocial evaluation, if possible. |

[9] The MHHS patient selection criteria policy is attached to this motion as Exhibit A.

| | |
|---|---|
| | (2) Before a transplant program places a transplant candidate on its waiting list, the candidate's medical record must contain documentation that the candidate's blood type has been determined.<br><br>(3) When a patient is placed on a program's waiting list or is selected to receive a transplant, the center must document in the patient's medical record the patient selection criteria used.<br><br>(4) A transplant program must provide a copy of its patient selection criteria to a transplant patient, or a dialysis facility, as requested by a patient or a dialysis facility. |
| **42 C.F.R. § 482.94** | **Condition of participation: Patient and living donor management.**<br><br>Transplant programs must have written patient management policies for the transplant and discharge phases of transplantation.[10] If a transplant program performs living donor transplants, the program also must have written donor management policies for the donor evaluation, donation, and discharge phases of living organ donation.<br><br>(a) Standard: Patient and living donor care. The transplant program's patient and donor management policies must ensure that:<br><br>(1) Each transplant patient is under the care of a multidisciplinary patient care team coordinated by a physician throughout the transplant and discharge phases of transplantation; and<br><br>(2) If a program performs living donor transplants, each living donor is under the care of a multidisciplinary patient care team coordinated by a physician throughout the donor evaluation, donation, and discharge phases of donation.<br><br>(b) Standard: Waiting list management. Transplant programs must keep their waiting lists up to date on an ongoing basis, including:<br><br>(1) Updating of waiting list patients' clinical information;<br><br>(2) Removing patients from the program's waiting list if a patient receives a transplant or dies, or if there is any other reason the patient should no longer be on a program's waiting list; and<br><br>(3) Notifying the OPTN no later than 24 hours after a patient's removal from the program's waiting list. |

[10] The MHHS waitlist management procedure is attached to this motion as Exhibit B.

| | |
|---|---|
| | (c) Standard: Patient records. Transplant programs must maintain up-to-date and accurate patient management records for each patient who receives an evaluation for placement on a program's waiting list and who is admitted for organ transplantation.<br><br>(1) For each patient who receives an evaluation for placement on a program's waiting list, the program must document in the patient's record that the patient (and in the case of a kidney patient, the patient's usual dialysis facility) has been informed of his or her transplant status, including notification of:<br><br>(i) The patient's placement on the program's waiting list;<br><br>(ii) The program's decision not to place the patient on its waiting list; or<br><br>(iii) The program's inability to make a determination regarding the patient's placement on its waiting list because further clinical testing or documentation is needed.<br><br>(2) If a patient on the waiting list is removed from the waiting list for any reason other than death or transplantation, the transplant program must document in the patient's record that the patient (and in the case of a kidney patient, the patient's usual dialysis facility) was notified no later than 10 days after the date the patient was removed from the waiting list.<br><br>(3) In the case of patients admitted for organ transplants, transplant programs must maintain written records of:<br><br>(i) Multidisciplinary patient care planning during the transplant period; and<br><br>(ii) Multidisciplinary discharge planning for post-transplant care. |

| | |
|---|---|
| **UNOS Terms of Use** | You represent and warrant that the data entered by you or your authorized personnel in UNOS Systems are accurate, timely, and complete to the best of your knowledge, information and belief; and that these data are based upon information contained in corresponding medical records and other source documents, or where appropriate, are based upon clinical observation.[11] |

Bynon served as the Director of Abdominal Organ Transplantation and Surgical Director for Liver Transplantation of at MHSS from 2011 to 2024. He also served on the Organ Procurement and Transplantation Network National Liver Review Board from 2018 through 2022, and as a peer visit team member, assessing other transplant programs for compliance with OPTN standards and policies. As part of Bynon's surgical role, he was routinely required to complete a Medicare Enrollment Certification through the Centers for Medicare and Medicaid Services ("CMS"). As a result, Bynon was aware of 18 U.S.C.§ 1035's prohibition of falsifying (material) information in connection to the delivery of health care benefits through his Medicare Enrollment (Re-) Certification. Subsection 5 of Section 14, entitled "Penalties for Falsifying Information," expressly informed Bynon not only that the law forbids a false statement or entry in connection with the delivery of health care benefits, but also the *specific statute* the conduct violates. Bynon's Medicare recertification is set forth below.

[11] The Court previously cited an analogy, stating that, "[if] a homeowner lists a home, or an artist offers to sell a work, on a platform that requires list prices to accurately reflect the value of what is offered, then offering an inaccurate price could be a false statement. Similarly, if UNOS requires doctors to set donor-acceptance criteria that accurately reflect their patients' medical needs, then Dr. Bynon's inaccurate donor-acceptance criteria for specific patients, which allegedly sought child donors, could be a false statement about those patients, all of whom were adults." *Bynon*, 2026 U.S. Dist. LEXIS 125562, at 18. The UNOS terms of use do, in fact, require users to enter accurate information based on corresponding medical records,

## SECTION 14: PENALTIES FOR FALSIFYING INFORMATION

**This section explains the penalties for deliberately furnishing false information in this application to gain or maintain enrollment in the Medicare program.**

1. 1.18 U.S.C. § 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry. Individual offenders are subject to fines of up to $250,000 and imprisonment for up to five years. Offenders that are organizations are subject to fines of up to $500,000 (18 U.S.C. § 3571). Section 3571(d) also authorizes fines of up to twice the gross gain derived by the offender if it is greater than the amount specifically authorized by the sentencing statute.

2. Section 1128B(a)(1) of the Social Security Act authorizes criminal penalties against any individual who, "knowingly and willfully," makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program. The offender is subject to fines of up to $25,000 and/or imprisonment for up to five years.

3. The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:
   a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;
   b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
   c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

   The Act imposes a civil penalty of $5,000 to $10,000 per violation, plus three times the amount of damages sustained by the Government

4. Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency…a claim…that the Secretary determines is for a medical or other item or service that the person knows or should know:
   a) was not provided as claimed; and/or
   b) the claim is false or fraudulent.

   This provision authorizes a civil monetary penalty of up to $10,000 for each item or service, an assessment of up to three times the amount claimed, and exclusion from participation in the Medicare program and State health care programs.

5. 18 U.S.C. 1035 authorizes criminal penalties against individuals in any matter involving a health care benefit program who knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; or makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services. The individual shall be fined or imprisoned up to 5 years or both.

## SECTION 15: CERTIFICATION STATEMENT *(Continued)*

| First Name | Middle Initial | Last Name | M.D., D.O., etc. |
|---|---|---|---|
| JOHN | S. | BYNON | MD |

| Practitioner Signature *(First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.)* | Date Signed *(mm/dd/yyyy)* |
|---|---|
| [signature] | 04/30/2016 |

**All signatures must be original and signed in ink (blue ink preferred). Applications with signatures deemed not original will not be processed. Stamped, faxed or copied signatures will not be accepted.**

### B. Bynon Falsified Donor Criteria

The misrepresentations pertaining to patient A.P are described in detail below. The allegations concerning patients C.C., R.O, P.P., and O.F. follow a similar trajectory. The MRB discussed A.P.'s candidacy for liver transplantation on September 29, 2023. It recommended that A.P. undergo additional testing. A.P. subsequently complied with these recommendations. On February 8, 2024, the MRB approved A.P.'s candidacy for transplantation. Below is the form used by the MRB to memorialize its decision regarding A.P.'s eligibility for a liver transplant.

Memorial Hermann Transplant Center
Recipient Selection/Exclusion Criteria Medical Review Board Action

Organ: ☐ Liver ☐ Kidney ☐ Pancreas ☒ L/K ☐ K/P ☐ H/K Karnofsky Score: ____________

Selection Criteria Reviewed: ☐ Met ☐ Does Not Meet Presentation: ☒ New ☐ Update ☐ Discussion

Medical Review Board Action: ☒ Accepted ☐ Indeterminate ☐ Declined

Pending issues required:

1. Ok to list
2. 
3. 
4. 

Reasons for deferral/decline:

1. 
2. 
3. 
4. 

Valinda Jones (Coordinator Signature) Valinda Jones (Print Name) RN (Title) 02/08/24 (Date) 1330 (Time) ☐ AM ☐ PM

[signature] (Physician Signature) Print Name NPI/MHHS ID. Date Time ☐ AM ☐ PM Contact No.

Re-present

This disposition was notated in A.P.'s medical chart, set forth below.

| | | |
|---|---|---|
| 2/9/2024 | MRB Note | Renal MRB Outcome Note<br>MRB Date: 02/08/24<br>DX: Acute renal failure presumed to be secondary to hepatorenal syndrome.<br>MRB Decision: Approved |

On February 13, 2024, a transplant coordinator input A.P.'s information into the UNet computer program. This action placed A.P. on the national waitlist as a potential organ recipient with a

MELD score of 28.[12] The donor criteria originally attributed to A.P. set forth the following parameters: Age, 0–75 years old; Weight, 70–300 pounds.[13] A transplant coordinator documented A.P.'s placement on the waitlist by updating his medical chart.

| | | |
|---|---|---|
| 2/13/2024 | Coordinator | The patient listed below has been added to the UNOS Liver waitlist and is pending kidney listing. |

MHHS sent a waitlist notification to A.P. on this same day in accordance with hospital and MHHS policy.[14] Indeed, the OPTN mandates that transplant hospitals "must send a notification within 10 business days when: (1) the "patient is registered on the waiting list," (2) the "patient is *not* registered on the waiting list," and (3) the "patient is removed from the waiting list for reasons other than transplant or death."

The day after the MRB determined that A.P. was eligible for a liver transplant, Bynon modified his donor criteria on UNet. The record below demonstrates that Bynon accessed A.P.'s UNet account on February 14, 2024.

---

[12] MELD is a numerical system used to access severity of liver disease and to prioritize patients for liver transplantation. The MELD score is a number that ranges from 6 to 40. A higher score indicates a more severe liver disease and a higher risk of morality within the next three months. A mathematical formula based on several laboratory tests and patient factors determines the applicable MELD score. A candidate's rank on the waitlist is determined primarily by their MELD score. Status 1A is reserved for candidates who are at risk of imminent death without transplantation, and these individuals are placed at the top of the waitlist. A "Status 7" designation deactivates a candidate who is temporarily too ill to undergo transplant surgery. Individuals classified as Status 7 remain on the waitlist, but do not receive organ offers. Another caveat specific to Status 7 is that candidates do not accrue waitlist credit while in this status. Duration on the waitlist is a subsidiary consideration. "[B]ecause waiting time is calculated *after* need and efficiency for both MELD and Status 1A candidates, it may simply be considered as a distinguishing tool and nothing more." Lisa Cherkassky, Cambridge Quarterly of Healthcare Ethics (2011), 20, 418-433 (emphasis in original).

[13] The donor criteria for the five patients listed in the indictment were initially set at this age and weight range.

[14] MHHS policy mandates that "[each] patient on Memorial Hermann's transplant waitlist will receive written notification of their transplant status, including notification of [. . . the] transplant program's decision to change the patient's status on the waiting list to 'active' or 'inactive' and reason for change." Memorial Hermann Health System, "Transplant Services: Recipient and Wait List Management Procedure," (Dec. 13, 2016).

**Liver Change Information**

| | |
|---|---|
| Change User: | Bynon, J. Steve |
| Change Date & Time: | 02/14/2024 20:44:48 |
| Change Type: | Modify |

Bynon deactivated A.P., stating that this patient could only receive a liver donation from a person with the following profile: Age, 0–8 years old; Weight, 70–300 pounds.

**Liver Donor Acceptance Criteria**

**Donor Characteristics**

| | | | |
|---|---|---|---|
| Minimum acceptable donor age: | Local: | 0 | Months |
| | Import: | 0 | Months |
| Maximum acceptable donor age: | Local: | 8 | Years |
| | Import: | 8 | Years |
| Minimum acceptable donor weight: | | 70 | lbs |
| Maximum acceptable donor weight: | | 300 | lbs |

This statement is false. A.P. did not require an organ from an obese child and he was eligible to receive offers from adult donors, just as the MRB had determined the previous day. A.P.'s medical record is devoid of any indication suggesting that his condition deteriorated in the 24 hours following his placement on the waitlist. Bynon informed no one of this modification, including A.P., his medical care team, and his transplant coordinator.[15] There is no record on A.P.'s medical chart indicating that Bynon entered restrictive donor criteria. A.P. continued to receive medical care as though he were active on the waitlist.

[15] Concealment is circumstantial evidence of intent. *See United States v. Dearing*, 504 F.3d 897, 902 (9th Cir. 2007) (noting that "willfulness may be inferred from circumstantial evidence of fraudulent intent," including "efforts to conceal unlawful activity") (quoting *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007)).

On March 22, 2024, MHHS received a letter from the OPTN concerning "donor acceptance criteria [that] has been changed for multiple liver candidates to effectively inactivate candidates without changing their status to inactive." *See* Ex. C. The OPTN expressed "a very serious concern for patient equity and safety," requesting that MHHS leadership and members of the transplant program participate in an "informal discussion." *Id.* The next day, Bynon modified A.P.'s UNet profile by expanding the pool of prospective donors, entering the following criteria: Age, 0-60 years old; Weight, 70-200 pounds. The UNet record of this modification is set forth below:

**Liver Change Information**

| | |
|---|---|
| Change User: | Bynon, J. Steve |
| Change Date & Time: | 03/23/2024 20:10:16 |
| Change Type: | Modify |

**Donor Characteristics**

| | | |
|---|---|---|
| Minimum acceptable donor age: | Local: | 0 Months |
| | Import: | 0 Months |
| Maximum acceptable donor age: | Local: | 60 Years |
| | Import: | 60 Years |
| Minimum acceptable donor weight: | | 70 lbs |
| Maximum acceptable donor weight: | | 200 lbs |

Bynon's abrupt modification demonstrates a consciousness of guilt and undermines the proposition that A.P. was ineligible for transplantation: The evidence suggests that Bynon restricted donor criteria for reasons other than his clinical judgment by tethering donor criteria to external considerations (*i.e.* to stymie a government investigation). *See, e.g.*, *United States v. Patel*, 485 Fed. Appx. 702, 709 (5th Cir. 2012) ("[There] was evidence that Patel abruptly changed course, evincing possible consciousness of guilt, after the government executed its search warrant.").

## III. LEGAL STANDARD

Federal Rule of Criminal Procedure 7(c) provides that an indictment shall contain "a plain, concise and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c). An indictment is sufficient if it "(1) enumerate[s] each prima facie element of the charged offense; (2) fairly inform[s] the defendant of the charges filed against him; and (3) provide[s] the defendant with a double jeopardy defense against future prosecutions." *United States v. Guzman-Ocampo*, 236 F.3d 233, 236 (5th Cir. 2000) (citation omitted). An indictment need not specify "the evidentiary details by which the government plans to establish [the defendant's] guilt." *United States v. Lightner*, Case No. 18-513, 2018 U.S. LEXIS 211527, at *5 (S.D. Tex. Dec. 17, 2019) (J., Rosenthal) (citing *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986)); *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978) ("It is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges."). Courts "[are] required to take the allegations in the indictment as true to determine whether an offense has been stated." *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017) (quoting *United States v. Crow,* 164 F.3d 229, 234 (5th Cir. 1999)). "As long as the statutory language of the charged offense unambiguously sets out all the necessary elements, an indictment setting forth the offense in the words of the statute itself is generally sufficient." *United States v. Hagmann*, 950 F.2d 175, 183 (5th Cir. 1991); *see, e.g.*, *United States v. Alexander*, 170 F.4th 1303, 1311 (11th Cir. 2026) (affirming the district court's denial of the defendant's motion to dismiss because "Count 19 of the indictment directly track[ed] the language of § 1035(a)(1)").

## IV. DISCUSSION

Bynon misrepresented the decision of the MRB when he falsely stated on UNet that his patients needed organs from donors of unrealistic age and weight criteria. These statements were

made in connection with the delivery (or lack of delivery) of healthcare benefits. The superseding indictment adequately apprises Bynon of the charges against him and protects against prospective double jeopardy violations. *See Guzman-Ocampo*, 236 F.3d at 236.

Bynon sets forth two principal arguments in support of his motion to dismiss the superseding indictment. (Docket No. 135.)[16] First, he contends that the "superseding indictment does not allege a viable falsity element." *Id*. at p. 13. Second, Bynon asserts that the "superseding indictment does not allege a viable willfulness element." *Id*. at p. 17.

**A. Falsity[17]**

According to Bynon, "[a] record that faithfully reports what a physician directed is not a false writing; it is a true one." *Id*. at p. 17. This proposition misconstrues the law. The United States is not aware of, and Bynon does not cite, precedent establishing that clinical judgment cannot be false or that medical opinions are immune from prosecution. Courts have routinely recognized that clinical judgments can be false statements. *See Hamilton*, 37 F.4th at 259 (affirming a Section 1035 conviction, holding that the "jury was entitled to discredit" the defendant's testimony that "her decisions were based on her medical judgment"); *Patel*, 485 F. App'x at 709 (affirming a health care fraud conviction because the defendant's clinical judgment regarding blockage of his patients' arteries was false, a fact proven beyond a reasonable doubt by expert testimony and evidence "probative of both intent and the absence of medical necessity in his procedures"); *United States v. McLean*, 715 F.3d 129, 140 (4th Cir. 2013) (affirming a Section

---

[16] Bynon also raises a due process challenge. This Court held, however, that, "[t]aking the indictment allegations as true for the purposes of this motion, its charges do not violate the Due Process Clause. The Fifth Amendment prohibits novel statutory constructions [. . .] not novel prosecutions." Bynon, 2026 U.S. Dist. LEXIS 125562, at *2.

[17] The Fifth Circuit Pattern Jury Instruction for Section 1035 provides that a "statement, representation or entry is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A statement, representation, or entry is also "false" when it constitutes a half-truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud." Fifth Circuit Pattern Jury Instructions (Criminal) § 2.50 (2024).

1035 conviction, in part, because patient and expert testimony established that the defendant's "misrepresentations were intentional and that he was not simply a negligent physician"); *United States ex. rel. Druding v. Druding*, 952 F.3d 89, 98-100 (3d Cir. 2020) ("[Medical] opinions may be considered false and are not shielded from scrutiny," holding that "a difference of medical opinion is enough evidence to create a triable dispute of fact regarding FCA falsity") (citation omitted); *United States ex rel. Dildine v. Pandya*, 389 F. Supp. 3d 1214, 1220 (N.D. Ga. 2019) ("Defendants insist that whether the cataract procedures and the glaucoma diagnoses and tests 'were reasonable and necessary' for Dr. Pandya's patients is a matter of medical judgment that rests with Dr. Pandya [. . .] However, allowing physicians to avoid allegations of fraud by simply subjectively asserting the services were medically necessary cannot be the standard for determining falsity.") (citation omitted); *United States ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 742 (10th Cir. 2018) (holding that "[i]t is possible for a medical judgment to be 'false or fraudulent' as proscribed by the FCA"); *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1113 (9th Cir. 2020) ("A doctor's clinical opinion must be judged under the same standard as any other representation. A doctor, like anyone else, can express an opinion that he knows to be false, or that he makes in reckless disregard of its truth or falsity."). The quantum of proof necessary to prove falsity, however, varies among jurisdictions. *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) ("[In] order to show objective falsity as to a claim for hospice benefits, the Government must show something more than the mere difference of reasonable opinion concerning the prognosis of a patient's likely longevity.") *contra United States v. Paulus*, 894 F.3d 267, 277 (6th Cir. 2018) ("[Expert] opinions, having been accepted into evidence, are sufficient to carry the government's burden of proof [in a Section 1035 prosecution]. They assert that Paulus routinely exaggerated what he saw on his patients' angiograms, and therefore that his statements were false.").

In *United States v. Masquias*, the Fifth Circuit rejected the proposition that clinical judgments cannot be false statements. 29 F.4th 276 (5th Cir. 2022). The defendants in *Masquias* engaged in a "scheme to falsely certify that patients were eligible for home health or hospice services" in violation of 18 U.S.C. § 1347. *Id*. at 279. They argued that the United States failed to prove "objective falsity." *Id*. at 282. That is, the defendants argued that certified patients were, in their medical judgment, eligible for hospice care. *Id*. The *Masquias* court ultimately rejected this argument, holding that "health care providers cannot immunize themselves from prosecution by cloaking fraud with a doctor's note." *Id*. at 282 (citing *United States v. Veasey*, 843 F. App'x 555, 561-52 (5th Cir. 2021) (rejecting the defendant's argument that "a difference in [expert] opinion cannot establish an intent to commit fraud")).

The Fifth Circuit in *Masquias* also distinguished the *AseraCare* decision, noting that the Eleventh Circuit merely held that "after-the-fact expert testimony" and "lax business practices" was insufficient evidence of fraud. *Id*. at 282-83 (citing *AseraCare, Inc.,* 938 F.3d at 1297). The *AseraCare* court recognized, however, that "stronger evidence, like facts inconsistent with the doctor's proper exercise of their clinical judgment, could change the outcome." *Id*. The United States intends to offer proof at trial that constitutes "stronger evidence," including *inter alia* a contemporaneous decision by the MRB contradicting Bynon's purported clinical judgment, Bynon's complete lack of transparency, and Bynon's admission that he used restrictive donor criteria "as a mechanism by me and only me for internal hold."

Significantly, the *Masquias* court refused to require expert testimony or adopt a threshold for proving the falsity of a clinical judgment. It held that "[categorical] evidentiary requirements are at odds with a jury's ability to consider a broad array of direct and circumstantial evidence." *Id*. (citing *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017) (rejecting defendant's argument that "expert testimony from a doctor who reviewed patient files is required

for a jury to find that the [psychiatric] treatment was not medically necessary," noting that "defendant points [the Court] to no other topics of testimony in which federal criminal law requires expert testimony to support a conviction")); Fifth Circuit Pattern Jury Instructions (Criminal) § 1.07 (2015) ("The law makes no distinction between the weight to be given either direct or circumstantial evidence.").

Whether Bynon's statements were false or true is a question for the jury to resolve. He argues that "widespread practice of internal holds before April 2026 was not prohibited by UNOS, OPTN, and HRSA." (Docket No. 135 at p. 23.) Bynon is entitled to argue that his actions aligned with "widespread practice." The United States is entitled to adduce evidence showing that Bynon's actions were not "widespread practice" and misrepresented the MRB's eligibility determinations and made false statements in a manner that circumvented notification policies.

Evidence at trial will place Bynon's statements in context. *See United States v. Elfenbein*, 144 F.4th 551, 566 (4th Cir. 2025) ("[Language] that doesn't mean much on its own can acquire meaning from context. And once it does, people can use that language to tell the truth—or not."). "A district court may make preliminary findings of fact necessary to decide questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Bynon*, 2026 U.S. Dist. LEXIS 125562, at *6-7 (quoting *United States v. Flores*, 404 F.2d 320, 324 n.6 (5th Cir. 2005)). The factual disputes in this case are not "preliminary," they are dispositive of criminal liability. Exhibits attached to motions and oral arguments at hearings are no substitution for a trial record. "There is no such thing as a motion for summary judgment in a criminal case." *Russell v United States*, 369 U.S. 749, 791 (1962) (Harlan, J., dissenting); *United States v. Ponce*, Case No. 09-516, 2009 U.S. Dist. LEXIS 104019, at *5 (S.D. Tex. Nov. 4, 2009) (Rosenthal, J.) ("A pretrial motion to dismiss an indictment is not a proper vehicle to challenge the adequacy of the Government's evidence.")

(citation omitted); *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) (per curium) (reversing the district court's ordering dismissing an indictment because "[there] is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of the sufficiency of the evidence."); *United States v. Green*, Case No. 25-030, 2025 U.S. Dist. LEXIS 211970, at *5 (E.D. La. Oct. 28, 2025) (denying a motion to dismiss because the defendant "essentially asks the Court to engage in an analysis of the facts and law equivalent to a civil motion for summary judgment") (citation and quotation omitted); *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) ("A defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence.").

In sum, dismissal at this juncture would usurp the jury's role as the ultimate arbiter of facts and would require this Court to rule on an incomplete record.

**B. Willfulness**

Bynon avers that the superseding indictment "fails to allege the willfulness element" because it sets forth "no sources of positive law that legally prescribed Dr. Bynon's conduct." (Docket No. 135 at p. 18.) It is unclear what Bynon is referring to when he cites "positive law." Positive law is "a system of law promulgated on and implemented within a particular political community by political superiors, as distinct from moral law or law existing in an ideal community or in some nonpolitical community. Positive law typically consists of enacted law – the codes, statutes, and regulations that are applied in the courts." *Stover v. United States*, Case No. 04-298, 2007 U.S. Dist. LEXIS 21804, at *7 (N.D. Ohio Mar. 27, 2007) (quoting Black's Law Dictionary "positive law" (8th ed. 2004)). Federal Rule of Criminal Procedure 7 makes no reference to "positive law," and at least one court has rejected a "positive law" argument in relation to a defendant's motion to dismiss. *See United States v. Pansier*, Case No. 05-272, 2007 U.S. Dist. LEXIS 43295, at *10 (E.D. Wis. June 13, 2007) ("Whether Title 26 is positive law or not, the

indictment's reference to sections of Title 19 and Title 26 put [the defendant] on fair notice of these statutes."). The superseding indictment alleges that Bynon violated 18 U.S.C. § 1035 by making false statements relating to health care matters. (Docket No. 128 at p. 9.) Section 1035 is positive law because this statute was enacted by Congress.

The superseding indictment need not cite a specific regulation or policy other than the charged offense. Moreover, the United States need not prove that Bynon intended to violate a specific regulation or policy. In *Bryan v. United States*, the Supreme Court considered whether the term "willfully" required the United States to prove "knowledge of the law." 524 U.S. 184, 194 (1998). The answer to this inquiry is contingent on the offense charged in the indictment. For instance, "in certain cases involving a willful violation of the tax law, [the Supreme Court] concluded that the jury must find that the defendant was aware of the specific provision of the tax code that he was charged with violating." *Id*. (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991)); *see Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (holding that "the jury had to find [that the defendant] knew the structuring in which he engaged was unlawful"). The *Bryan* Court distinguished *Cheek* and *Ratzlaf* from a case charging a firearm offense (18 U.S.C. § 924) because the former "involved highly technical statues that threatened to ensnare individuals engaged in apparently innocent conduct." *Id*. at 195. Accordingly, the "willfulness requirement of [the firearm statute did] not carve out an exception to the traditional rule that ignorance of the law is no excuse: knowledge that the conduct is unlawful is all that is required." *Id*. at 196*; see United States v. George*, 386 F.3d 383, 393 (2d Cir. 2004) ("[The] Second Circuit has held that the term 'willfully' in criminal statutes typically does not require the government to prove the defendant's specific intent to violate the particular criminal statute in question.").

The Fifth Circuit adopted the rationale set forth in *Bryan*, identifying "three levels" of willfulness in criminal statutes. *United States v. Kay*, 513 F.3d 432, 447 (5th Cir. 2007). The first

tier is the "most basic:" The defendant "need not have known of the specific terms of the statute or even the existence of the statute." *Id.* The second "intermediate" tier of willfulness requires the "defendant to have known that his actions were in some way unlawful." *Id.* Namely, the defendant "need not have known of the specific statute, but rather that he must have acted with the knowledge that he was doing a 'bad' act under the general rules of law." *Id.* The third tier is the "strictest," requiring proof that the defendant "knew the terms of the statute and that he was violating the statute." *Id.* at 448. This tier is reserved for complex criminal statutes, such as federal tax law. *Id.*

Because Section 1035 is not a complex or technical statute, the intermediate tier of willfulness is applicable. *See United States v. Starnes*, 583 F.3d 196, 210 (3rd Cir. 2009) ("[When] 'willfully' is used in a criminal statute, and particularly where the term is used in conjunction with 'knowingly,' as it is in § 1001, it usually requires the government to prove that the defendant acted 'not merely voluntarily, but with a bad purpose,' that is, with knowledge that his conduct was, *in some general sense*, 'unlawful.'") (emphasis added); *George*, 386 F.3d at 389 (holding that "a conviction under § 1542 only requires that a defendant provide in a passport application information he or she knows to be false and does not mandate that the defendant act with a specific purpose to make false statements or to violate the law, either generally or § 1542 specifically"); *United States v. Perry*, Case No. 13-156, 2014 U.S. Dist. LEXIS 175643, at *6-8 (E.D. Va. Dec. 19, 2014) (rejecting the defendant's argument that Section 1035 is subject to the "elevated *mens rea*" identified by the *Cheek* and *Ratzlaf* courts). Thus, the United States need not prove that Bynon knew the specific statute, regulation, or policy that he violated. *Kay*, 513 F.3d at 447; *see also, e.g., United States v. Delgado*, 668 F.3d 219, 225-26 (5th Cir. 2012) (holding that "the jury could readily infer [the defendant's] criminal intent to commit healthcare fraud and to make false statements relating to health care matters" based on the fact that this defendant was "a medical

billing expert with thirty years experience who received continual updates from Medicaid and Medicare"). The indictment sufficiently alleges a willful violation of § 1035.

Section 1035 requires that the defendant act "knowingly and willfully." 18 U.S.C. § 1035, *United States v. Henderson*, 893 F.3d. 1338 (11th Circ. 2018). "A defendant acts willfully when he acts with 'knowledge that his conduct was unlawful' and acts knowingly if he acts with 'knowledge of the facts that constitute the offense.'" *United States v. Clay*, 832 F.3d 1259, 1301 (11th Cir. 2016) (quoting *United States v. Dominguez*, 661 F.3d 1051, 1068 (11th Cir. 2011)). The United States is entitled to prove such knowledge or intent through circumstantial evidence. *Henderson* at 1309. In *Henderson*, circumstantial evidence demonstrated that the defendant "knowingly and willfully" violation Section 1035: This evidence included the defendant's familiarity with the process for conducting clinical consults. *Id*. at 1349; *see, e.g*., *United States v. Reed*, 710 F.3d 219, 226-27 (5th Cir. 2012) ("Because the trial evidence showed that the Reeds were familiar with Medicare regulations, and knew they were overutilizing non-emergency ambulance transport, the jury was permitted to find that the Reeds knew their agreement's objective was illegal."). Like *Henderson*, Bynon's state of willfulness can be established through a series of circumstantial facts. Bynon is well versed as a transplant surgeon and has served on several organ transplant committees, notwithstanding the fact that he was the Director of Transplant Surgery at MHHS. His expertise and comprehensive understanding of the procedures and protocols is probative of intent. He knew how use the proper procedures such as *transparent* internal holds and/or "Status 7" to properly deactivate a patient from receiving an organ donation. Bynon chose, however, to do it in secret. Guilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their very nature, often yield little in the way of direct proof. *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998). See also United States vs Clay, 832 F.3d. 1259 (11th Cir. 2016). Mens rea elements such as knowledge or intent

may be proven by circumstantial evidence. *See United States v. Santos*, 553 U.S. 507, 521, 128 S. Ct. 2020, 2029, 170 L. Ed. 2d 912 (2008). The willful intent of Bynon can be shown through a pattern of deceit and lack of transparency and not by one single isolated act. The United States will present a course of conduct to the jury to see what happened before the defendant's false entries, what happened after the false entries were made, what was documented at the time, what the defendant knew, what he communicated, and what occurred afterward. That chronology is central to determining both falsity and intent. A single unexplained entry might be characterized as an error which is not the case here. The jury cannot examine a single entry in isolation but should examine the entire series of events and the accumulation of circumstances, not one alteration standing alone.

## V. CONCLUSION

For the reasons set forth above, the United States requests that the Court deny Bynon's motion to dismiss the superseding indictment. (Docket No. 135.)

Respectfully Submitted,
AARON F. REITZ
United States Attorney
Southern District of Texas

By: */s/ Amanda Alum*
Amanda Alum
Suzanne Elmilady
Sherin Daniel
Anthony Franklin
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9000

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been delivered on counsel of record via ECF upon filing.

*/s/ Amanda Alum*
Amanda Alum
Assistant United States Attorney