United States District Court
Southern District of Texas
**ENTERED**
October 14, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CRIMINAL ACTION NO. H-26-23 |
| | § | |
| JOHN STEVENSON BYNON, JR., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDERS**

A grand jury returned a superseding indictment against Dr. John Stevenson Bynon, Jr., an experienced liver transplant surgeon, for making false statements in connection with a health-care benefit program, in violation of 18 U.S.C. § 1035. (Docket Entry No. 128). The government alleges that Dr. Bynon entered unrealistic age and weight donor criteria for five of his patients on the United Network of Organ Sharing's donor-matching system. (*See id.* ¶¶ 12–19; Docket Entry No. 135). The government alleges that the donor-matching criteria were false statements and that they made Dr. Bynon's patients "either severely restricted or functionally ineligible to receive a donor organ offer," (Docket Entry No. 128 ¶ 12), while the criteria were in place.

Dr. Bynon has filed several pretrial motions: a limine motion to exclude evidence and testimony about alleged violations of 42 C.F.R. § 482, Subpart E (.60–.104), (Docket Entry No. 91); motions for a bill of particulars on the "willfulness" and "falsity" elements of the charges against him, (Docket Entry Nos. 93, 120); a motion to exclude the testimony of one of the government's expert witnesses, Dr. Raymond Lynch, who will opine that Memorial Hermann's liver-transplant patients had their donor-matching criteria adjusted more frequently than those in other liver transplant programs, (Docket Entry No. 99); a motion to exclude the testimony of

another government expert Dr. Matthew Cooper, who will opine about the medical suitability of the five patients at issue for liver transplantation when Dr. Bynon adjusted their donor criteria, (Docket Entry No. 103); a motion to exclude the undisclosed expert testimony of treating physicians at Memorial Hermann and UT health, and the testimony of Ms. Shauna Schwarm, the government's witness who works with Medicare, (Docket Entry No. 136); and an omnibus motion in limine, (Docket Entry No. 137).

The government has also filed several pretrial motions. One is a limine motion to exclude the testimony of two of Dr. Bynon's experts: Dr. Jesse Schold, who will opine, *inter alia*, about how donor-matching operates; and Dr. Sophoclis Alexopoulos, who will opine that the five patients described in the superseding indictment were not healthy enough to accept a transplant when Dr. Bynon altered their donor-matching criteria to preclude donor offers, (Docket Entry Nos. 128, 133, 179, 182); an omnibus motion in limine about, *inter alia*, good-character evidence and the reasonable-doubt standard, (Docket Entry No. 139); a notice of the government's intent to introduce evidence under Federal Rule of Evidence 404(b), (Docket Entry No. 140); a motion to file late designations of treating physicians as non-retained experts, (Docket Entry No. 163); a motion for reconsideration, (Docket Entry Nos. 164, 165); another limine motion to exclude the expert testimony of Dr. Alexopoulos, (Docket Entry No. 172); and a motion to require the production of defense witness statements, (Docket Entry No. 174).

The court granted Dr. Bynon's motion for a bill of particulars on the "willfulness" element. (Docket Entry No. 126). Based on a thorough review of the motions, the responses, the replies, the record, the applicable law, and with the benefit of oral argument, (*see, e.g.*, Docket Entry Nos. 146, 150, 157, 173, 178), the court grants the defense limine motion on 42 C.F.R. § 482, Subpart E, (Docket Entry No. 91); denies the defense motion for a bill of particulars on the "falsity"

element, (Docket Entry No. 120); grants in part and denies in part the defense motions to exclude the testimony of Dr. Lynch and the testimony of Dr. Cooper, (Docket Entry Nos. 99, 103); denies the government's motions to exclude the testimony of Dr. Schold and the testimony of Dr. Alexopoulos, (Docket Entry Nos. 133, 179, 182); grants the defense motion to exclude undisclosed expert testimony, (Docket Entry No. 136); grants in large part, *see infra* at 45–51, the defense motion in limine, (Docket Entry No. 137); grants in part and denies in part, *see infra* at 59–61, the government's motion in limine, (Docket Entry No. 139); defers ruling on the government's Rule 404(b) motion until trial, (Docket Entry No. 140), but enters a limine order as to the evidence at issue until that ruling is made; denies the government's motion for leave to file late designations of treating physicians as non-retained experts, (Docket Entry No. 163); denies the government's motion for reconsideration, (Docket Entry Nos. 164, 165); grants in part and denies in part the government's motion in limine as to Dr. Alexopoulos, (Docket Entry No. 172); and will hear the government's motion to require the production of defense witness statements, (Docket Entry No. 174), at the appropriate time during the trial, subject to the condition that the government may not demand that the defense produce witness statements in the jury's presence.

The reasons for these rulings are set out below.

## I. Background

In 1984, Congress passed the National Organ Transplant Act, establishing the Organ Procurement and Transplant Network. (Docket Entry No. 128 ¶ 5). Congress directed the Transplant Network to maintain a national registry for organ matching and to contract with a private organization to operate the network. (*Id.*). The Transplant Network awarded the contract to the United Network of Organ Sharing ("UNOS") to operate the national registry. (*Id.*). UNOS is "responsible for managing the national transplant waiting list, matching potential transplant

donors and recipients, maintaining the database that contains all organ transplant data for every transplant that occurs in the United States, [and] ensuring that patients receive a fair chance at receiving organ[s] they need without regard for age, sex, ethnicity, religion, [or] financial/social status . . . ." (*Id.* ¶ 6).

UNOS created UNet, a platform to help match organ donors and potential recipients. (*Id.* ¶ 7). UNet includes a "Waitlist" of individuals in need of organ transplants; a "DonorNet" category identifying organ donors; a "TransNet" category designed to match donors and recipients correctly and efficiently; and other information resources, such as the Transplant Information Electronic Data Interchange, to facilitate compatible matches between donors and transplant recipients. (*Id.*).

UNet's matching system relies on patient medical data supplied by physicians. (*Id.* ¶ 8). UNet's matching system includes facts about a patient's immunological system and "donor matching criteria," such as the size and weight of an acceptable donor for that patient. (*Id.*). "These parameters contribute to the ability of the transplant recipient to be matched with a transplant donor and therefore the likelihood of a successful transplant." (*Id.*).

John Stevenson Bynon, Jr., is a Houston physician licensed to practice medicine in Texas. (*Id.* ¶ 10). Dr. Bynon served as the Director of Abdominal Organ Transplantation and the Surgical Director for Liver Transplantation of Memorial Hermann Health System's Texas Medical Center. (*Id.*). He was the Texas Medical Center's primary surgeon for liver transplants in the Organ Procurement and Transplant Network. (*Id.*).

A grand jury indicted Dr. Bynon for five counts of making false statements relating to health-care matters, in violation of 18 U.S.C. § 1035, as shown in the following table:

| Count | Date | Patient | Description | Nature of Falsity |
|---|---|---|---|---|
| 1 | March 22, 2023 - February 14, 2024 | C.C. | Medical Record | Donor matching criteria |
| 2 | February 13, 2024 – March 23, 2024 | A.P. | Medical Record | Donor matching criteria |
| 3 | February 10, 2023 – December 22, 2023 | R.O. | Medical Record | Donor matching criteria |
| 4 | April 25, 2023 – March 26, 2024 | P.P. | Medical Record | Donor matching criteria |
| 5 | December 23, 2023 – December 24, 2023 | O.F. | Medical Record | Donor matching criteria |

(*Id.* at 9).

The government alleges that, when Dr. Bynon changed the donor-matching criteria for these five patients, "[t]here was no documented change in the patient's condition supporting the newly restrictive criteria" and that Dr. Bynon did "not disclose[]" the changes in the criteria "to the patients, transplant committee, or other people who reasonably would have expected to know about it." (*Id.* ¶ 20). The government alleges that "[t]he absence of documented clinical justification, the departure from established procedures, the failure to obtain or seek appropriate review, the lack of transparency to fellow physicians, staff and patients, and the secretive nature of Bynon's material alterations capable of eliminating transplant offers are circumstances supporting a reasonable inference that the false statements . . . were created intentionally and deliberately and materially influenced the opportunity for a liver transplant." (*Id.* ¶ 21).

## II. The Legal Standards

### A. The Limine Motions under Rule 403

Under Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion

of relevant matter under Rule 403." *United States v. Pace*, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (cleaned up). Courts can prevent the prejudice impact of evidence by issuing "limiting instructions to the jury." *United States v. King*, 93 F.4th 845, 850 (5th Cir.), *cert. denied sub nom. Diggs v. United States*, 145 S. Ct. 213 (2024).

**B. The Motion for a Bill of Particulars**

Under Federal Rule of Criminal Procedure 7, "[t]he court may direct the government to file a bill of particulars." FED. R. CRIM. P. 7(f). "A bill of particulars is used to further inform a defendant of the charges against him, to minimize surprise at trial, and to enable him to adequately prepare a defense." *United States v. Natividad-Garcia*, 560 F. Supp. 2d 561, 570 (W.D. Tex. 2008) (citing *United States v. Carlock*, 806 F.2d 535, 550 (5th Cir. 1986)). Although a trial court may require the government to provide a bill of particulars, "most requests for bills of particulars are denied." *United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009). The bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980).

**C. Expert Testimony**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)). Expert testimony must be both "relevant and reliable" to be admissible. *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *Pipitone*, 288 F.3d at 243–44); *Daubert*, 509 U.S. at 589 (stating that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education. Fed. R. Evid. 702. Experts must have expertise in the general area in which they testify but need not have expertise in the specialized area directly pertinent to the issues in question. *United States v. Marler*, 614 F.2d 47, 50 (5th Cir. 1980). The court must determine whether the proposed expert's training and experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004).

The court must determine relevance by asking whether the expert testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *Pipitone*, 288 F.3d at 245. The court must determine reliability considering the soundness of the general principles or reasoning on which the expert relies and of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer,*

*Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001). The court's focus is not on the expert's conclusions but on the reasoning and methodology used to reach those conclusions. *Daubert*, 509 U.S. at 594–95. These considerations apply to all types of expert testimony, whether based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999); *Tucker*, 345 F.3d at 327.

The reliability factors from *Daubert* include whether the expert's technique or theory can be or has been tested; whether it has been subjected to peer review and publication; whether it has a known or potential rate of error or standards and controls guiding its operation; and whether it has been generally accepted in the scientific community. *Pipitone*, 288 F.3d at 244 (citing *Daubert*, 509 U.S. at 593). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The test for reliability is flexible. The specific factors listed in *Daubert* and its progeny neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire*, 526 U.S. at 150. The district court "has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 458–59 (5th Cir. 2012) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)). The trial court's role as gatekeeper is not intended to replace the adversary system; "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Daubert*, 509 U.S. at 596; *Pipitone*, 288 F.3d at 250. "[A] trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone*, 288 F.3d at 250.

Admissibility of expert testimony is an issue for the trial judge to resolve under Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592–93; *Brumley*, 200 F.R.D. at 601. The party offering the testimony must prove by a preponderance of the evidence that the expert's opinion is relevant and reliable. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Brumley*, 200 F.R.D. at 601. "A trial court's ruling regarding admissibility of expert testimony is protected by an ambit of discretion and must be sustained unless manifestly erroneous." *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995).

## III. Dr. Bynon's Limine Motion

Dr. Bynon moves to exclude "evidence or testimony about § 482.94 at trial." (Docket Entry No. 91 at 8). This regulation provides that a transplant program must keep up-to-date waiting-list patients' "clinical information." 42 C.F.R. § 482.94(b)(1). The regulation requires transplant programs to inform patients of their "transplant status," specified as the patient's "placement on the program's waiting list"; a "program's decision not to place the patient on its waiting list"; or a "program's inability to make a determination regarding the patient's placement on its waiting list because further clinical testing or documentation is needed." *Id.* § 482.94(c)(1)(i)–(iii). If a patient "is removed from the waiting list for any reason other than death or transplantation, the transplant program must document in the patient's record that the patient . . . was notified no later than 10 days after the date the patient was removed from the waiting list." *Id.* § 482.94(c)(2).

Dr. Bynon argues that § 482.94 is irrelevant, for several reasons: it regulates only transplant programs, not individual doctors; it cannot be used to "'bootstrap' a criminal law violation from a defendant's 'civil regulatory violation[,]'"; and there is no violation of § 482.94 because it does not require patient notification when the patient is temporarily inactive but still on the waiting list (a "Status 7 formal hold") or temporarily ineligible based on changes to the donor-eligibility-screening criteria (an "internal hold"). (*See* Docket Entry No. 91 at 5, 9–10).

The government responds that Dr. Bynon violated § 482.94, citing an investigation and report by the Texas Department of Health and Human Services. (*See* Docket Entry No. 108 at 4–5). The government argues that, in any event, exclusion is not appropriate because § 482.94 is probative evidence of Dr. Bynon's willfulness in making the misrepresentations alleged. (Docket Entry No. 108 at 6–10). The government argues that Dr. Bynon's failure to disclose his changes to the donor criteria for the five patients is admissible because Dr. Bynon signed forms certifying his agreement to comply with Medicare regulations and § 482.94 requires disclosure of certain changes to a patient's transplant status. (*See id.* at 4, 6–8). The government acknowledges that "limiting instruction[s]" may be needed to reduce the risk of unfair prejudice to Dr. Bynon. (*See id.* at 9).

The court grants Dr. Bynon's motion in limine and will exclude evidence relating to § 482.94. Dr. Bynon, as a matter of law, did not violate § 482.94 by failing to inform his patients when he changed the criteria to preclude donor offers for these patients. Section 482.94 requires that a transplant program notify a patient of: (1) his or her "placement" on the waitlist; (2) the decision "not to place the patient on" the waitlist; (3) the transplant program's "inability to make a determination" about whether to place the patient on the organ waitlist; and (4) the patient's "removal" from the waitlist. *See* 42 C.F.R. § 482.94(c)(1)–(2). Status 7 inactivations, internal

holds, or donor-criteria changes, are not in any of these categories. The government asks the court to imply a requirement to notify patients of the donor-criteria adjustments at issue here from the term "transplant status." *See id.* § 482.92(c)(1). But neither the language of, nor the guidance under, this regulation required a treating physician to notify patients of the donor-criteria adjustments, as the government alleges.

Guidance at the time of the charged conduct and even today does not require treating doctors or transplant programs to notify patients of inactivations, internal holds, or donor-criteria adjustments. A frequently asked question that UNOS receives is whether "patient notification [is] required for individual candidate inactivation[.]" UNOS answers, "No[,]" to that question. UNOS, FAQs (Mar. 23, 2020), https://perma.cc/QX5W-TKT6.

The federal Health Resources and Services Administration ("HRSA") acknowledges that its guidance does not require such notification. In seeking public comment on proposals for new regulations, HRSA stated that "[c]urrent OPTN Policy does not require transplant programs to notify patients when their status changes, so it is not a uniform practice across the country." *Require Patient Notification for Waitlist Status Changes*, HEALTH RES. & SERVS. ADMIN. (Oct. 2025), https://perma.cc/A8KN-FCEL. Indeed, OPTN has proposed changes that "would [require] patient[] notice within 10 business days if: [t]he patient is changed from active to inactive status on the waiting list (meaning they are temporarily not eligible to receive organ offers)[;] [or] [t]he patient is changed from inactive back to active status on the waiting list (meaning they are once again eligible to receive organ offers)." *Id.* The federal government has sought public comment to *change* the regulations to require notifications under the circumstances alleged in the indictment.

The government's argument is undermined by the record it cites. In response to the COVID-19 pandemic, UNet guidance to transplant programs was that they could falsify donor

criteria in the same fashion Dr. Bynon did, to preclude donor organ offers during the period that COVID affected a patient's ability to withstand the transplant procedure. That approach allowed a patient on the wait list for a donated organ to stay on the wait list and to keep accruing time on the list, while being temporarily ineligible to receive a donor organ offer. Dr. Bynon used this same approach of adjusting donor criteria for patients who did not have COVID but who, he asserts, were not medically able to withstand transplantation at the time. The government may dispute his medical judgment, but—as the government acknowledges—this is not a medical malpractice case. (*See* Docket Entry No. 157 at 43:04–10). Federal regulations and guidance did not require Dr. Bynon to notify his patients of his adjustments to their donor criteria when they took place.

The jury must not be misled into thinking that Dr. Bynon did, or could have, violated § 482.94. The risk of that misconception is in addition to the general concern that violations of federal regulations are not crimes and that "bootstrap[ped]" violations of civil regulations cannot be violations of criminal statutes. *See United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980).

To avoid undue prejudice and prevent jury confusion, the government may not refer to or present testimony or evidence about § 482.94 at trial. The motion in limine, (Docket Entry No. 91), is granted.

**IV. Dr. Bynon's Motion for a Bill of Particulars**

Dr. Bynon has moved for a bill of particulars on the "falsity" element of the charges against him. (Docket Entry No. 120). Dr. Bynon so moved after the government conceded, in the face of Dr. Bynon's *Daubert* motions, that it would call its experts, Dr. Raymond Lynch and Dr. Matthew Cooper, to testify only in its rebuttal. (*See id.* at 9–11). Dr. Bynon argues that the government's

theory of the case has been "shifting" and that he needs to know what theory the government will attempt to prove in its case-in-chief. (*See id.* at 11–12).

Dr. Bynon asks the government to "explain the legal theories upon which it intends to rely at trial." *Burgin*, 621 F.2d at 1359; *see also United States v. Hajecate*, 683 F.2d 894, 898 (5th Cir. 1982) ("[A] bill of particulars cannot be required to compel revelation of the full theory of the case or all the evidentiary facts." (citations omitted)); *see also id.* ("We conclude that the government has fulfilled its duty here in presenting a constitutionally adequate indictment . . . and in voluntarily furnishing two bills of particulars to assist the defendants.").

This case does not present a compelling need for additional disclosures from the government. The government has alleged that Dr. Bynon made false statements when he changed the donor-matching criteria to temporarily preclude organ-donor offers to the five patients at issue. (*See* Docket Entry No. 37 at 5 ("[T]he donor criteria established by Defendant contain factual assertions.")). Dr. Bynon argues that adjusting the donor-matching criteria, without more, was not a statement at all and, if it was a statement, it was not false in context, but rather truthfully communicated that organs should not be offered to these patients because they were not, at the time, medically able to accept them for transplantation. (*See* Docket Entry No. 44 at 3). The court declined to dismiss the indictment on this basis because there is "no procedural mechanism to close the factual record before the [government] rests its case at trial" and "additional evidence could [through added context] change the meaning (or lack thereof) of a donor-acceptance-criteria adjustment." *Bynon*, 2026 WL 1595296, at *6.

The government's position, that adjusting the donor-matching criteria to specify medically inappropriate donor organs is literally a false statement, has not changed. Dr. Bynon's motion appears to be in part, a challenge to the sufficiency of the evidence of "literal falsity," because the

donor-criteria adjustment, in context, truthfully stated that no donor offers were sought for the particular patients while those criteria were in place. (*See* Docket Entry No. 43 at 7–9, 8 n.2 (discussing the "literal falsity" and "contextual falsity" legal theories)). But that does not require additional disclosures from the government.

The government has stated that it will not call its expert witnesses, Dr. Cooper or Dr. Lynch, in its case-in-chief, but only in rebuttal. (Docket Entry No. 157 at 89:14–18). The government may not improperly continue its case-in-chief in rebuttal. *See Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief."); *see also Stone v. Chicago, M., St. P. & P.R. Co.*, 53 F.2d 813, 816 (8th Cir. 1931) ("The rule requires that plaintiff must try his case out when he commences, and cannot divide up his evidence so as to give part of it in chief and hold back part of it for rebuttal."); *see also Steele v. Kenner*, 129 F. App'x 777, 780 (4th Cir. 2005) ("A party may not use rebuttal as an attempt to introduce evidence that he should have introduced in his case-in-chief." (citing *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (defining rebuttal evidence as "evidence given to explain, repel, counteract, or disprove evidence offered by the adverse party"))). If necessary, the court may permit surrebuttal, which "is merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony." *See United States v. Moody*, 903 F.2d 321, 331 (5th Cir. 1990) (citing *United States v. Durnin*, 632 F.3d 1297, 1301 n.8 (5th Cir. Unit A 1980). But the effect of the government's decision to present its experts in rebuttal is a separate issue from the central one presented in the motion for a bill of particulars, (Docket Entry No. 120).

The government has outlined its literal falsity theory in response to Dr. Bynon's pre-trial motion practice, through a separate trial brief, and in response to the court's questions at pre-trial hearings. The government has disclosed its witness and exhibit lists and has produced the exhibits on its list. *See United States v. Faulkner*, No. 3:09-CR-249-D(02), 2011 WL 2880919, at *2 (N.D. Tex. July 15, 2011). Dr. Bynon does not need a bill of particulars on the "falsity" element to prepare for trial.

The motion for a bill of particulars on the "falsity" element, (Docket Entry No. 120), is denied.

**V. Dr. Bynon's Motions to Exclude Expert Testimony**

Dr. Bynon has moved to exclude the expert opinions and testimony of Dr. Raymond Lynch and Dr. Matthew Cooper. (Docket Entry Nos. 99, 103). The motions are granted in part and denied in part.

**A. Dr. Raymond Lynch**

Dr. Raymond Lynch is the "Acting Director of the Division of Transplantation (DOT) in the Health Resources and Services Administration (HRSA), an agency within the United States Department of Health and Human Services (HHS)." (Docket Entry No. 100 at 2) (dated June 7, 2026). Before joining the government, Dr. Lynch "was a practicing academic transplant surgeon." (*Id.* at 3). He has an "undergraduate degree in biochemistry at Boston College" and "Doctor of Medicine and Master of Science (Immunobiology) degrees from Yale University School of Medicine." (*Id.*). He completed his "internship and residency in general surgery at the University of Michigan" and then completed "a fellowship in abdominal transplant surgery at Emory University." (*Id.*). He received faculty appointments "as an Assistant Professor of Surgery at the University of Kansas Medical Center"; an Assistant Professor of Surgery at Emory, where he was

later promoted to Associate Professor of Surgery; and a "Professor of Surgery and Public Health Sciences at Penn State Health," where he "also served as the Director of Transplantation Quality and Outcomes and the Director of Public Health and Policy for the Penn State Health Liver Center." (*Id.*). At the October 6, 2026, *Daubert* hearing, Dr. Lynch acknowledged that did not voluntarily leave Penn State and confirmed that he reached a settlement with his former employer. (*See* Docket Entry No. 173). He began working for the federal government in October 2024. (*See id.*).

Dr. Lynch has "performed hundreds of deceased donor organ procurements, kidney transplants, and liver transplants." (*Id.*). He has "also conducted or supervised hundreds of inpatient and outpatient evaluations of patients for initial suitability and continued candidacy on transplant waitlists." (*Id.*). Dr. Lynch "was recognized by Atlanta Magazine as one of Atlanta's Top Doctors for seven consecutive years from 2017-2023." (*Id.*).

As an academic, Dr. Lynch has "published 71 peer-reviewed articles, including 25 as the first or last author." (*Id.*). His areas of focus include "fairness in access to organ transplant and assessment of the performance of organ procurement organizations (OPOs) and the OPTN." (*Id.*). He has "served as a member of the editorial board of the journal Liver Transplantation, and ha[s] been a reviewer of articles submitted to The Lancet, The Journal of the American Medical Association (JAMA), Annals of Surgery, Hepatology, the American Journal of Transplantation, Liver Transplantation, Transplantation, Clinical Transplantation, and the Journal of the American College of Surgeons." (*Id.*). He also testified before Congress on "reforms to the oversight of transplant centers," which led to "the Securing the U.S. Organ Procurement and Transplantation Network Act." (*Id.* at 3–4).

Dr. Lynch plans to testify on up to eight topics at trial:

(1) [An] overview of HRSA, [the Organ and Transplantation Network, ("OPTN")], and oversight of transplantation to improve health outcomes through access to quality services, skilled health workforce, and innovative high-value programs. The OPTN's responsibility of maintaining the national transplant waiting list and developing policies around the placement of patients on the waitlist and creating policies and procedures for the matching of donated organs to waitlisted candidates.

(2) Liver transplantation as the definitive treatment for end stage liver disease ("ESLD"), of the point at which liver dysfunction is irreversible and can only be corrected by the replacement of the damaged organ;

(3) Evaluation for placement on the liver transplant waitlist after signs or symptoms of ESLD, listing practices and thresholds including considerations such as the presence of ESLD (need for transplant), cardiopulmonary fitness and surgical considerations (ability to undergo and withstand the procedure), survival potential and expected capacity to adhere to post-transplant regimen;

(4) OPTN Membership and Professional Standards Committee's ("MPSC") review of concerns at MHHS liver transplant program including a site visit by OPTN peer review volunteers in May 2024, substantiated unusual patterns of changes to donor acceptance criteria for liver waitlist candidates, and strong concerns about the conduct of Dr. Bynon and the voluntarily inactivation of its liver transplant program on April 10, 2024;

(5) Dr. Bynon's extensive involvement as a volunteer with OPTN, participation on the National Liver Review Board ("NLRB") from 2018-2022 involving assessment of the medical necessity and utility of MELD exception requests submitted by OPTN member[s], which requires familiarity with both patient disease and the transplant environment;

(6) The overview of MHHS' liver transplant program from OPTN data and comparison with other liver transplant programs in OPTN Region 4 (Texas and Oklahoma), utilization of donation after circulatory death (DCD) livers and transplants from donors infected with Hepatitis C virus (HCV+);

(7) MHHS's SRTR metrics for the period from the middle of 2020 through the inactivation of the program in 2024 showing worse than expected rates of transplant and death for patients on the liver transplant waitlist at MHHS, despite expected or higher-than-expected offer acceptance rates;

(8) Application of "throttle" criteria at MHHS- unusually narrow parameters for donor age and weight causing the effect of restricting, or throttling, the proportion of donors from whom livers would be offered to patients, comparison of the fraction of adult patients at MHHS with throttle criteria applied at least once during their time on the waitlist with the rest of OPTN Region 4.

(Docket Entry No. 116 at 3–4 (first quoting Docket Entry No. 99 at 1–2; and then quoting Docket Entry No. 89 at 5–7)).

Dr. Bynon moves under Rule 702 to exclude Dr. Lynch's testimony on topics 4, 5, 7, and 8. (Docket Entry No. 99 at 1 n.1). In addition, Dr. Bynon moves under Rule 403 to exclude Dr. Lynch's use of the term "throttle criteria"; to prevent Dr. Lynch from comparing Memorial Hermann's program to others; and to prevent Dr. Lynch from testifying about patient mortality rates and what happened to Dr. Bynon's patients after the donor-criteria adjustments. (Docket Entry No. 99 at 13–15).

**1. Rule 702**

Dr. Bynon makes six arguments in support of his motion to exclude Dr. Lynch's opinions and testimony: (1) Dr. Lynch is not qualified to make epidemiological and statistical opinions, (Docket Entry No. 99 at 7–8); (2) Dr. Lynch has not adequately disclosed the bases for his opinions, precluding an examination on the reliability of the data supporting his opinions, (*id.* at 9); (3) Dr. Lynch's statistical analyses are unreliable, are based on cherry-picked data, and include substantial analytical gaps, (*see id.* at 9–10); (4) Dr. Lynch relies on testimonial hearsay, in violation of the Sixth Amendment's Confrontation Clause, (*see id.* at 10–11); (5) Dr. Lynch will opine directly on Dr. Bynon's state of mind, in violation of Rule 704(b), (*see id.* at 11–12); and (6) Dr. Lynch is biased, not a "a bona fide scientific expert," (*see id.* at 12).

**i. Qualifications**

Dr. Bynon argues that "Dr. Lynch's report is replete with statistical and epidemiological conclusions." (Docket Entry No. 99 at 7). Although Dr. Lynch is a transplant surgeon with a master's degree in immunobiology, he does not have a degree in statistics or epidemiology. (*See id.*). Dr. Lynch is not an epidemiologist or biostatistician. (*See id.*). Tellingly, Dr. Bynon argues,

Dr. Lynch's report relies heavily on the work of staff members from the Division of Transplant, who in turn used data that was collected and coded by HRSA's Scientific Registry of Transplant Recipients ("SRTR") analytics contractor to create the statistics on which Dr. Lynch relies. (*Id.* at 8).

"[S]imply demonstrating a general knowledge in a particular field does not necessarily qualify a witness as an expert on every specific issue associated with that field." *Lofton v. Gen. Motors Corp.*, 33 F.3d 1379, at *1 (5th Cir. 1994); *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:15-CV-00551 RC-JDL, 2016 WL 9245441, at *1 (E.D. Tex. Dec. 15, 2016), *report and recommendation adopted*, No. 6:15-CV-00551-RC, 2017 WL 3404795 (E.D. Tex. Aug. 8, 2017); *see, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (cautioning that a medical degree "is not sufficient to permit a physician to testify concerning any medical-related issue"); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1112–13 (5th Cir. 1991) (same). "The court must determine whether the proposed expert's training or experience are sufficiently related to the issues and evidence before the court that the expert's testimony will assist the trier of fact." *United States v. Abdallah*, 629 F. Supp. 2d 699, 749 (S.D. Tex. 2009) (citing *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004)).

Dr. Lynch is an experienced transplant surgeon and has experience overseeing transplant programs. Although Dr. Lynch is not an epidemiologist or biostatistician, he has experience using statistics and other metrics that transplant surgeons and transplant-program administrators frequently rely on to care for their transplant patients and to run transplant programs. Many of the opinions in Dr. Lynch's report fall under this umbrella of experience. Dr. Lynch is qualified to opine about whether Memorial Hermann's "liver waitlist addition practice looks grossly similar to that at other programs," (Docket Entry No. 100 at 10); whether Memorial Hermann's "transplant

practice also showed a progressive departure from that at peer hospitals" because, for example, Memorial Hermann stopped accepting organs from after-circulatory-death donors, (*id.*); and whether "TXHH's liver program also showed a divergence from contemporary practice with regard to donors infected with Hepatitis C virus," (*id.*). Testimony about high-level trends in transplant practice and whether Memorial Hermann's liver transplant program deviated from them, are within the wheelhouse of a transplant surgeon, transplant-program administrator, and government official charged with overseeing transplant programs.

Dr. Bynon's argument that Dr. Lynch did not create the statistics on which he relies raises a separate point. An expert may be qualified to interpret metrics or statistics that he or she would not be qualified to create. *See In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 12-CV-00064, 2014 WL 120973, at *17 (W.D. La. Jan. 10, 2014) ("Dr. Kessler needn't be a statistician to rely on statistics and analyses conducted by a statistician . . . ."); *ADM Int'l SARL v. River Ventures, LLC*, No. CV 18-3466, 2019 WL 6036651, at *4 (E.D. La. Nov. 14, 2019) ("Mr. Stakelum has the necessary qualifications to interpret this data and come to conclusions, which is what he has done.").

The relevant questions are whether Dr. Lynch can "reasonably rely on those kinds of facts or data," FED. R. EVID. 703; whether the facts and data reasonably support his conclusions, *Joiner*, 522 U.S. at 146; and whether the Constitution permits Dr. Lynch to rely on others' work as crucial support for his opinions, *see Smith v. Arizona*, 602 U.S. 779, 783 (2024) (discussing the Confrontation Clause). Dr. Bynon raises each of these questions separately.

**ii. Opinion Data and Bases**

Dr. Bynon argues that Dr. Lynch failed to identify "the specific documents underlying his opinions." (Docket Entry No. 99 at 9). He argues that Dr. Lynch refers generally to "OPTN data

and SRTR reports" and other "hospital and OPTN data system records" without showing what specific data and reports result in the statistics on which he relies. (*Id.*). The government responds that Rule 16 does not require it to "identify the specific document upon which each opinion is based." (Docket Entry No. 116 at 10). The government argues that Dr. Bynon's experts do not meet the standard of specificity that he sets out in the motion to exclude. (*See id.*).

Dr. Lynch adequately disclosed the facts and data on which he relied. Dr. Lynch's report provides citations for the OPTN and SRTR data and reports on which he relies, and which are publicly available. (Docket Entry No. 100 at 9 n.35, 11 n.42). Dr. Bynon has not articulated how these links or references to publicly available databases and reports are inadequate support for Dr. Lynch's opinions.

The defense's argument is about the sufficiency of disclosure of the supporting facts or data. On the current record, Dr. Lynch adequately disclosed the facts and data underlying his opinions.

**iii. Reliability**

Dr. Bynon argues that there is "simply too great an analytical gap between the data and the opinion [Dr. Lynch] proffered," *see Joiner*, 522 U.S. at 146, for three reasons. First, Dr. Lynch conceded that "[t]he discrepancy between patient outcomes and offer acceptance patterns could reflect unmodeled confounding factors that differ between TXHH patients and patients listed at other programs." (Docket Entry No. 99 at 9 (quoting Docket Entry No. 100 at 11)). Second, Dr. Lynch did not compare Memorial Hermann's liver-transplant program to other programs in Oklahoma and Texas. (*See id.* at 10). And third, Dr. Lynch reported findings of "396-fold" and "245-fold" higher death rates against a base rate of 0.02% and 0.04%," making the "ratios

statistically fragile." (*Id.*). The first issue goes to reliability, while the second and third issues go to weight.

First, Dr. Lynch's failure to account for confounding variables is significant. "An expert's failure to consider, or control for, other explanatory variables is fatal to the reliability of his testimony." *Flores v. Allstate Texas Lloyd's Co.*, 229 F. Supp. 2d 697, 703 (S.D. Tex. 2002) (citing *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)). "Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables." *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010). An expert can present evidence when the "correlation itself is potentially relevant and unlikely to mislead the jury." *Id.* But mere correlation is not sufficient on "the law and facts at issue" in this "case." *Id.* Dr. Lynch leaves out "major factors" relevant to his "analysis." *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 393 (5th Cir. 2002).

Dr. Lynch conceded that "unmodeled confounding factors" could explain why Memorial Hermann's transplant program had "worse than expected rates of transplant and death for patients on the liver transplant waitlist at TXHH, despite expected or higher-than-expected offer acceptance rates." (Docket Entry No. 100 at 11). Those "unmodeled confounding factors" include differences between "TXHH patients and patients listed at other programs." (*Id.*). That is critical because the confounding variables that Dr. Lynch did not account for are key to the indictment allegations—that Dr. Bynon changed the patients' donor-eligibility criteria "knowingly and willfully," with the intent to disregard or violate the law. *See Bynon*, 2026 WL 1595296, at *7. That allegation turns on whether Dr. Bynon changed the criteria to preclude his patients from receiving organ-donor offers without a medical basis for doing so. By failing to account for individual patient circumstances, Dr. Lynch assumes the very facts that would make his opinions relevant to the trier

of fact. Dr. Lynch cannot reliably opine that Memorial Hermann's liver-transplant patients had worse-than-expected patient outcomes without accounting for the individual patients' health and circumstances. Nor can a jury reasonably infer that Dr. Bynon acted with the requisite mens rea—without a medical judgment that the patients at issue were not physically suitable for transplantation when he changed their donor criteria, *see Bynon*, 2026 WL 1595296, at *7—based on evidence that does not account for the patients' individual, medically relevant circumstances.

Dr. Lynch's opinions about Memorial Hermann's liver-transplant program performance as measured by SRTR, (Docket Entry No. 100 at 11–12), are unreliable. They are excluded.

Second, Dr. Lynch's failure to look beyond Oklahoma and Texas for comparable information goes to weight, not admissibility. Courts have held that an expert's decision to use one region or baseline, as opposed to another, goes "to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013) (holding that the expert's opinion was not unreliable because he used "the national rather than the Alaska market as a baseline"); *see United States v. Florida*, 172 F.4th 1201, 1236 (11th Cir. 2026) ("[A]n expert may extrapolate information from qualitative samples and surveys."). The minimum requirement is that the expert has "a reason to believe the sample is in fact representative of the whole population." *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763, at *26 (S.D.N.Y. Mar. 19, 2019). "Unless the movant can show a reason that the assumption of representativeness is unsound, courts routinely allow experts to extrapolate from a nonrandom sample." *Id.*

Dr. Bynon argues that "Memorial Hermann differed from other programs in Texas and Oklahoma but was similar to programs in large cities like New York, Los Angeles, and Chicago." (Docket Entry No. 99 at 10). This argument goes to weight, not admissibility. A jury is capable

of weighing competing arguments about whether specific programs are sufficiently comparable to Memorial Hermann's program. Dr. Bynon's arguments that national or big-city statistics are more representative of his patient population and his decisions to place patients on internal holds raise credibility disputes that lay jurors can understand, consider, and resolve. *See Daubert*, 509 U.S. at 596 (Rule 702 does not replace adversarial testing when juries can weigh the evidence).

Third, Dr. Lynch's use of "hyperbolic" statistics does not raise admissibility issues. Dr. Bynon can argue that Dr. Lynch's use of percentage or multiple differences obscures the baseline rate and the fact that the real differences between transplant programs may be nominal or statistically insignificant. (*See* Docket Entry No. 99 at 10). Dr. Bynon challenges Dr. Lynch's use of "descriptive" statistics, such as how many patients in Memorial Hermann's liver-transplant program, as compared to other programs, had patients with donor-matching criteria set at "maximum age of 10 years or less" or "an age range of 10 or fewer years." (Docket Entry No. 100 at 13). The parties can argue about whether the statistics are representative, relevant, or probative in proving the alleged offenses. The jury can determine the weight the statistics deserve and the inferences they support. *Cf. Zuniga v. Boeing Co*, 133 F. App'x 570, 581 (10th Cir. 2005) ("Juries are able to make basic inferences from simple statistical information, making an expert unnecessary."); *see Walther v. Lone Star Gas Co.*, 952 F.2d 119, 125–26 (5th Cir. 1992) ("The question of the weight to be accorded admissible statistical evidence is for the jury to answer."). Dr. Bynon's challenge to the high ratios goes to weight, not admissibility. His request to exclude this testimony is overruled.

**iv. Hearsay and the Confrontation Clause**

Dr. Bynon argues that "the facts about OPTN's site visit in May 2024, on which Dr. Lynch's report relies heavily, constitute rank hearsay[,]" and that Dr. Lynch is impermissibly

relying on others' work, infringing Dr. Bynon's constitutional right to confront the witnesses against him. (*See* Docket Entry No. 99 at 10–11). Dr. Bynon argues that Dr. Lynch did not conduct important statistical analyses, such as the analyses based on the OPTN and SRTR data, and that allowing Dr. Lynch to rubber stamp others' analyses violates Rule 702 and prevents him from testing the credibility of the underlying findings. (*See id.* at 8).

Four transplant professionals, two HRSA representatives, and three UNOS staff members helped create the site visit report. (Docket Entry No. 170 at 11 (citing Docket Entry No. 164 at 3)). The site visit report concluded that Dr. Bynon's donor-criteria changes were "inconsistent with liver transplant practice." (Docket Entry No. 170 at 11). The government does not intend to call any of these individuals to testify at trial. (*See id.*). There is little doubt, under *Smith*, that the site visit report, the Standards Committee findings, and the OPTN and SRTR data analyses are hearsay. "The jury cannot decide whether [Dr. Lynch's] opinion[s] [are] credible without evaluating the truth of the factual assertions on which it is based"—here, the site-visit report, the findings, and the data analyses. *See Smith*, 602 U.S. at 796.

At the August 18, 2026, hearing, the government stated, "[W]e understand that the [OPTN] report should not come in. It's hearsay. We understand that." (Docket Entry No. 157 at 159:07–15; *see also id.* at 159:21–22 ("We can agree not to use the report. We can agree to talk – to approach the bench before we bring it in[.]"); *see also id.* at 162:01–08 ("We're not asking to bring in the legal findings . . . We're not asking to bring anything up except that an . . . investigation . . . occurred."). A few weeks later, the government invoked the public-records hearsay exception to allow for the "admi[ssion] [of] a redacted version of this report at trial." (Docket Entry No. 164 at 19–21).

Federal Rule of Evidence 803(8) provides a hearsay exception for public records. FED. R. EVID. 803(8). But Rule 803(8)(iii) does not permit the government to use the factual findings from an investigation against a defendant in a criminal case. *See id.* The government may not impermissibly introduce factual findings from the report through Dr. Lynch's testimony. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("The expert may not . . . simply transmit that hearsay to the jury. . . . Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [g]overnment to circumvent the rules prohibiting hearsay." (citations and internal quotations omitted)); *see also Smith*, 602 U.S. at 780 ("[T]he jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based. But that is what raises the Confrontation Clause problem. For the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work.").

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Clause prevents the government from admitting the testimonial hearsay "of an absent witness unless she is 'unavailable to testify, and the defendant has had a prior opportunity' to cross-examine her." *Smith*, 602 U.S. at 783 (alterations adopted) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)). For a statement to be testimonial, it generally must be made or elicited for use as evidence in court proceedings. *See id.* at 785, 802. And for a statement to be hearsay, it must be an out-of-court statement admitted for the truth of the matter asserted. *See id.* at 783.

These rules limit an expert's ability to rely on the findings of others as evidence in criminal cases. "When an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. "[T]he truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion." *Id.* at 795. So "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* "And if those statements are testimonial too," then "the Confrontation Clause will bar their admission." *Id.* at 783.

While the Supreme Court has not defined precisely what evidence is "testimonial," it includes evidence or testimony created for use at trial. *See id.* at 800–01, 800 n.5. For example, the Court has held that statements "made in the course of police interrogation" are testimonial because "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822–23 (2006). Similarly, certificates of the results of forensic analysis are testimonial because they were created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (quoting *Crawford*, 541 U.S. at 52). By contrast, statements made to the police "to meet an ongoing emergency" are not testimonial when they were "not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). Courts consider the "range of" the hearsay declarant's normal "activities" in assessing whether the contested statement was made with an "evidentiary purpose" or a "focus on court." *Smith*, 602 U.S. at 802.

The government argues that the site visit report is "not testimonial." (Docket Entry No. 164 at 20). But "[t]he assertion cannot be evaluated on the government's description alone." (Docket Entry No. 170 at 12). "The OPTN bylaws . . . describe a compliance proceeding convened to 'evaluate whether a potential noncompliance exists' and to assess 'the urgency and severity of the risk,' with member obligations to respond and consequences for the member." (Docket Entry No. 170 at 12 (citing Docket Entry No. 164 at 2 n.2)). "Findings generated by that process, by a panel that includes representatives of a federal agency," (Docket Entry No. 170 at 12), may "lead an objective witness reasonably to believe that the statement would be available to use at a later trial[,]" *see Crawford*, 541 U.S. at 52.

Whether Dr. Lynch can discuss the report's findings depends on whether they are "otherwise . . . inadmissible." FED. R. EVID. 703. If the findings are not testimonial *and* are admissible under a hearsay exception, *see, e.g.*, FED. R. EVID. 803(8), then Dr. Bynon must meet Rule 403's high standard for exclusion. If the findings are "otherwise . . . inadmissible," because, for example, they are offered against the defendant in a criminal case, which Rule 803(8) does not permit, then the government must show why it can disclose the findings to the jury. *See* FED. R. EVID. 703 (the "probative value in helping the jury evaluate the opinion" must "substantially outweigh[] their prejudicial effect"). Context at trial will enable a more accurate ruling on this issue. Until that determination is made, the OPTN site visit, findings, and report are subject to a limine order.

**v. State of Mind**

Dr. Bynon argues that several of Dr. Lynch's opinions are about Dr. Bynon's state of mind. For example, Dr. Lynch opines that the "uniform application of this [donor-criteria] change to all listed patients regardless of clinical situation suggests decision making independent of

considerations of patient disease status or availability for transplant." (Docket Entry No. 100 at 13). Dr. Bynon argues that this testimony violates Rule 704(b).

Under Rule 704(b), "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" because "[t]hose matters are for the trier of fact alone." FED. R. EVID. 704(b). The Rule "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Diaz v. United States*, 602 U.S. 526, 534 (2024). An expert may testify in a manner that raises "an appropriate inference" about the defendant's mental state, *United States v. Wilson*, 355 F.3d 358, 362 (5th Cir. 2003), so long as the expert does not "directly opine" on the ultimate mens rea issue, *United States v. Portillo*, 969 F.3d 144, 170 (5th Cir. 2020) (cleaned up) (quoting *United States v. Dvorin*, 817 F.3d 438, 448 (5th Cir. 2016)).

Opinions about the mental state of individuals in a defendant's position may be admissible because they are not opinions about the defendant's state of mind. *See Diaz*, 602 U.S. at 538 ("An expert's conclusion that 'most people' in a group have a particular mental state . . . does not violate Rule 704(b)."); *Portillo*, 969 F.3d at 171 (experts may testify about "the typical characteristics" of someone in the defendant's position). For example, in *Diaz*, the Supreme Court held that an agent's testimony "about the knowledge of *most* drug couriers" did not violate Rule 704(b) because that testimony "did not express an opinion about whether [the defendant] herself knowingly transported" drugs. 602 U.S. at 538 (emphasis in original). But the Court cautioned that a statement about "*all*" people with defendant's characteristics would run afoul of Rule 704(b) because "'all people in the defendant's shoes' includes, of course, the defendant himself." *Id.* at

536. Rule 704(b) bars "the functional equivalent of an opinion" about a defendant's mental state, *United States v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) (citing *United States v. Gutierrez-Farias*, 294 F.3d 657, 663 (5th Cir. 2002)); *United States v. Hernandez-Acuna*, 202 F. App'x 736, 741 (5th Cir. 2006) (per curiam), if the opinion does not "leave[] room for the jury to determine whether the defendant herself had that mental state," *United States v. Kissentaner*, No. 23-20348, 2024 WL 3949071, at *3 (5th Cir. Aug. 27, 2024) (unpublished), *cert. denied*, 145 S. Ct. 1103 (2025).

Under these principles, some of Dr. Lynch's opinions violate Rule 704(b). Dr. Lynch's report opines on Dr. Bynon's mental state in entering the "waitlist record changes." *See Diaz*, 602 U.S. at 538; (Docket Entry No. 100 at 13). These opinions are about Dr. Bynon's intent and are inadmissible. Second, Dr. Lynch's opinions are about "a mental state or condition" that is "an element of the crime charged or of a defense." *Diaz*, 602 U.S. at 538 (quoting FED. R. EVID. 704(b)). Dr. Lynch's report states that he will opine that the pattern of Dr. Bynon's waitlist entries "suggests decision making independent of considerations of patient disease status or availability for transplant." (Docket Entry No. 100 at 13). But Dr. Bynon's reasons for making the waitlist changes are "an element of the crime charged," FED. R. EVID. 704(b), because he made the changes with the required willfulness only if he "did not subjectively believe that the selected donor-acceptance criteria were medically appropriate," *Bynon*, 2026 WL 1595296, at *7. Whether Dr. Bynon changed the donor criteria based on his medical judgment or for other reasons is a "matter[] . . . for the trier of fact alone." FED. R. EVID. 704(b).

Dr. Lynch cannot give testimony that violates Rule 704(b).

**vi. Bias**

Dr. Bynon argues that Dr. Lynch is not a "bona fide scientific expert." (Docket Entry No. 99 at 12). He argues that Dr. Lynch is instead a "senior executive of an agency that has already investigated Memorial Hermann (with a focus on Dr. Bynon), forced its liver transplant program to inactivate, and designated it a 'Member Not in Good Standing' before Dr. Lynch was ever asked by the prosecution to write his report and testify at trial." (*Id.*). This argument does not warrant exclusion. Questions of bias go to weight, not admissibility. *See United States v. Ewell*, 252 F. Supp. 2d 104, 115 (D.N.J. 2003) ("Questions of bias go to the credibility and weight of the evidence rather than . . . admissibility."); *U.S. ex rel. Becker v. Tools & Metals, Inc.*, No. 3:05-CV-0627-L, 2013 WL 1293818, at *10 (N.D. Tex. Mar. 31, 2013) (same). That is so even when the proposed expert is a government employee who instigated and oversaw the investigation into the defendant's actions. *See, e.g.*, *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 107 (D.D.C. 2025) (doubting the expert's credibility because he "urged a party to bring this very suit, advised it on litigation strategy, and publicly championed its case before getting hired").

**2. Rule 403**

Dr. Bynon argues that, for many of Dr. Lynch's opinions, the risk of unfair prejudice and confusion substantially outweighs their probative value. (*See* Docket Entry No. 99 at 13–15). Dr. Bynon argues, for example, that what "other transplant programs in Texas or Oklahoma did" is not relevant to whether Dr. Bynon made the false statements alleged in the superseding indictment. (*Id.* at 13; *see* Docket Entry No. 128). He also argues that it is irrelevant whether Memorial Hermann's liver-transplant program: (1) used fewer "deceased donor livers after donors' circulatory death"; (2) used fewer livers from "donors infected with Hepatitis C virus"; and (3) "added progressively fewer patients to the waitlist at lower MELD scores." (Docket Entry No. 99

at 14). Dr. Bynon adds that some of Dr. Lynch's opinions about mortality rates and what happened to Dr. Bynon's patients after their donor criteria were adjusted are irrelevant, highly prejudicial, and contravene this court's limine order. (*See id.*; Docket Entry No. 62 at 26).

The court agrees that the probative value of Dr. Lynch's opinions about patient-mortality rates and the health outcomes of Dr. Bynon's patients after they left his care is substantially outweighed by the risk of unfair prejudice. The government may not elicit those opinions "without first approaching the bench outside the venire's or the jury's presence and obtaining leave to do so." (*See* Docket Entry No. 62 at 26).

Dr. Lynch's opinions comparing Memorial Hermann's liver-transplant program to others that are sufficiently similar in relevant respects, however, do not warrant exclusion. Facts "'inconsistent with doctors' proper exercise of their clinical judgment' can support a fraud conviction." *Bynon*, 2026 WL 1595296, at *7 (quoting *United States v. Mesquias*, 29 F.4th 276, 282 (5th Cir. 2022)). Although Dr. Bynon offers reasons why a jury should assign little weight to Dr. Lynch's opinions based on comparing different transplant programs, he has not currently shown that the risks of unfair prejudice, juror confusion, and undue delay substantially outweigh the probative value of the opinions. A jury can assess the differences between Memorial Hermann's liver-transplant program and others. To the extent Dr. Bynon argues that the jury will be "overwhelmed, rather than assisted" by Dr. Lynch's purportedly "hyperbolic" and marginally relevant testimony, the court can consider these Rule 403 issues based on the record that is developed at trial.

At this time, however, the court enters a limine order that Dr. Lynch, the parties, counsel, and the witnesses may not use the term "throttle criteria." As the government acknowledges, Dr. Lynch coined the term for this case, (*see* Docket Entry No. 178), and the term has a sinister

connotation. Instead, the parties, counsel, and witnesses must refer to Dr. Bynon's adjustments as "changes to the donor criteria" or "donor-criteria adjustments."

For these reasons, the court grants in part and denies in part Dr. Bynon's motion to exclude Dr. Lynch's opinions and testimony.

**B. Dr. Matthew Cooper**

Dr. Matthew Cooper is "a board-certified general surgeon and accredited by the American Society of Transplant Surgeons." (Docket Entry No. 104 at 2). He completed a "multi-organ transplant fellowship at the Johns Hopkins Hospital." (*Id.*). He has practiced transplant surgery since 2002. He is "currently the Chief of Transplantation and the Director for the Solid Organ Transplant Service Line at Froedtert Memorial Lutheran Hospital and Children's Wisconsin, the Mark B. Adams Distinguished Professor of Surgery and a Tenured Professor at the Medical College of Wisconsin." (*Id.*). Dr. Cooper opined in his report that the five patients at issue in this case were healthy enough to accept a transplant when Dr. Bynon placed them on an internal hold and that the actions "of Dr. Bynon and the staff of Memorial Herman Transplant program fell well below the acceptable levels of medical care." (*See id.* at 2–21). Dr. Cooper's report also states that Dr. Bynon's patients "were deceived, misinformed, and disrespected as they placed their trust in a team that was not protecting his needs or best interests." (*Id.* at 4).

Dr. Bynon moves to exclude Dr. Cooper's opinions and testimony under Rule 702 and Rule 403. (Docket Entry No. 103).

**1. Rule 702**

Dr. Bynon makes five arguments in support of his motion to exclude Dr. Lynch's opinions and testimony: (1) Dr. Cooper plans to testify to Dr. Bynon's mental state, in violation of Rule 704(b), (Docket Entry No. 103 at 8–11); (2) his opinions are unreliable under *Joiner*, (*id.* at 11–

12, 13–14); (3) his opinions are based on testimonial hearsay, in violation of the Confrontation Clause, (*id.* at 12–13); (4) his opinions were developed expressly for litigation, (*id.* at 15–16); and (5) his uses moral characterizations that are not related to relevant medical standards, (*id.* at 16).

**i. State of Mind**

Dr. Cooper's disclosures include statements raising suspicions about "why Dr. Bynon sought to change [one patient at issue] to an inactive status[,]" (Docket Entry No. 104 at 3); that the changes to the "donor acceptance criteria were a deliberate effort to eliminate opportunities for" his patients, (*id.* at 4); and that Dr. Bynon's actions are inconsistent with "a sincere and committed effort" on behalf of his patients, (*id.*). The testimony opines on Dr. Bynon's mental state in making the donor-criteria adjustments. *See Diaz*, 602 U.S. at 538. Whether Dr. Bynon acted based on his sincere medical judgments is a key element of the government's charges. *See Bynon*, 2026 WL 1595296, at *7. These opinions are textbook violations of Rule 704(b).

The government does not dispute this and concedes that it will not ask Dr. Cooper questions that would elicit these improper opinions. (Docket Entry No. 118 at 7). The government instead plans to ask Dr. Cooper about the patients' "clinical condition on a given date and whether such patient was medically suitable for organ-transplantation surgery." (*Id.* (quoting Docket Entry No. 103 at 10)). Even this testimony runs the risk of turning this trial into one for medical malpractice, which the government has agreed it will not do. Dr. Bynon could have been wrong, even negligently so, about his patients' medical suitability for transplant surgery when he changed the donor criteria without knowingly and willfully violating the law.

Dr. Cooper may not testify about Dr. Bynon's mental state.

**ii. Bias**

Dr. Bynon argues that Dr. Cooper's opinions were developed for litigation, not in "the ordinary course of his practice." (Docket Entry No. 103 at 15–16). The issue is reliability. *See Ewell*, 252 F. Supp. 2d at 115; *Tools & Metals, Inc.*, 2013 WL 1293818, at *10; *Meta Platforms*, 811 F. Supp. 3d at 107.

**iii. Reliability**

Dr. Bynon argues that two aspects of Dr. Cooper's opinions are unreliable: (1) Dr. Cooper's causation opinions about "specific patient outcomes," including "death, kidney injury, lost transplants," are not based on a stated methodology, (Docket Entry No. 103 at 11–12); and (2) Dr. Cooper "leaps to the conclusion" that no medical rationale for Dr. Bynon's donor-criteria adjustments existed because Dr. Bynon did not sufficiently record one in the patients' medical charts. (*Id.* at 13–15). Dr. Bynon makes these arguments under the broader point that Dr. Cooper has not explained why he thinks each of the patients at issue "was in fact a suitable transplant candidate at the time in question." (*Id.* at 12).

The government responds that Dr. Cooper's opinions are based on his review of the record and his experience, and that Dr. Cooper is allowed to draw a negative inference from the "absence of evidence" in the patients' medical records about changes in the patients' medical conditions when Dr. Bynon changed the donor-acceptance criteria. (Docket Entry No. 118 at 7–8).

"A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness." *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citation omitted). Courts consider several "factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact." *See* FED. R. EVID. 702, Advisory Committee's Note to 2000 amendment. "These factors include: (1) [w]hether experts are proposing to testify about matters growing

naturally and directly out of research they have conducted independent of litigation . . . ." (2) [w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . (3) [w]hether the expert has adequately accounted for obvious alternative explanations . . . (4) [w]hether the expert is being as careful as he would be in his professional work outside his paid litigation consulting . . . (5) [w]hether the field of expertise claimed by the expert is known to reach reliable results . . . ." *Id.* (citations and internal quotations omitted).

First, in the October 10, 2026, *Daubert* hearing, Dr. Cooper testified that, in making his conclusions, he relied only on the Memorial Hermann medical records for the five patients and on UNet data. (*See* Docket Entry No. 178). Although Dr. Cooper has experience as a transplant surgeon, his research focus and experience are not related to donor-criteria adjustments. (*See id.*). Factor one is neutral.

Second, throughout the *Daubert* hearing, Dr. Cooper emphasized that he had not seen enough information in four[1] of the five patients' medical records to enable him to opine on the patients' medical suitability for transplantation when the donor-eligibility criteria were changed. (*See id.*). Dr. Cooper cannot opine on whether the patients were suitable for transplantation at that time. Dr. Cooper himself identified "too great an analytical gap between the data [relied on] and the opinion proffered" to allow the opinions stated in his report that the patients were suitable for transplantation to go to the jury. *See Joiner*, 522 U.S. at 146. Factor two weighs against finding the opinions reliable or helpful to the finder of fact.

Third, Dr. Cooper did not consider or rule out obvious alternative explanations shown in the medical records for Dr. Bynon's donor-criteria adjustments for the patients at issue. For

[1] Dr. Cooper testified that one patient was too ill for transplantation and that the decision not to transplant was the correct decision for this patient. (*See* Docket Entry No. 178).

example, patient C.C. had a cardioMEMS device procedure completed on August 25, 2023. (Docket Entry No. 104 at 3). Dr. Cooper did not include in his report that cardiologists had recommended the cardioMEMS device on August 11, 2023. Dr. Cooper did not consider or rule out whether the cardiologists' recommendation was a medical reason for making the liver donor-criteria adjustment for this patient. (*See id.*).

Patient A.P. needed both a liver and kidney transplant, which was confirmed on the UNOS Liver and Kidney Candidate Registration forms. (*Id.* at 19). Dr. Cooper testified that he did not check the kidney waiting list in forming his opinions about A.P.'s suitability for a liver transplant. (*See* Docket Entry No. 178). A.P.'s kidney-waiting-list status does not appear in Dr. Cooper's report. (Docket Entry No. 104 at 19–21). Dr. Cooper did not consider or rule out whether the kidney-waiting-list status was a medical reason for making the liver donor-criteria adjustment for this patient. (*See id.*).

Patient R.O.'s medical records showed that R.O. had imaging done, but Dr. Cooper did not request access to the imaging. (*See* Docket Entry No. 178). Dr. Cooper did not consider or rule out whether the information provided by R.O.'s imaging was a medical reason for making the liver donor-criteria adjustment. (*See* Docket Entry Nos. 104, 178).

Patient P.P.'s medical record showed a recent loss of vision and difficulty speaking, neither of which appears in Dr. Cooper's report. (*Compare* Docket Entry No. 104 at 15–17, *with* Docket Entry No. 178). Dr. Cooper did not consider or rule out whether these changes in P.P.'s functional status were a medical reason for making the liver donor-criteria adjustment. (*See id.*).

Patient O.F.'s lactate level, which appears in the patient's medical records, does not appear in Dr. Cooper's report. (*Compare* Docket Entry No. 104 at 7–9, *with* Docket Entry No. 178). Dr. Cooper did not consider or rule out whether patient O.F.'s lactate level was a medical reason for

making the liver donor-criteria adjustment. (*See id.*) Dr. Cooper testified that patient O.F. was the most critically ill of all the five patients that he reviewed, and he confirmed that the decision not to transplant patient O.F. was the correct decision. (*See* Docket Entry No. 178).

For four of the patients at issue, Dr. Cooper did not adequately account for alternative reasons for finding them unsuitable for liver transplantation when the liver donor-criteria adjustments were made. (*Compare* Docket Entry No. 104, *with* Docket Entry No. 178). Factor three weighs against finding his opinions reliable or helpful to the finder of fact. *See, e.g.*, *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

Fourth, in failing to consider these alternatives, Dr. Cooper did not "employ[] . . . the same level of intellectual rigor" in his expert report that "characterizes the practice of an expert" who is the "Chief of Transplantation and the Director for the Solid Organ Transplant Service Line at Froedtert Memorial Lutheran Hospital and Children's Wisconsin[.]" *Compare Kumho Tire Co.*, 526 U.S. at 152, *with* (Docket Entry No. 104). Factor four weighs against finding his testimony reliable or helpful to the finder of fact.

Fifth, Dr. Cooper's transplantation expertise and experience are relevant to his conclusions about patient suitability for transplantation. Factor five weighs in favor of finding reliability.

After carefully considering the record, the motions, and the totality of Dr. Cooper's expert report and testimony, the court finds that Dr. Cooper's opinions about the patients' suitability for liver transplantation when the donor criteria were changed are not sufficiently reliable to be admissible. Dr. Cooper may not testify that the patients at issue were medically suitable for transplantation when Dr. Bynon changed their donor criteria. Dr. Cooper may testify that the medical records did not contain sufficient information to allow him to determine the patients' suitability for liver transplantation.

**iv. Moral Characterizations**

Dr. Bynon argues that "Dr. Cooper's moral characterizations—that patients were 'deceived,' 'misinformed,' 'disrespected,' and 'betrayed,' and that Dr. Bynon's conduct was 'reprehensible'—cannot satisfy Rule 702's helpfulness requirement." (Docket Entry No. 103 at 16). The court agrees. Dr. Cooper cannot base his speculation about patients' mental states on "scientific, technical, or other specialized knowledge." FED. R. EVID.702(a). This proposed testimony is not "the product of reliable principles and methods." *Id.* 702(c). Nor is his moral condemnation of Dr. Bynon's alleged false statements. The court excludes the moral characterizations under Rule 403 because the remarks' inflammatory and prejudicial effects far outweigh their probative value.

**2. Rule 403**

Dr. Bynon moves to exclude three aspects of Dr. Cooper's proposed testimony under Rule 403: (1) his moral characterizations of Dr. Bynon's alleged conduct, (Docket Entry No. 103 at 17); (2) his causation opinions on patients' deaths and adverse health events, (*id.*); and (3) the "repetition and adoption of the MPSC's investigative findings," (*id.* at 18).

The court agrees with Dr. Bynon's first two arguments. Dr. Cooper's moral characterizations are not appropriate expert testimony and are unduly prejudicial and inflammatory. And as already discussed, the government may not elicit testimony about the health outcomes of Dr. Bynon's patients after they left his care "without first approaching the bench outside the venire's or the jury's presence and obtaining leave to do so." (Docket Entry No. 62 at 26).

Dr. Cooper relies on the OPTN Membership and Professional Standards Committee's findings about Memorial Hermann. The Confrontation Clause bars testimonial hearsay. *Smith*,

602 U.S. at 783. The Standards Committee findings are hearsay. At the October 10, 2026, *Daubert* hearing, the government stated that Dr. Cooper will not be testifying about the OPTN findings. (*See* Docket Entry No. 178). If the findings are not testimonial and are admissible under a hearsay exception, *see, e.g.*, FED. R. EVID. 803(8), then Dr. Bynon must meet Rule 403's high standard for exclusion. If the findings are "otherwise . . . inadmissible," then the government must show why it can disclose the findings to the jury. *See* FED. R. EVID. 703 (the "probative value in helping the jury evaluate the opinion" must "substantially outweigh[] their prejudicial effect"). Context at trial will enable a more accurate ruling on this issue. Until that determination is made, the OPTN site visit, findings, and report are subject to a limine order.

## VI. Dr. Bynon's Motion to Exclude Undisclosed Expert Testimony

The government did not timely designate health-care professionals at Memorial Hermann, health-care professionals at UT health, or the government's case agent, as expert witnesses. Dr. Bynon moves "to exclude (1) any testimony from a Memorial Hermann or UT Health physician—including any member of the Medical Review Board—or from the government's case agent [(the RN)] offering an opinion that any of the five patients was medically suitable or eligible for transplantation . . . ; and (2) any expert testimony from Shauna Schwarm." (Docket Entry No. 136 at 1). The government has moved for leave to file late designations of the treating physicians as non-retained experts. (Docket Entry No. 163. The court address both motions in turn.

### A. Dr. Merwat, Dr. Fair, Dr. Kulkarni, and Dr. Villani; Agent Ferreira

Dr. Bynon notes that the "four Memorial Hermann and UT Health physicians on the case-in-chief list – Dr. Merwat, Dr. Fair, Dr. Kulkarni, and Dr. Villani – and the government's case agent [FBI Special Agent Cooper Ferreira], who is a registered nurse[,]" "were never [designated as experts], and the deadline for designating experts passed six weeks ago[.]" (*Id.* at 1–3, 12). Dr.

Bynon correctly argues that "[w]hether a patient's condition changed, and whether a transplant surgeon's judgment departed from accepted clinical practice, are not matters an ordinary person can assess." (*Id.*). Dr. Bynon emphasizes that "[t]he government has never designated any Memorial Hermann or UT health physician as an expert, and has never provided a Rule 16(a)(1)(G) disclosure for any such witness." (*Id.* at 6).

At the August 18, 2026, hearing, the government agreed that Drs. Merwat, Fair, Kulkarni, and Villani would limit their testimony to factual matters that they observed and not offer expert opinions. (Docket Entry No. 157 at 182). The government "do[es] not anticipate . . . calling [Agent Ferreira] as an expert in his capacity as a medical" professional. (*Id.* at 181–82).

The testimony of Drs. Merwat, Fair, Kulkarni, and Villani and Agent Ferreira must be limited to their factual knowledge and cannot extend to opinions that rest on their specialized knowledge as health-care professionals. *See United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) ("[*A*]*ny* part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701." (emphasis in original; citations omitted)). The four physicians may testify to their factual knowledge about the patient-listing process for liver-transplant eligibility, without discussing how they applied the criteria to any individual patient. (Docket Entry No. 157 at 202–06). This "preclude[s] any suggestion that the listing establishes the patient's medical condition, on that date or a later one." (*See* Docket Entry No. 136 at 12).

The failure to timely designate Drs. Merwat, Fair, Kulkarni, and Villani and Agent Ferreira as experts precludes the government from presenting their expert testimony as lay witness opinion testimony. (*See* Docket Entry No. 136 at 6); *see In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 259–260 (5th Cir. 2022) ("[A party]'s maneuvers in cloaking [a physician]'s quasi-

expert testimony as 'lay witness' opinion testimony under Federal Rule of Evidence 701, and then using [an expert witness] to repeat it as expert analysis, effected a concerning end around Rule 702. Because this strategy allowed [the party] to shoehorn inadmissible opinion testimony into evidence—and then emphasize those 'expert' conclusions in closing arguments to the jury—it significantly prejudiced [the opposing party's case]."). Drs. Merwat, Fair, Kulkarni, and Villani may not cross the line from fact to expert testimony. *Cf. United States v. Betro*, 115 F.4th 429, 451 (6th Cir. 2024).

The government may present one of these doctors to talk about the role of the Medical Review Board; how the Medical Review Board process works; who serves on the Medical Review Board; that the Medical Review Board placed the five patients on the transplant waiting list; the date of each placement decision; and the factual criteria for liver transplantation. Only one such witness is needed to testify as to the Medical Review Board process to avoid cumulative testimony. (*See* Docket Entry 157 at 205:22–24). These witnesses may not present expert testimony on why the Medical Review Board reached a decision on the particular patients at issue. These witnesses cannot testify as to an opinion that the patients were suitable for a transplant when the donor criteria were changed because the Medical Review Board had earlier decided that the patients could be placed on the transplant-eligibility list. These witnesses' testimony must be limited to facts about the Medical Review Board's process, not expert opinion about the Medical Review Board's decisions about the five patients at issue. (*See* Docket Entry No. 157 at 205:13–20).

**B. Shauna Schwarm and Eric Hansen**

At the August 18, 2026, hearing, the government also stated that it is "going to call a witness [who] works with Medicare" and "is not a doctor or a specialized expert." (Docket Entry No. 157 at 179–80). The government intends on calling Eric Hansen, not Shauna Schwarm, "just

to confirm coverage" and to serve as a fact witness whose "sole purpose is . . . to testify that [the patients] were Medicare beneficiaries." (*Id.* at 180).

To the extent that Eric Hansen or Shauna Schwarm plan to testify about Medicare's statutory or regulatory coverage framework for organ transplantation, that calls for specialized knowledge beyond that of a layperson. *See United States v. White*, 492 F.3d 380, 403 (6th Cir. 2007) ("The Medicare program operates within a complex and intricate regulatory scheme and we cannot say that the average lay person, including any Medicare beneficiary, commands a working knowledge of Medicare reimbursement procedures." (citation omitted)). After all, these "opinions will be based on . . . knowledge, training, skill, and experience working with the Medicare program, including its rules and regulations, as well as her review and analysis of documents and claims data[.]" (Docket Entry No. 89 at 8). This expert testimony must be excluded "because the government has not made the disclosures Rule 16 requires." (*See* Docket Entry No. 136 at 16).

**C. The Government's Motion for Leave to File Late Expert Designations**

The government moves for leave to file late designations of treating physicians as non-retained experts. (Docket Entry No. 163). The government acknowledges that its "deadline for expert disclosures was July 3, 2026[,]" and the deadline "for rebuttal expert disclosures was July 31, 2026." (*Id.* at 1). The government did not designate the treating physicians as experts by the required deadline. At the August 18, 2026, pretrial conference, the government stated that the treating physicians would be fact witnesses only, not expert witnesses. (Docket Entry No. 157 at 182:03–05) (acknowledging that the treating physicians would limit their testimony to only factual matters)). However, in its motion filed on September 16, 2026, the government changed its position to argue that late designations should be allowed because "the circumstances underlying

the original disclosure schedule have materially changed, and the parties now have additional time before trial." (Docket Entry No. 163 at 1–2).

"A schedule may be modified only for good cause and with the judge's consent." FED. R. CRIM. P. 16(b)(4). Courts "consider four factors in determining whether the district court abused its discretion in holding that [the moving party] did not show good cause: '(1) the explanation for the failure to [timely comply with the schedule]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice.'" *Reliance Ins. Co. v. La. Land and Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997) (citation omitted). The court concludes that the government has not demonstrated good cause. *See id.*

First, the government has not explained why it failed to timely designate the treating physicians as experts. (*Cf.* Docket Entry No. 163). Instead, the government "chose a different litigation position [than the one made at the August 18, 2026, pretrial conference], maintained that position through the August 18 hearing, and abandoned it on the last day of the supplemental-briefing period." (Docket Entry No. 171 at 8). Second, the government has repeatedly acknowledged that the "[t]reating [p]hysicans will testify primarily based upon their personal observations, treatment, and involvement in the underlying events." (*Id.* at 4). That the treating physicians will be "testify[ing] primarily" as fact witnesses cuts against the government's argument that the treating physicians must belatedly be designated as experts. Third, Dr. Bynon would clearly be unfairly prejudiced by the late designation of the treating physicians as experts, after the government agreed to limit the treating physicians' testimony to facts and agreed not to discuss expert opinions. (Docket Entry No. 157 at 182:03–05; Docket Entry No. 171 at 9–10). Although Dr. Bynon knew the identities of the treating physicians, allowing them to testify as

experts would require Dr. Bynon, in the few weeks before trial, to "prepare and brief *Daubert* challenges as to the" treating physicians and if they are allowed to testify as experts, to cross-examine them at trial and prepare his experts to rebut their testimony. (Docket Entry No. 171 at 9–10). Fourth, Dr. Bynon has a Sixth Amendment right to a speedy trial under the Constitution, which counsels against the availability of a continuance to cure the substantial prejudice. *See* U.S. CONST. amend. VI.

No factor clearly favors the government's position. The government has not shown good cause for late expert designations. If any testimony from the treating physicians can plausibly be interpreted as expert testimony, the government must approach the bench outside the jury's presence and obtain leave before continuing the questioning.

The court grants Dr. Bynon's motion to exclude undisclosed expert testimony, (Docket Entry No. 136), and denies the government's motion for leave to file late designations of the treating physicians as non-retained experts, (Docket Entry No. 163).

## VII. Dr. Bynon's Omnibus Limine Motion

Dr. Bynon moves in limine "for a series of related orders directed at a single risk: that th[e] jury will be invited to decide the case on sympathy, outrage, and the assumption that a crime occurred, rather than on the elements the government must prove." (Docket Entry No. 137 at 1).

### A. Testimony of the Five Patients and Relatives

There are several lay witnesses: two patients identified as "[v]ictim," a third patient, a "[f]riend of [v]ictim," and two "[r]elative[s] of victim." (Docket Entry No. 137 at 4 (citing Docket Entry No. 125 at 2)). Dr. Bynon asks that the testimony of these individuals be limited to matters within their personal knowledge that are relevant to an element of the charged offense, 18 U.S.C. § 1035. Dr. Bynon requests that the court exclude: (1) opinions on a patient's medical suitability

for, or likely benefit from, transplantation; (2) testimony concerning a patient's medical course, deterioration, transplantation, or death after the criteria were adjusted; (3) testimony concerning the emotional, financial, or familial consequences of those events; and (4) characterizations of Dr. Bynon's knowledge or motive. (*Id.* at 6).

The patients or their families have no knowledge of the "statements" Dr. Bynon submitted to UNet and cannot provide opinions on Dr. Bynon's disputed medical judgments. The patients or their families cannot testify to Dr. Bynon's statement of mind. The probative value of the patients' or family members' testimony on the elements of the offenses the government alleged is substantially outweighed by the unfair prejudice. (*See* Docket Entry No. 128). Such testimony of the five patients and their relatives is excluded. To avoid the risk of undue prejudice, the government is precluded from presenting patients or family members from providing or discussing "([1]) opinions on a patient's medical suitability for, or likely benefit from, transplantation; ([2]) testimony concerning a patient's medical course, deterioration, transplantation, or death after the criteria were adjusted; ([3]) testimony concerning the emotional, financial, or familial consequences of those events; and ([4]) characterizations of Dr. Bynon's knowledge or motive." (*See* Docket Entry No. 137 at 6). Such testimony may be important as victim-impact evidence at sentencing but is irrelevant and unfairly prejudicial at the guilt-innocence stage.

**B. Hypotheticals**

Dr. Bynon argues that the court should preclude testimony based on counterfactuals about what the patients would have done had they been told. (Docket Entry No. 137 at 6). Dr. Bynon argues that this information is: (1) irrelevant, because what each patient would have chosen is not an element and does not bear on materiality, and (2) is speculation. (*Id.* at 6–8). He also argues that the prejudice is extreme because "[s]pend their final days at home surrounding by family and

friends" is not a fact to be proved. (*Id.* at 8). The testimony on this subject is both speculative and unfairly prejudicial. The government has agreed not to introduce evidence or elicit testimony about what the patients would have done had they been told about the change in their donor-organ criteria. (*See* Docket Entry No. 157 at 175:07–12). If the government believes that the door is open for such evidence, the government must approach the bench outside the jury's presence and must obtain leave to do so. (*Id.* at 175:14–21).

**C. Patient Photographs**

Dr. Bynon argues that the photographs should be excluded because the patients' identities are not in dispute. (*Id.*). The risk of undue prejudice is high, and the photographs are not relevant to whether Dr. Bynon knowingly and willfully made misrepresentations to UNOS, as alleged in the superseding indictment. (*See* Docket Entry No. 128). The court will not permit photographs of the patients.

**D. Descriptions of Patients as "Victims"**

Dr. Bynon asks that the court preclude the use of the term "victim" to describe the patients. (Docket Entry No. 137 at 9). Dr. Bynon argues that this label is unfairly prejudicial and presupposes a fact that the jury must decide—whether Dr. Bynon knowingly and willfully made a false statement.

Federal law defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense . . . ." (*Id.* (quoting 18 U.S.C. § 3771(e)(2)(A)). Dr. Bynon is not charged with crimes against any of the five patients; his statements were made to UNOS. *See United States v. Hollington*, 2023 WL 4315747, at *8 (M.D. Fla. 2023) ("Because [the defendant] is not charged with crimes against the patients, the [g]overnment's use of the term continually throughout the trial risks unduly prejudicing [the

defendant]. Accordingly, the [g]overnment may not refer to the patients as 'victims' throughout the trial."). "[C]ourts have granted a defendant's motion in limine and prohibited the government from using the term 'victim' to describe witnesses." *Id.* In *United States v. August*, 590 F. Supp. 3d 972, 976 (W.D. Tex. Mar. 10, 2022), the court precluded the use of the term "victim" because it presupposed guilt. "Core issues in this cause include not just whether Defendant distributed controlled substances, but whether his alleged distribution *caused* death or serious bodily injury to the individuals the [g]overnment seeks to address as victims. . . Therefore, reference to an individual as a 'victim' is unfairly prejudicial as it 'encourage[s] the jury to find guilt from improper reasoning,' i.e., due to the implication that a crime has already been committed by Defendant." *Id.* So too here. The "use of the term 'victim' creates an inference that Defendant has committed a crime," which would "color the jury's decision-making by creating an assumption that the Government has already proven a core element of its case." *Id.* at 976–77. The government may not use the word "victim" to describe the patients.

**E. "Lies," "Deceptions," and "Manipulations"**

Dr. Bynon asks that the court preclude the witnesses and counsel from characterizing the UNet entries as "lies" or "deception[s]." (*See* Docket Entry No. 137 at 11). Dr. Bynon argues that if the government is allowed to make this characterization at all, it could only be during closing arguments, after the close of the evidence. (*Id.*). He also argues that any testimony from the government's fact witnesses on whether a statement is a "lie" falls within Rule 702 and must be precluded on that ground as well. Dr. Bynon requests an order: (1) precluding the government's witnesses from characterizing the donor-criteria adjustments as "lies," "lying," "manipulations," "deception," or "fraud," or from opinion or speculating that Dr. Bynon acted improperly, deceptively, or with knowledge of wrongdoing; (2) directing counsel to instruct its witnesses

accordingly; and (3) precluding counsel from using those characterizations during voir dire and opening statement. (*Id.* at 13). At the August 18, 2026, pretrial conference, the government agreed not to use the words "lies" and "deception." (Docket Entry No. 157 at 158:20–159:05; *id.* at 175:25–176:01). The court precludes the use of the terms "lies," "lying," "deception," "manipulate," and "manipulations"[2] because the probative value of these terms is substantially outweighed by their prejudicial effect. Instead, the parties, counsel, and witnesses must refer to Dr. Bynon's adjustments as "changes to the donor criteria" or "donor-criteria adjustments."

**F. The Memorial Hermann Program Inactivation and the 2024 Investigation**

In March 2024, OPTN received an anonymous report about the Memorial Hermann liver program, leading to an administrative peer-review process. (Docket Entry No. 137 at 13). Dr. Bynon asks the court to exclude the exhibits and testimony about the review, for several reasons. (Docket Entry No. 137 at 14). Those are: (1) the MPSC's findings are inadmissible hearsay, (2) admitting findings through a witness who did not make them would violate the Confrontation Clause; (3) the findings post-date the charged conduct; and (4) the superseding indictments' allegations do not make the findings admissible; (5) Rule 403 independently requires exclusion; and (6) the government's conditional intentions are not a substitute for a ruling. (*Id.* at 14–16).

The government has acknowledged that the OPTN "report should not come in" because it is "hearsay," (Docket Entry No. 157 at 159:07–13), and has agreed not to mention "the Memorial Hermann transplant program getting shut down." (*See id.* at 159:16–17). The government argues that the fact that there was a 2024 MPSC "investigation should come in under relevance." (*See id.* at 159:19–20). The government has provided supplemental briefing on this issue. (*See* Docket Entry No. 164). The court reiterates its analysis of the hearsay and Confrontation Clause issues.

[2] The court precludes the use of synonyms or functional equivalents of these terms.

Context at trial will allow the court to determine whether the fact that there was an investigation, the site visit, its findings, or its report, should come in as evidence. Until that determination is made, Memorial Hermann's program inactivation, the OPTN site visit and report's findings, and the fact that there was an investigation are subject to a limine order.

### G. Managerial Style

Dr. Bynon argues that the court should exclude evidence that about his managerial style. (Docket Entry No. 137 at 17–20). The evidence is inadmissible under Rule 404 and Rule 403. The government must prove knowing and willful false statements, material to a health-care benefit program, in connection with the delivery of or payment for health-care benefits, items, or services. 18 U.S.C. § 1035(a). Dr. Bynon's managerial style is not probative of the elements of the charged offenses. *See id.*

Evidence of Dr. Bynon's managerial style is independently prohibited under Rule 404(b) because the government does not appear to have provided the notice required by Rule 404(b)(3). As Dr. Bynon points out, to the extent that this is a Rule 403 question, the probative value of Dr. Bynon being "hard to work for" is negligible while the prejudice—a jury's dislike of the defendant—is not. The government cannot "build an affirmative criminal case out of how its witnesses felt about their former boss." (*Id.* at 20); *see* FED. R. EVID. 404. Before the government presents critiques of Dr. Bynon's management style, failure to collaborate or cooperate, or his personality, the government must approach the bench outside the jury's presence and obtain leave to do so. (Docket Entry No. 157 at 169:08–11).

### H. Financial Motive

The superseding indictment does not allege that Dr. Bynon was motivated by financial gain. The government acknowledges that it has no evidence of personal financial gain (*see id.* at

171:14–16), and notes that "evidence surrounding [Dr.] Bynon's motivation is irrelevant . . . for the prosecution to solicit[,]" (Docket Entry No. 164 at 21–23). The government and its witnesses may not discuss a financial or previously undisclosed motive without first approaching the bench and obtaining leave to do so outside the jury's presence.

**I. Medicare Billing**

Dr. Bynon notes that the government's trial brief closes its account of the charged conduct with the statement that: "The false statements made by Bynon resulted in thousands of dollars that [Memorial Hermann] billed to Medicare." (Docket Entry No. 137 at 21). Dr. Bynon "anticipates that the government will attempt to characterize the billing as the harm his conduct caused." (*Id.* at 21–22). He states that although the government can prove that Medicare is a "health care benefit program," the government cannot "convert a false-statement case into an uncharged health-care-fraud case by inviting the jury to conclude that Dr. Bynon cost the taxpayers money." (*Id.* at 22).

The government has acknowledged that it will not "bring[] up any uncharged healthcare fraud statements; argu[e] that this is taxpayers['] money; nothing of that sort." (Docket Entry No. 157 at 172:18–20; *id.* at 171:17–174:25 (noting that the government agrees not to discuss the financial impact on Medicare, a financial fraud on Medicare, or that Dr. Bynon improperly cost Medicare by prolonging life). The government is ordered to refrain from making such arguments or eliciting such testimony.

**VIII. The Government's Motions to Exclude Expert Testimony**

The government has moved to exclude the testimony and opinions of Dr. Jesse Schold and Dr. Sophoclis Alexopoulos. (Docket Entry No. 133). The court denies the government's motion to exclude.

### A. Dr. Jesse Schold

Dr. Schold has "an undergraduate degree from Emory University, two master's degrees, in Statistics and Mathematics Education, from North Carolina State University and a Doctor of Philosophy in Health Services Research from the University of Florida, where my dissertation examined the association of transplant center characteristics with candidate outcomes." (Docket Entry No. 121-1 at 2). He is "currently a Full Professor of Surgery and Epidemiology with tenure at the University of Colorado Anschutz Medical Campus," where he serves as "Director of the Center for Outcomes Research and Policy in the Division of Transplantation, Director of Transplant Epidemiology, and Vice Chair of Policy and Outcomes in the Department of Surgery." (*Id.*). He has "published more than 440 peer-reviewed articles, with primary focus on patients with end-stage organ disease and organ transplants." (*Id.*). His "research interests have included transplant program performance, access to transplantation, organ offer and acceptance behavior, and healthcare policy." (*Id.*).

Dr. Schold will opine that the "donor acceptance parameters at issue are entries in fields" that "do not include descriptions of a candidate's condition" and "have no external referent against which they can be verified." (*Id.* at 4). He will opine that "there exists no scientific or professional standard by which a given value [in the acceptance criteria] can be shown to be correct or incorrect." (*Id.*). He will testify that the "multiple modes for restricting offers have somewhat different connotations for patients and transplant programs." (*Id.*). According to Dr. Schold, they are "used based on clinical discretion and are largely unregulated features of the national allocation system." (*Id.*). He will also opine that "[n]one of the TXHH program's published regulatory metrics for the cohorts reviewed met the criteria applied by the Membership and Professional Standards Committee to identify low-performing programs." (*Id.*).

The government argues that Dr. Schold's opinions are not "based on sufficient facts or data," FED. R. EVID. 702(b), or are simply incorrect. For example, the government argues that, contrary to Dr. Schold's planned testimony, "there is no system of patient-level offer filters in OPTN systems." (Docket Entry No. 133 at 5). The government also argues that there are objectively incorrect and correct donor-matching criteria. The government cites, as an example, UNet's instructions that the "recommended minimum acceptable donor weight is no more than 30% below the candidate's listing weight" or the "recommended maximum donor weight . . . is no more than 100 percent (100%) greater than the candidate's listing weight." (*Id.* (citing Docket Entry No. 133-1 at 7). In its supplemental briefing, the government argues that Dr. Schold's opinions "are inadmissible . . . because they: (1) rest on unreliable reasoning and unsupported analytical assumptions; and (3) [*sic*] invoke program-wide regulatory metrics that cannot reliably address the individual conduct at issue in this prosecution[;] and (3) only become[] relevant as a rebuttal expert if Dr. Lynch is called in the government's case in chief." (Docket Entry No. 179 at 1; Docket Entry No. 182 at 1).

These are not reasons to exclude Dr. Schold's testimony. Dr. Bynon disputes the government's arguments. The UNet instructions that the government cites, for example, are recommendations, (Docket Entry No. 133 at 5) and potentially conflict with other UNOS instructions, *see Bynon*, 2026 WL 1595296, at *6. Because an "attack on the factual basis of [an expert's] opinion is not a ground for exclusion," *Solstice Oil & Gas I LLC v. OBES Inc.*, No. 12-2417, 2015 WL 5059601, at *7 (E.D. La. Aug. 26, 2015), the court denies the government's motion to exclude Dr. Schold's testimony, (Docket Entry Nos. 133, 179, 182). "Challenges to the basis of an expert's opinions generally go to the weight of the evidence." *Cervantez v. Collier*, No. A-18-CV-1059-RP, 2019 WL 6727872, at *3 (W.D. Tex. Dec. 11, 2019). The alleged "[f]laws,

inaccurate conclusions, omissions and/or exaggerations [in Dr. Schold's report]—while perfect fodder for a strenuous cross-examination—are not generally grounds for prohibiting the [his] testimony." *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, 2019 WL 2723263, at *2 (S.D. Tex. June 28, 2019).

At this pretrial stage, the court cannot categorically exclude Dr. Schold's testimony, as the government asks. (*Cf.* Docket Entry No. 179 at 1; Docket Entry No. 182 at 1). Context at trial will be important in assessing Dr. Schold's opinions. For example, Dr. Schold may testify in the defense case, or on surrebuttal, which "is merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony." *See Moody*, 903 F.2d at 331 (5th Cir. 1990) (citing *Durnin*, 632 F.3d at 1301 n.8); (*cf.* Docket Entry No. 179; Docket Entry No. 182).

**B. Dr. Sophoclis Alexopoulos**

Dr. Alexopoulos is "a board-certified general surgeon" who is "accredited by the American Society of Transplant Surgeons" and who completed "a multi-organ transplant fellowship at Stanford University." (Docket Entry No. 121 at 2). He is "currently the Transplant Center Director and Chief of Transplant Surgery at UC Davis Health and a Professor of Clinical Surgery at the University of California Davis School of Medicine." (*Id.*). For each of the five patients at issue, Dr. Alexopoulos "reviewed the history, evaluation, and listing, and then reviewed the clinical record to identify the encounter notes, laboratory and microbiology results, and imaging studies documented in the record as of the date at issue." (*Id.*). He concluded, to a reasonable degree of medical certainty, that each of the five patients at issue was not healthy enough to accept a transplant at the time Dr. Bynon changed their donor-matching criteria. (*See id.* at 2–7).

The government moves to exclude Dr. Alexopoulos's opinions because the literature on which he relies does not support his opinions. (Docket Entry No. 133 at 5–7). The government focuses on Dr. Alexopoulos's citation of Weiss *et al.*, *When Is a Critically Ill Cirrhotic Patient Too Sick to Transplant? Development of Consensus Criteria by a Multidisciplinary Panel of 35 International Experts*, 105 TRANSPLANTATION 561 (2021). This article supports Dr. Alexopoulos's conclusion that patient O.F. was not healthy enough to accept a transplant when Dr. Bynon changed his donor-matching criteria. That patient had a lactate level of 12.8 mmol/L at that time. (*See* Docket Entry No. 133 at 6). The article states that "lactate levels above 4 or 5 mmol/L [are] reported in the literature to be associated with worse posttransplant outcomes." Weiss, 105 TRANSPLANTATION at 567. The article concludes that "81% of panelists considered a serum lactate level above 9 mmol/L as a contraindication for transplantation," *id.* at 565, and that doctors consider a transplant futile under those conditions, *see id.* at 568 ("This study provides a consensus on the posttransplant outcome that should define futility of LT and on specific patient conditions, ongoing sepsis and intensity of organ failures that may justify to cancel o[r] postpone the transplantation LT."). If this published article and Dr. Alexopoulos's opinions are credited, a jury could find that Dr. Bynon's medical judgment was sincere and sound.

The government does not persuasively dispute the article's validity or argue that patients with a lactate level higher than 9 mmol/L should or could receive a donor organ for a liver. The government instead tries to distinguish between whether a patient can medically undergo a transplant and whether a patient should receive offers of donor organs for a transplant. (*See* Docket Entry No. 133 at 6). The government argues that "clinical considerations relevant to whether transplantation should be delayed or denied" do not establish "that donor offers should be precluded." (Docket Entry No. 133 at 6).

This argument appears to prove too much. If a patient's health condition—his or her medical ability to undergo liver transplantation—is not tied to whether that patient should receive organ-donor offers, then Dr. Bynon cannot be guilty of making a false statement. *Contra Bynon*, 2026 WL 1595296, at *5–7 (denying the motion to dismiss the indictment because evidence could show that the truth or falsity of donor-matching criteria is tied to representations about a patient's medical status or needs).

Dr. Alexopoulos's opinions are relevant and based on adequate facts and data. The government's motion to exclude his opinions and testimony, (Docket Entry No. 133), is denied.

About two months after moving to exclude the testimony of Dr. Alexopoulos, the government filed a supplemental motion in limine. (Docket Entry No. 172). The government argues that "Dr. Alexopoulos may testify about his own review and analysis of the medical records, but he may not testify (1) that [Dr.] Bynon had access to or had reviewed the medical records at the time he [changed] a patient's donor acceptance criteria; (2) whether [Dr.] Bynon made a medical[-]judgment call at the time he [changed] a patient's donor acceptance criteria; (3) that [Dr.] Bynon's [changes] of donor acceptance criteria w[ere] a proper exercise of his clinical judgment; or (4) what [Dr.] Bynon's state of mind was when he [changed] donor acceptance criteria." (*Id.* at 4).

Dr. Bynon "does not oppose the government's motion, in part[,]" and has agreed "not [to] ask Dr. Alexopoulos what Dr. Bynon knew, believed, or intended . . . or whether Dr. Bynon reviewed any particular record." (Docket Entry No. 181 at 1). But "Dr. Bynon opposes the government's request to forbid Dr. Alexopoulos from testifying[:] (1) that the five patients [at issue] were medically unsuitable for transplantation on the dates the criteria were adjusted, and (2) that precluding donor offers was within the standard of care." (*Id.*). Dr. Alexopoulos's "report

contains no opinion concerning Dr. Bynon's knowledge, belief, intent, or purpose . . . [and] does not state that Dr. Bynon reviewed any particular record[;] that he formed any particular judgment[;] or that he acted for any particular reason." (*See id.* at 3). "Dr. Alexopoulos did not interview Dr. Bynon, and [Dr. Alexopoulos's] conclusions rest on [his review] o[f] the contemporaneous medical records." (*See id.*).

Dr. Alexopoulos's testimony "does not run afoul" of "Rule 704(b)'s limitation[,]" which is "quite narrow" and "only 'prohibits experts from testifying as to . . . whether the defendant did or did not have the requisite state of mind' to be convicted of the crime . . . , or 'the functional equivalent[.]'" *See United States v. Hesson*, 746 F. App'x 324, 332 (5th Cir. 2018) ("Experts are still . . . permitted to analyze evidence and offer conclusions that that would have a bear on th[e] [Rule 704(b)] issue." (citing, *inter alia*, *United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994))). Dr. Alexopoulos's "testimony can more accurately be characterized as an analysis of the evidence in light of his special knowledge as an expert in the area of" organ transplantation. *See Speer*, 30 F.3d at 610 (holding that "[t]he district court did not abuse its discretion in admitting this testimony" (footnote omitted)). Much of Dr. Alexopoulos's testimony is focused on his "review[] [of] the history, evaluation, and listing, and . . . the clinical record . . . , [and] laboratory . . . results . . . documented in the record as of the date at issue." (Docket Entry No. 121 at 2); *see Hesson*, 746 F. App'x at 332 ("Indeed, the majority [of the expert's testimony] was entirely unrelated to mental states. For example, [the expert] largely discussed and evaluated the propriety of the psychological reports and Medicare reporting he reviewed."); *see also id.* ("Even those parts of [the expert's] testimony relating to intent—e.g., his interpretation of emails—never broached the ultimate mens rea issue here: that [the defendant] 'knowingly and willfully' defrauded Medicare or so conspired.").

Dr. Alexopoulos may testify about "the standards of conduct applicable to" liver transplantation as a practice or to transplant surgeons "in general." *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 640 (S.D. Tex. 2008) ("The court finds that [the expert] can testify as to the standards of conduct applicable to directors in general . . . ."); *see also United States v. Hebert*, cr-17-39, 2017 WL 4891348, at *2 (W.D. La. Oct. 30, 2017) (noting that the expert "may testify regarding how pharmacy is practiced, how compounding works, and what compounding pharmacists do on a daily basis . . . ."). Dr. Alexopoulos may testify "about how transplant medicine is practiced, what the standard of care requires of a transplant surgeon presented with documented clinical findings, and what a reasonable transplant physician would do[.]" (*See* Docket Entry No. 181 at 7).

The court precludes Dr. Alexopoulos from testifying that Dr. Bynon reviewed a particular medical record or from hypothesizing about Dr. Bynon's knowledge, intent, or belief. Dr. Alexopoulos's expert testimony may address "whether facts similar to those in evidence were consistent with the conduct of a hypothetical person[.]" *See, e.g.*, *United States v. Levine*, 80 F.3d 129, 134–35 (5th Cir. 1996) (holding that an "expert's testimony fell within permissive bounds of Rule 704(b)[]" because the "expert's answers . . . did not contain an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto"); *see also id.* ("Instead, the expert's testimony focused on whether facts similar to those in evidence were consistent with the conduct of a hypothetical person suffering a severe manic episode.").

The court grants in part and denies in part the government's motion in limine as to Dr. Alexopoulos, (Docket Entry No. 172).

## IX. The Government's Limine Motion

The government moves "for an order in limine to preclude: (1) improper use of interview reports written by investigators, but not adopted by interviewees; (2) improper character evidence; (3) argument that incorrectly defines the beyond-a-reasonable-doubt standard; (4) evidence or argument about the pretrial discovery process in this case; (5) evidence or argument about the government's exercise of its prosecutorial discretion; (6) evidence or argument about the potential consequences that [Dr. Bynon] could face if [he is] found guilty; and (7) any reference to civil lawsuits or 'medical malpractice' actions." (Docket Entry No. 139 at 1).

### A. Investigator Interview Reports

Dr. Bynon does not object to the government's motion to preclude improper use of investigators' interview reports. (Docket Entry No. 166 at 1). The court precludes the improper use of investigators' interview reports.

### B. Good Character Evidence

The court precludes the improper use of character evidence. Evidence of a pertinent character trait must comply with Federal Rule of Evidence 404.

### C. Reasonable-Doubt Standard

The government's argument about the reasonable-doubt standard presupposes that Dr. Bynon's discussion of, or use of illustrative aids about, the standard will mislead the jury. (*See* Docket Entry No. 139 at 5–6). At this pretrial stage, the court cannot make that determination. The court will instruct the jury on the definition of proof beyond a reasonable doubt and that the

only instructions on the law will come from the bench, not the lawyers on either side. That does not preclude counsel from discussing the standard or using illustrative aids.

**D. Discovery Issues**

The court precludes both parties from raising discovery issues in the presence of the jury. These issues, including demands that a witness or counsel produce certain documents or provide certain information, must be raised outside the jury's presence.

**E. Prosecutorial Discretion**

The court has noted that the "fact that Dr. Bynon relies on UNOS guidance and industry practice to argue that he did not knowingly and willfully make a false statement abates his fair-notice concern." (Docket Entry No. 162 at 9–10). The court will permit Dr. Bynon to introduce evidence and arguments that other "transplant physicians and programs used donor-acceptance criteria in the same way." (Docket Entry No. 166 at 2–3). This evidence bears on the willfulness element of the charged offenses. *United States v. Bynon*, 834 F. Supp. 3d 728, 746 (S.D. Tex. 2026) ("[I]ndustry practice is often relevant to a defendant's mens rea" (citing *United States v. Riley*, 550 F.2d 233, 236–38)). But Dr. Bynon may not make conclusory assertions about selective prosecution in the jury's presence.

**F. Conviction Consequences**

"Dr. Bynon does not object to the government's motion to preclude evidence and arguments on the consequences of conviction." (Docket Entry No. 166 at 3). Discussion of the consequences of conviction is excluded. (*See* Docket Entry No. 139 at 8).

**G. Civil Matters**

The court excludes references to "[c]ivil lawsuits involving [Dr.] Bynon, witnesses, and the patients named in the superseding indictment, or related parties"; those lawsuits are, as the

government asserts, "irrelevant and immaterial to this litigation." (Docket Entry No. 139 at 9). Dr. Bynon may argue that the government's case amounts to disputed allegations of medical malpractice or violations of hospital policy or practices, because these descriptions are ways of highlighting the defense of a lack of mens rea. (*See* Docket Entry No. 166 at 3–4). The court will, of course, instruct the jury about the reasonable-doubt standard and the elements of the offense charged.

## X. The Government's Rule 404(b) Notice

The government has provided notice of its intent to introduce evidence of Dr. Bynon's use of donor-criteria adjustments before the COVID-19 pandemic "to establish [Dr. Bynon's knowledge, willfulness, and . . . to rebut any contention that the conduct charged . . . resulted from a good-faith purpose justified by the 2020 COVID-19 newsletter issued by . . . [UNOS] on its website." (Docket Entry No. 140 at 1). The court will preclude discussion of pre-COVID-19 donor-criteria adjustments in the opening statements. If the government wishes to elicit testimony or introduce evidence about pre-COVID-19 donor-criteria adjustments, the government must approach the bench outside the jury's presence and obtain leave before doing so.

At that time, the court will conduct the two-step test required under Rule 404(b). *See, e.g.*, *United States v. Beechum*, 582 F.2d 898, 910–11 (5th Cir. 1978) (en banc) ("What the rule calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." (citation omitted)); (Docket Entry No. 157 at 213:12–219:10). The government acknowledged that the "proposal is fair as to the balancing test[]" and that the government will "approach" the bench and obtain leave from the court. (*See* Docket Entry No.

157 at 216:23–25; *id.* at 217:17–19). The government notes that if the Rule 404(b) evidence is permitted, "an appropriate limiting instruction [must be provided,] informing the jury that it may consider the evidence only for permissible purposes[.]" (*See* Docket Entry No. 140 at 6).

The court defers ruling on the government's Rule 404(b) motion until trial, (Docket Entry No. 140), but enters a limine order as to the evidence at issue until that ruling is made.

## XI. The Government's Motion for Reconsideration

The government has moved for reconsideration of certain preliminary rulings. (Docket Entry No. 164 at 12). Some courts have noted "that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits." *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (citation omitted). The government agrees that it "must clearly establish a manifest error of law or fact or must presently newly discovered evidence and cannot be used be used to raise arguments which could, and should, have been made before the judgment issued[.]" (Docket Entry No. 164 at 12) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). The *Simon* statement referred to "[m]otions for a new trial or to alter or amend a judgment[.]" *See id.*

The government's argument does not satisfy the test it identifies as applicable. *See id.* The government has not identified "a manifest error of law or fact or . . . present[ed] newly discovered evidence." *See id.* Instead, the government has "raised[]d arguments which could, and should, have been made" earlier. *See id.*; *Compare* Docket Entry No. 164, *with* Docket Entry No. 157;

*United States v. Bynon*, 834 F. Supp. 3d 728 (S.D. Tex. 2026). The court denies the government's motion for reconsideration, (Docket Entry Nos. 164, 165).

## XII. The Government's Motion to Require the Production of Defense Witness Statements

The government has moved to require the defense to produce witness statements, (Docket Entry No. 174). At the *Daubert* hearing, the government moved to produce witness statements under Federal Rule of Criminal Procedure 26.2. (Docket Entry Nos. 173, 174). The court ordered the government to submit case law demonstrating that Rule 26.2 is applicable at *Daubert* hearings. The government has not submitted such case law.

Rule 26.2(g) provides,

> This rule applies at trial, at a suppression hearing under Rule 12, and to the extent specified in the following rules:
> (1) Rule 5.1(h) (preliminary hearing);
> (2) Rule 32(i)(2) (sentencing);
> (3) Rule 32.1(e) (hearing to revoke or modify probation or supervised release);
> (4) Rule 46(j) (detention hearing); and
> (5) Rule 8 of the Rules Governing Proceedings under 28 U.S.C. § 2255.

FED. R. CRIM. P. 26.2(g) (titled "Scope"). Under the plain text of Rule 26.2(g), a *Daubert* hearing falls outside the scope of Rule 26.2(g). *See id.* The government indicates that "it will reassert its request for all defense witness statements" at trial. (Docket Entry No. 174). That is subject to the condition that the government may not demand that the defense produce witness statements in the jury's presence.

## XIII. Conclusion

For the reasons explained above, the court grants the defense limine motion on 42 C.F.R. § 482, Subpart E, (Docket Entry No. 91); denies the defense motion for a bill of particulars on the "falsity" element, (Docket Entry No. 120); and grants in part and denies in part the defense motions to exclude the testimony of Dr. Lynch and the testimony of Dr. Cooper, (Docket Entry Nos. 99,

103); denies the government's motions to exclude the testimony of Dr. Schold and the testimony of Dr. Alexopoulos, (Docket Entry Nos. 133, 179, 182); grants the defense motion to exclude undisclosed expert testimony, (Docket Entry No. 136); grants in large part, *see supra* at 45–51, the defense motion in limine, (Docket Entry No. 137); grants in part and denies in part, *see supra* at 59–61, the government's motion in limine, (Docket Entry No. 139); defers ruling on the government's Rule 404(b) motion until trial, (Docket Entry No. 140), but enters a limine order as to the evidence at issue until that ruling is made; denies the government's motion for leave to file late designations of treating physicians as non-retained experts, (Docket Entry No. 163); denies the government's motion for reconsideration, (Docket Entry Nos. 164, 165); grants in part and denies in part the government's motion in limine as to Dr. Alexopoulos, (Docket Entry No. 172); and will hear the government's motion to require the production of defense witness statements, (Docket Entry No. 174), at the appropriate time during the trial, subject to the condition that the government may not demand that the defense produce witness statements in the jury's presence. Unless otherwise noted above, the parties may not deviate from the court's pretrial-hearing instructions without first approaching the bench outside the jury's presence and obtaining leave to do so.

SIGNED on October 14, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge